### IN THE UNITED STATES DISTRICT COURT FOR
### THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MIRZA N. BAIG, and BLUE SPRINGS WATER CO., | ) | |
| | ) | |
| Plaintiffs, | ) | **No.: 08 CV 04206** |
| | ) | |
| v. | ) | Judge: Gettleman |
| | ) | |
| THE COCA-COLA COMPANY, | ) | Magistrate Judge: Denlow |
| | ) | |
| Defendant. | ) | Plaintiffs Demand Trial By Jury |

### FIRST AMENDED COMPLAINT

NOW COME the plaintiffs, MIRZA N. BAIG and BLUE SPRINGS WATER

CO., an Illinois Corporation (referred to collectively as "Baig"), by their attorneys,

DAVID J. KIESLER & ASSOCIATES, LLC, and complaining of defendant, THE

COCA-COLA COMPANY ("Coca-Cola"), state as follows:

### General Allegations

1.     At all relevant times, plaintiff, Baig, has been a resident of Chicago,

Illinois, and is the president and sole shareholder of plaintiff, BLUES SPRINGS

WATER CO. ("Blue Springs"), an Illinois Corporation having its principal place of

business in Chicago, Illinois.


2.     At all relevant times, defendant, Coca-Cola, has been a Delaware

Corporation having its principal place of business in Atlanta, Georgia. Coca-Cola

is in the business of, *inter alia*, manufacturing, distributing and selling a variety of soft drink products in the United States, Canada and worldwide.

3.　　Federal question jurisdiction for Count I arises under the Lanham Act, 15 U.S.C. §§ 1051 - 1129, and specifically under 15 U.S.C. § 1121, and under 28 U.S.C §§ 1331 and 1338. Diversity jurisdiction for Count II exists under 28 U.S.C. § 1332(a) and is based on the fact that Baig and Coca-Cola are citizens of different States, and the value of the matters in controversy exceeds $75,000, exclusive of interest and costs. Diversity jurisdiction and federal question jurisdiction exist under Count III which seeks a declaratory judgment under 28 U.S.C. § 2201 et seq. that a default judgment entered on July 25, 2008, by the United States District Court for the Northern District of Georgia against Baig and in favor of Coca-Cola was and is void *ab initio* due to that Court's lack of personal jurisdiction over Baig and Blue Springs.

4.　　At all relevant times, Coca-Cola has been doing business in the State of Illinois and in the Northern District of Illinois of the United States District Court. Venue is therefore proper in this judicial district pursuant to 28 U.S.C. §1391(b).

5.　　In the spring of 1998, Baig commenced manufacturing, distributing, marketing, advertising and selling a brand of Canadian bottled spring water, under the name and trademark "Naturally Zero," throughout the greater Chicago

land area including the City of Chicago and its surrounding suburbs, downstate Illinois, Southern Wisconsin and Northwestern Indiana.   By virtue of Baig's continued use, advertising, and promotion, his "Naturally Zero" name and mark became and still are distinctive, well-recognized, and famous, possess a strong secondary meaning, and represent an extremely valuable goodwill. A photograph of specimens of Baig's Canadian bottled spring water, bearing the mark "Naturally Zero," is attached as Exhibit "1."

6.   As part of Baig's marketing plan designed to emphasize the purity and clean taste of his Canadian spring water, Baig developed several similar taglines or slogans, including: "A drink about nothing," "There's nothing better than absolutely nothing" and "Could you ask for anything less?", which he used in written marketing material, press releases and by word of mouth. True and correct copies of a sampling of Baig's press releases and marketing literature is attached hereto as Group Exhibit "2."

7.   At all relevant times, Baig hired and collaborated with The Beverage Network, a beverage marketing and distribution firm, and its president, Russell Hopkins, to promote "Naturally Zero" and expand its sales volume and increase its geographic market. Baig's ultimate business goal was to continue expanding his regional sales area throughout the Midwest and to sell his company and trademark rights in "Naturally Zero" to a large beverage manufacturer or national retailer.

8.    In the spring of 1999, as a result of Baig's marketing efforts and the growing success and public awareness of his product, "Naturally Zero" appeared in several beverage trade journal magazines. In March, 1999, Baig's "Naturally Zero" Canadian bottled spring water was written up in *Beverage Industry* magazine:

> "Total Zero. The Beverage Network, Chicago, is representing new bottled water called Naturally Zero Spring Water: The product's name lets its content speak for itself – zero calories, zero carbonation, etc. Naturally Zero is a Canadian water product. For more information, call 847/673-4614" A true and correct copy of the 3/99 *Beverage Industry* article is attached hereto as Exhibit "3."

9.    In the spring of 1999, Coca-Cola launched a brand of purified bottled water it named and trademarked "Dasani." In the same March, 1999, volume of *Beverage Industry* magazine, an article about Coca-Cola's launch of its Dasani purified water was located on the same page and immediately next to the article about Baig's "Naturally Zero" brand spring water. Upon information and belief, executives and management of Coca-Cola read the article about "Naturally Zero" which was unavoidably next to the "Dasani" article. As a result, Coca-Cola had actual knowledge of Baig's bottled water and his trademark, "Naturally Zero," as early as March, 1999.

10.    In December, 2002, Hopkins, on behalf of Baig, had a phone conference with Coca-Cola's then-president of its North American operations

(U.S. and Canada), Jeffrey Dunn ("Dunn"), for the purpose of discussing the possible sale of Baig's business, and intellectual property trademark rights in "Naturally Zero," to Coca-Cola.  At the end of their phone conference, Dunn told Hopkins that he (Dunn) was very interested in Baig's "Naturally Zero" spring water product and asked Hopkins to send Dunn product information and literature on "Naturally Zero."

11.     On January 12, 2003, Baig, based on Dunn's request to Hopkins, sent Dunn a letter about "Naturally Zero" and described his product's new and unique features, including its eye-catching label design. Baig also enclosed three articles about "Naturally Zero" appearing in the beverage trade journals *Beverage Industry*, *Soft Drink International* and *Beverage World*. A copy of Baig's 1/12/03 letter to Dunn, and the attached trade journal articles referenced therein, are attached hereto as Group Exhibit "4."

12.     Shortly after January 12, 2003, Dunn received and read Baig's 1/12/03 letter and its enclosures. Therefore, Dunn and Coca-Cola had actual knowledge of Baig's product, logo and trademark In January 2003.

13.     On or about February 7, 2003, Charles McCoy ("McCoy"), Coca-Cola's then-Vice- President of Supply Chain Network, sent Baig a letter advising Baig that McCoy had reviewed Baig's 1/12/03 letter to Dunn regarding "Naturally Zero."  McCoy wrote that due to "strategic priorities," Coca-Cola allegedly was

not interested in pursuing the purchase of Baig's "Naturally Zero" bottled Canadian spring water. A true and correct copy of McCoy's 2/7/03 letter to Baig is attached hereto as Exhibit "5." McCoy, upon information and belief, from at least as early as 2001, was involved on behalf of Coca-Cola in the formation of a joint venture with Danone Waters of North America which became CCDA Waters, LLC ("CCDA"), a privately held company owned and/or controlled by Coca-Cola, on July 1, 2002. Since the time of its formation, McCoy has held numerous offices with CCDA including chairman of the board, vice chairman and treasurer. Since as early as 2001, McCoy has also been a prominent member of the International Bottled Water Association, and has served on its board, including as its chairman and vice chairman.

14.    On October 20, 2003, unbeknownst to Baig, Coca-Cola filed its application with the United States Patent and Trademark Office ("PTO") to register its claimed trademark, "Sprite Zero," on an intent-to-use basis. A true and correct copy of said application, Serial Number 78316078, is attached hereto as Exhibit "6". Coca-Cola filed this application with actual knowledge of Baig's "Naturally Zero" trademark, and deliberately and wrongfully copied and misappropriated the dominant and salient feature of Baig's trademark – "Zero" – in formulating its "Sprite Zero" trademark. Upon information and belief, McCoy had significant involvement with, and/or direct knowledge of, Coca-Cola's deliberate theft and outright misappropriation of Baig's trademark "Zero." In fact, in his capacity as board member and/or officer of CCDA, McCoy, for the benefit

of and ultimate assignment or sale to Coca-Cola, oversaw the development of a bottled spring water product for which CCDA filed an application with the PTO on September 20, 2005 to register the trademark "It's Only Natural." A true and correct copy of this application, Serial Number 78716556, is attached hereto as Exhibit "19." This mark is confusingly similar to Baig's "Naturally Zero" trademark for bottled spring water and shows a common plan, design or *modus operandi* on the part of Coca-Cola to steal, and then "dissect," Baig's valid trademark for its own improper and illegal uses and financial gain.

15.    On August 31, 2004, Coca-Cola filed an application in the PTO to register the trademark, "Nothing is lighter than Zero,"  with actual knowledge of Baig's trademarks, "A drink about nothing," "There's nothing better than absolutely nothing" and "Could you ask for anything less?". A true and correct copy of Coca-Cola's application, Serial Number 78476290, is attached hereto as Exhibit "7."

16.    In September, 2004, Coca-Cola, with actual knowledge of Baig's "Naturally Zero" trademark, began manufacturing, distributing, advertising, and selling a diet, carbonated soft drink bearing the trademark "Sprite Zero." Photographs of specimens of the original, and current, "Sprite Zero" labels and trademark are attached hereto as Exhibits "8" and "9," respectively.

17. When Coca-Cola commenced manufacturing, distributing, advertising, and selling "Sprite Zero," it competed directly with Baig's "Naturally Zero" bottled water and indeed was sold side-by-side on retailers' shelves and on the Internet.

18. Coca-Cola's use of the dominant feature of Baig's trademark - "Zero"- in Coca-Cola's trademark, "Sprite Zero," was and is without the consent or authorization of Baig.

19. On March 4, 2005, Coca-Cola filed its application in the PTO to register its claimed trademark, "Coca-Cola Zero."  On May 5, 2005, Coca-Cola filed its application in the PTO to register "Fanta Zero." True and correct copies of these applications, Serial Numbers 78580598 and 78620677, are attached hereto, respectively, as Exhibit "10" and "11."

20. In June 2005, Coca-Cola, with actual knowledge of Baig's "Naturally Zero" trademark, began manufacturing, distributing, advertising, and selling a diet, carbonated soft drink bearing the name and trademark "Coca-Cola Zero." A photograph of a specimen of the "Coca-Cola Zero" label and trademark is attached hereto as Exhibit "12."

21. On June 28, 2005, Coca-Cola filed its application to register the trademark "Coca-Cola Zero" with the Canadian Intellectual Property Office

("CIPO"). On July 6, 2005, Coca-Cola Company filed its application to register "Coke Zero" with the PTO.

22.    In January, 2007, Coca-Cola began manufacturing, distributing, advertising, and selling a diet, carbonated soft drink bearing the name and trademark "Coca-Cola Cherry Zero," a/k/a "Coke Cherry Zero." A photograph of a specimen of the "Coca-Cola Cherry Zero" label and trademark is attached hereto as Exhibit "13." In May, 2007, Coca-Cola filed its applications in the PTO to register "Coca-Cola Cherry Zero" and "Coke Cherry Zero." True and correct copies of these applications, Serial Numbers 77176279 and 77175066, are attached hereto, respectively, as Exhibits "14" and "15."

23.    In addition and subsequent to its manufacture, marketing, distribution and sale of the foregoing products, Coca-Cola has manufactured, distributed, advertised and sold a host of additional Coca-Cola "Zero" drinks, including "Pibb Zero," "Vault Zero," "Powerade Zero" and others. A photograph of specimens of some of the members of the Coca-Cola Zero family is attached hereto as Exhibit "16."

24.    Since 1998, Baig has sold over $150,000.00 dollars' worth of Canadian bottled spring water under the name and mark "Naturally Zero" throughout the identified market area, and has spent thousands of dollars annually in advertising and promoting the name and mark in that area. At all

relevant times, including at the present, Baig has also promoted "Naturally Zero" on a world-wide basis through his internet web site, www.naturallyzero.com. Therefore, Baig has enforceable common law use rights in the trademark, "Naturally Zero."

## COUNT I

### (TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN-LANHAM ACT)

25. Baig repeats and re-alleges paragraphs 1 - 24 of the General Allegations as paragraph 25. of Count I, as though same were fully set forth herein.

26. As a result of its unauthorized and illegal use of the mark "Zero" in connection with its manufacture, advertising, and sale of "Sprite Zero", "Coca-Cola Zero," "Coca-Cola Cherry Zero," "Pibb Zero," "Vault Zero," "Powerade Zero" and every other product in Coca-Cola's "Zero Family," Coca-Cola is likely to cause reverse confusion or mistake or to deceive the public, in violation of the Trademark Laws of the United States, 15 U.S.C. § 1125(a).

27. As a result of its unauthorized and illegal use of the mark "Zero" in connection with its manufacture, advertising, and sale of "Sprite Zero", "Coca-Cola Zero," "Coca-Cola Cherry Zero," "Pibb Zero," "Vault Zero," "Powerade Zero" and every other product in Coca-Cola's "Zero Family," Coca-Cola is likely to mislead prospective purchasers as to the affiliation, connection, or association of

Coca-Cola or Coca-Cola's "Zero" products with Baig or Baig's "Naturally Zero" products, or as to the origin, sponsorship or approval of Coca-Cola's "Sprite Zero", "Coca-Cola Zero," "Coca-Cola Cherry Zero," "Pibb Zero," "Vault Zero," "Powerade Zero" and every other product in Coca-Cola's "Zero Family," by Baig, causing purchasers to rely thereon, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

28.    Coca-Cola's acts were undertaken in bad faith and in a deliberate and willful manner to copy and misappropriate and call its own through reverse confusion of Baig and Baig's "Naturally Zero" trademark for Canadian bottled spring water and to mislead the public into believing that there is a connection, affiliation, or association between Coca-Cola or its "Zero"-branded products and Baig or his "Naturally Zero"-branded products.

29.    By reason of Coca-Cola's acts, Baig has suffered and will continue to suffer damage and injury to his business, reputation, and goodwill, and will sustain loss of revenues and profits.

30.    Unless enjoined by this Court, Coca-Cola will continue to perform the acts complained of herein and cause said damages and injury, all to the immediate and irreparable harm of Baig, for which Baig has no adequate remedy at law.

WHEREFORE, Plaintiffs, MIRZA N. BAIG and BLUES SPRINGS WATER CO., pray for a judgment in their favor and against Defendant, THE COCA-COLA COMPANY:

A.    Permanently enjoining and restraining THE COCA-COLA COMPNAY, its officers, agents employees, representatives, and all others acting in concert or participation with any of them from:

>    (1)    using the trademarks "Sprite Zero", "Coca-Cola Zero," "Coke Zero," "Fanta Zero," "Pibb Zero," "Vault Zero" or any other beverage using the mark "Zero" or any other colorable imitation of the "Naturally Zero" mark, or any other mark that is confusingly similar to the "Naturally Zero" mark; and

>    (2)  doing any other act or thing likely to induce the belief that THE COCA-COLA COMPANY'S business or products are in any way connected with BAIG'S business or products, or are sponsored or approved by BAIG.

B.    Directing THE COCA-COLA COMPANY to:

>    (1)  account for and pay over to BAIG all profits derived by THE COCA-COLA COMPANY from its acts complained of herein, together with prejudgment interest;

>    (2)  pay to BAIG all the damages he has suffered as a result of the acts of THE COCA-COLA COMPANY complained of herein, including an assessment of trebled actual damages, together with prejudgment interest;

>    (3)  pay to BAIG his attorneys' fees and costs in this action;

>    (4)  file with this Court and serve on BAIG'S counsel, within fourteen days after entry of an injunction issued by

this Court, a sworn written statement as provided in 15 U.S.C. §1116.

C. Awarding BAIG and against THE COCA-COLA COMPANY such further relief as this Court deems just, equitable and proper.

## COUNT II

### (TRADEMARK INFRINGEMENT – CANADIAN TRADE-MARKS ACT)

31. Baig repeats and re-alleges paragraphs 1 - 24 of the General Allegations as paragraph 31. of Count II as though same were fully set forth herein.

32. On November 19, 1997, Baig filed an application with CIPO to register his "Naturally Zero" trademark and design under the Canadian Trade-marks Act ("Act"), R.S., c. T-10, ss. 1. – 69. A true and correct copy of Baig's application, Application Number 0861998, is attached hereto as Exhibit "17."

33. Section 2 of the Act defines the term "use," in relation to a trademark, as "any use that by section 4 is deemed to be a use in association with wares or services…" Section 4(3) of the Act provides:

> "(3) A trade-mark that is marked in Canada on wares or on the packages in which they are contained is, when the wares are exported from Canada, deemed to be used in Canada in association with those wares."

- 13 -

34.    In early 1998, Baig entered into a manufacturing and bottling agreement with Breuvages Drummond Ltée, a Canadian bottling company having its principal place of business in Drummondville, Quebec, to manufacture, bottle and affix the label and trademark to, Baig's "Naturally Zero" Canadian bottled spring water. Breuvages Drummond commenced manufacturing "Naturally Zero" for Baig in the spring of 1998 and for the remainder of the year. Baig exported from Canada all of the "Naturally Zero" bottled water produced by Breuvages Drummond to the United States for sale in the United States.

35.    In 1999, Baig switched bottlers to Echo Springs Corporate Brands, a Canadian bottling company having its principal place of business in Mississauga, Ontario. All of the "Naturally Zero" Canadian bottled spring water Baig sold was manufactured and labeled in Canada and was exported to the United States for sale. "Naturally Zero," therefore, was "used" in Canada under the Act.

36.    On November 20, 2000, Baig's trademark for "Naturally Zero" and design were registered under the Act.    A true and correct copy of Baig's Canadian trademark registration, Registration Number TMA537375, is attached hereto as Exhibit "18." Under the registration, Baig was granted "the right to the exclusive use of …. the word ZERO" in his trademark.

37.     As a result of its unauthorized use of the mark "Zero" in connection with its manufacture, advertising, and sale of "Sprite Zero", "Coca-Cola Zero," "Coca-Cola Cherry Zero," "Pibb Zero," "Vault Zero" and every other product in Coca-Cola's "Zero Family," Coca-Cola is likely to mislead prospective purchasers as to the affiliation, connection, or association of Coca-Cola or Coca-Cola's "Zero" products with Baig or Baig's "Naturally Zero" products, or as to the origin, sponsorship or approval of Coca-Cola's "Sprite Zero", "Coca-Cola Zero," "Coca-Cola Cherry Zero," "Pibb Zero," "Vault Zero" and every other product in Coca-Cola's "Zero Family," by Baig, causing purchasers to rely thereon, in violation of Sections 7 and 8 of the Act

38.     Coca-Cola's acts were undertaken in bad faith and in a deliberate attempt to copy and misappropriate and call its own through reverse confusion of Baig and Baig's "Naturally Zero" trademark for Canadian bottled spring water and to mislead the public into believing that there is a connection, affiliation, or association between Coca-Cola or its "Zero"-branded products and Baig or his "Naturally Zero"-branded products.

39.     By reason of Coca-Cola's acts, Baig has suffered and will continue to suffer damage and injury to his business, reputation, and goodwill, and will sustain loss of revenues and profits.

- 15 -

40.    Unless enjoined by this Court, Coca-Cola will continue to perform the acts complained of herein and cause said damages and injury, all to the immediate and irreparable harm of Baig, for which Baig has no adequate remedy at law.

WHEREFORE, Plaintiffs, MIRZA N. BAIG and BLUES SPRINGS WATER CO., pray for a judgment in their favor and against Defendant, THE COCA-COLA COMPANY:

A.    Permanently enjoining and restraining THE COCA-COLA COMPNAY, its officers, agents employees, representatives, and all others acting in concert or participation with any of them from:

> (1)    using the trademarks "Sprite Zero", "Coca-Cola Zero," "Coke Zero," "Fanta Zero," "Pibb Zero," "Vault Zero" or any other beverage using the mark "Zero" or any other colorable imitation of the "Naturally Zero" mark, or any other mark that is confusingly similar to the "Naturally Zero" mark; and
>
> (2)  doing any other act or thing likely to induce the belief that THE COCA-COLA COMPANY'S business or products are in any way connected with BAIG'S business or products, or are sponsored or approved by BAIG.

B.   Directing THE COCA-COLA COMPANY to:

> (1)  account for and pay over to BAIG all profits derived by THE COCA-COLA COMPANY from its acts complained of herein, together with prejudgment interest;
>
> (2)  pay to BAIG all the damages he has suffered as a result of the acts of THE COCA-COLA COMPANY

complained of herein, including an assessment of trebled actual damages, together with prejudgment interest;

(3) pay to BAIG his attorneys' fees and costs in this action;

(4) file with this Court and serve on BAIG'S counsel, within fourteen days after entry of an injunction issued by this Court, a sworn written statement as provided in 15 U.S.C. §1116.

C.    Awarding BAIG and against THE COCA-COLA COMPANY such further relief as this Court deems just, equitable and proper.

## COUNT III - DECLARATORY JUDGMENT

41.-80.    Baig repeats and re-alleges paragraphs 1 – 40 of his complaint as paragraphs 41-80 of Count III, as though same were fully set forth herein.

81.    On September 3, 2004, Baig was driving southbound on Interstate I-294 near O'Hare Airport in Chicago when he looked up at a billboard and observed an advertisement by Coca-Cola for a new diet drink, "Sprite Zero." Baig, incredulous and stunned, instantly knew that Coca-Cola had stolen and misappropriated the dominant feature of his "Naturally Zero" trademark - "Zero" - and had used it to name, advertise and market its new diet soft drink, Sprite Zero. The very name he had invented, developed, marketed, placed on a label, manufactured and sold, and had devoted seven years of his life to building, and the very name he had presented to Coca-Cola the year before, was appearing on a variation of a nationally known soft drink manufactured by the largest beverage

company in the world. The circumstances were too suspicious for Baig to believe that Coca-Cola developed the name coincidentally and independently, and Baig decided to pursue recourse against Coca-Cola.

82.    In October, 2004, a friend of Baig's phoned Coca-Cola legal department to discuss Coca-Cola's trademark infringement by its use of "Zero" in its Sprite Zero drink name, and a potential settlement of all claims Baig had against Coca-Cola.    Coca-Cola's in-house trademark counsel, Caroline Pearlstein ("Pearlstein"), told Baig's friend during their phone call that Coca-Cola had done nothing wrong and had not stolen or otherwise used Baig's trademark. Baig followed up with a letter to Pearlstein in November 2004, seeking to resolve "this matter is a positive way." A true and correct copy of Baig's November 12, 2004, letter to Pearlstein is attached hereto as Exhibit "20." Pearlstein then wrote Baig a letter dated January 11, 2005, denying Baig's offer to settle his claims against Coca-Cola.  A true and correct copy of Pearlstein's January 11, 2005, letter is attached hereto as Exhibit "21."

83.    In early 2005, Baig became very ill and underwent surgery for the removal of an inner-ear cyst and other related surgical procedures in March, 2005. In May, 2005, to recuperate from surgery, Baig, a United States citizen, left the United States for an extended trip to his homeland, Pakistan, and did not return to the United States until December, 2005. Baig had no personal contact with Coca-Cola in the year 2005, and never retained any attorney in the year

2005 to pursue Baig's claims against Coca-Cola. Up to and including the present, Baig has **never been in the state of Georgia** and most certainly never met with representatives of Coca-Cola in Atlanta in early 2003 to discuss settlement of his trademark infringement claims.

84.     Baig had no contact with Coca-Cola in the year 2006. In early 2007, a friend of Baig's contacted Coca-Cola's Pearlstein to again raise the issue of settlement of Baig's trademark claim against Coca-Cola. Pearlstein denied any liability on the part of Coca-Cola. In October, 2007, Baig hired the law firm of David J. Kiesler & Associates, LLC ("Kiesler"), to pursue all of his lawful claims for damages and other relief against Coca-Cola. Kiesler is the first and only law firm that Baig has ever hired to pursue recovery against Coca-Cola.

88.     In the latter part of 2007 and early 2008, Kiesler corresponded by letter and email with Pearlstein regarding the settlement of Baig's claims. In March, 2008, Kiesler sent Pearlstein a letter in which he demanded the sum of $100,000,000 (one hundred million dollars) to settle all of Baig's claims against Coca-Cola, an amount that equaled approximately 4% of Coca-Cola's estimated $2.354 billion dollars in profits Coca-Cola has derived from the sale of all of its "Zero" products in the United States and Canada from the time the infringement started in September 2004, through the present. A true and correct copy of Kiesler's March 12, 2008 demand letter, without exhibits, is attached hereto as Exhibit "22." Thus, Coca-Cola knew as early as October 2007 and at the latest,

by March, 2008, that Baig intended to file suit against Coca-Cola in Chicago if it did not agree to settle Baig's trademark claims.

89.    In May, 2008, Kiesler received a letter from attorney Bruce Baber of the Atlanta Law Firm of King & Spalding LLP ("Baber") advising that he was now representing the Coca-Cola Company and that Kiesler should direct all future communications to him. Kiesler and Baber thereafter exchanged additional correspondence and spoke regarding a potential settlement of Baig's trademark claims against Coca-Cola.

90.    By letter to Baber dated June 5, 2008, Kiesler advised Baber that that suit would be filed against Coca-Cola on June 13, 2008, in the Unites States District Court for the Northern District of Illinois, if the case was not settled by that date.    A copy of Kiesler's June 5, 2008 letter to Baber is attached hereto as Exhibit "23."

91.    On June 12, 2008, unbeknownst and without prior warning to Kiesler, and despite the parties' ongoing settlement discussions, Baber, on behalf of Coca-Cola, filed a complaint against Baig in the United States District Court for the Northern District of Georgia, docket number 1:08-CV-2010, seeking, *inter alia*, a declaratory judgment that Coca-Cola had not infringed Baig's "Naturally Zero" trademark. A true and correct copy of Coca-Cola's complaint against Baig (the "Georgia complaint" or "Georgia lawsuit") is attached hereto as

Exhibit "24."   Baig never appeared personally or by counsel in the Georgia lawsuit. Upon information and belief, Coca-Cola and Baber, on its behalf, stalled and delayed settlement negotiations in order to give Baber time to research, prepare and file the Georgia complaint, and deliberately filed this complaint before Baig's settlement deadline so it could subsequently argue that its suit was filed before Baig's.

92.   On July 24, 2008, Baig filed the instant lawsuit (the "Illinois Complaint" or "Illinois lawsuit.") against Coca-Cola in the United States District Court for the Northern District of Illinois. That same day, Kiesler emailed a copy of the Illinois Complaint to Baber. On July 25, 2008, without prior notice to Baig or Kiesler, Coca-Cola, through Baber, moved for and obtained a default judgment against Baig and in favor Cola-Cola in the Georgia lawsuit, finding and determining, *inter alia*, that Coca-Cola had not infringed Baig's "Naturally Zero" trademark. A true and correct copy of the Georgia lawsuit default judgment, prepared by or under the direction of Baber, is attached hereto as Exhibit "25."

93.   That the default judgment entered in the Georgia lawsuit was, and is, null and void, *ab initio,* since the Court in Georgia did not have personal jurisdiction over Baig.  Baig has never been in the state of Georgia and did not have sufficient minimum contacts with the state of Georgia to satisfy the constitutional requirements of due process. Coca-Cola's allegations in the Georgia complaint, intended to establish personal jurisdiction, are either false,

pertain to Baig's conduct well after the subject infringement took place or involve Baig's conduct that occurred as part of settlement negotiations after Baig discovered the infringement and are, hence, inadmissible under the Federal Rules of Evidence.

94.    That an actual and justiciable controversy exists between Baig and Coca-Cola pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201 et seq.

WHEREFORE, Plaintiffs, MIRZA N. BAIG and BLUES SPRINGS WATER CO., pray for a declaratory judgment in their favor and against Defendant, THE COCA-COLA COMPANY, finding and determining that the judgment entered on July 25, 2008, by the United States District Court for the Northern District of Georgia is void and unenforceable as a result of that Court's lack of personal jurisdiction over MIRZA N. BAIG and BLUES SPRINGS WATER CO., and for such other and further relief the Court deems just and proper.

DAVID J. KIESLER & SSOCIATES, LLC

*/s/ David J. Kiesler*

_____
By:  David J. Kiesler

David J. Kiesler, Esq.
David J. Kiesler & Associates, LLC
Attorneys for Plaintiffs
161 N. Clark St., Suite 2500
Chicago, IL 60601
(312) 920-6666
(312) 920-6667 Fax
ARDC No. 6193042





# Some highlights of the Bluesprings Co. bottled water marketing program.

- With its striking product image, we are promoting the consumption of pure spring water to adopt a healthy life style, enhancing healthy kidney function.

**NATURALLY ZERO 0**

- In order to bring awareness regarding the dangers of a high intake of sugar and sodium, we include a phrase to our label:

**WHEN LESS IS BETTER!**
No Sodium • No Sugar • No Calories

- To highlight the qualities of bottled spring water , and due to some fears of contamination in home tap water, we are using a promotional theme which features a rather humorous, tongue in cheek claim, namely:

## Unleaded Premium Calorie Free

Bottled at the source

- Sports activities are a major part of our healthy lifestyle. We have emphasis that aspect by adding some sports symbols to our label:



Bluesprings Co. is pleased to invite the **National Kidney Foundation** to support our efforts by joining hands in this health oriented appeal.



**EXHIBIT "2"**

To:

Company:

Subject: "Naturally Zero" Spring Water

Dear:

Bottled water sales are booming in the United States as more and more Americans seek to pursue healthy diets and weight control programs.

A major advantage of bottled spring water is that it is natural and contains <u>no harmful additives</u> or calories.

The <u>"Naturally Zero"</u> logo with it's distinctive image, was created for the specific purpose of highlighting this <u>special health oriented appeal.</u>

We believe that "Naturally Zero" has that special magical brand recognition appeal that will spur favorable attention from today's health conscious consumers - making them regular, repeat customers.

If you are seeking to <u>put more profitable life into your water marketing program</u> - "Naturally Zero" may very well be just the boost you have been looking for with its <u>striking label that will stand out in a crowd.</u>

Bluesprings Co. is prepared to consider assigning your highly respected beverage firm the <u>exclusive</u> "Naturally Zero" <u>brand rights</u> for your area - a privilege not granted by most bottled water brand owners.

We invite you to call us today to discuss this promising spring water marketing opportunity.


Yours sincerely,

 Nadeem Mirza




# Bluesprings Co.
*A New Image In Bottled Water.*

Ontario, Canada; Chicago, IL
847-673-4614; 1-800-410-1801

For Immediate Release.                                    Feb. 18, 1999

# GAIN THE UNFORGETTABLE EDGE!
## FEATURE
## "NATURALLY ZERO" SPRING WATER

Chicago IL... Almost everyday, a new bottled water brand is born. Most have a label that looks about the same as other waters. The consumer is confronted by an army of clones.

Amidst, this crowd of Blah-Blah Brands- a new brand with an eye catching, youthful look, has emerged: "Naturally Zero Spring Water" from the fabled Blue Mountains of Canada.

The brand's creator and president of Bluesprings Co., Nadeem Mirza, says that our initial marketing vision is to promote "Naturally Zero" as 'A Drink About the Nothing' and boost a passionate interest among the bottle water consumers. Being first to market, he believes, we surely have an advantage.

According to Mirza, the Naturally Zero logo's unforgettable appearance and association with a healthy lifestyle assures a successful entry into the booming market for bottled waters.

Mirza exclaims, "In terms of healthy drinking habits, there is nothing better than absolutely nothing. That's what 'Naturally Zero' emphasizes: 'No Calories,' 'No Fat,' 'No Carbonation,' 'No Cholesterol,' and 'No Zebra Mussel,' just plain drinking pleasure."

Russ Hopkins, president of The Beverage Network, finds the "Naturally Zero" label to be "intriguing in that the brand name itself challenges the consumer to ask a key question concerning why people prefer bottled water over other drinks. The answer, in part, is that premium water does not offer any of of the negative characteristic of many other beverages offering just plain ordinary refreshment."

"It appears to me that Naturally Zero's distinctive label design is likely to spark a good deal of consumer interest due to its unique, modern look and the valid message it projects," Hopkins observes.

"Naturally Zero" spring water's initial promotional theme features a rather humorous, tongue in cheek claim, namely, "unleaded, premium, calorie free."

Distributors interested in marketing "Naturally Zero" in their areas are invited to call: The Beverage Network at 847-673-4614.

FOR IMMEDIATE RELEASE

# NAT. ZERO

### Natural Spring Water

# WELCOMES THE MILLENIUM !

As the year 2000 gets underway, bottled spring water sales continues to soar as Generation X-ers adopt a "back to the basics" lifestyle approach in terms of their beverage consumption habits.

"Naturally Zero Spring Water", after a successful entry into the Chicago market in 1999, is poised to capture the fancy of the nation's "smart drinkers" as the New Millenium unfolds.

According to Nadeem Mirza, founder of Bluesprings Co., the brand's creator , "Naturally Zero's" unforgettable and modern logo, linked to pursuit of a healthy lifestyle assures success for the brand.

"Naturally Zero" is the ideal Y2K refreshment beverage," exclaims Mirza, who cites fear of contamination and foul taste concerns with which the media constantly bombards us with respect to public tap water source.

He contends that "Naturally Zero's promotional theme,  "Unleaded Premium – Calories Free," will highlight the spring water  "good for you" bottled at the source image.

Asked to comment on the "Naturally Zero" concept, Russ Hopkins of the Beverage Network observed, "This is a crazy business, One never knows what will turn consumers on or for how long," pointing out, "for a while, small was beautiful, then, big was beautiful. Sometimes, more is the key word. Other times, less is what buyers are looking for."

"As the New Millenium dawns," he notes, 0's are more and more visible and the letter, Z, is found in a growing number of brand names. May be we have reached the stage where NOTHING is BEAUTIFUL will become fashionable."

"It may very well be that combining natural with ZERO is the way to go at the start of the New Millenium. The folks with "NATURALLY ZERO" might find themselves in the right place at the right time," he concluded.

Bluesprings Co., Now looking to expand its marketing and distribution network in the larger market. In its first step, it is joined by Stawski Distributing Co. ( An Importer of Fine Quality Wines , Beers , and Liquors. )

Mr. Larry Nevers,  Who is vice president of the company,  says, " If you are seeking to put more profitable life in to your water marketing program – "Naturally Zero" may very well be just the boost you have been looking with its striking image, that will stand out in a crowd."

We invite you to call today to discuss this promising spring water marketing oportunity.

FOR ADDITIONAL INFORMATION PLEASE CONTACT:  *Email ; Zerowater @aol.com*

# *Bluesprings Co.*





## Water That Is Nothing?

Nine years ago a TV show about nothing was created. It took some time before its popularity caught on, henceforth, one of the mega hits of all time.

We feel our product holds many similarities. Being brand new to the market, we need to establish our product. Its name, "Zero" implies nothing. A drink about nothing.

Our product is very different. Zero is a naturally pure and refreshing spring water that originates from the Canadian Appalachian Mountains and protected for centuries by Mother Nature and bottled by using a state of the art purification process.

Aimed at the health-conscious individual with an available disposable income, we look to become the key to bottled water success.

Our unique, eye-catching, packaging will sell itself off the shelf, and if we can target the consumer toward that package, then we are going to sell. With our unique name, distinctive bottle and label design, we expect to stand out from the competition.

Millions of active American sports, health, and fitness enthusiasts can now discover the difference.

And by the way, the name of that TV show about nothing… Seinfeld. The name of our product… Zero.

Sincerely,



Stagnito Communications Inc./An MWC Company

# Beverage INDUSTRY

Covering production, marketing, technology & distribution

ANNUAL
SOFT DRI
REPOR

...ommunications Inc./An MWC Company

*...verage*
...STRY

*...marketing, technology & distribution*

March 1999
Volume 90, Number 3

**IN THIS ISSUE**

**Industry Issues:**
**Stroh exits beer business**

**Production:**
**The beverage pouch**
**challenge**

**Beverage R&D:**
**The road to HACCP**

...NNUAL
...FT DRINK
REPORT



# Tea

## *Soft Drinks*

# *Water*



## Dasani hits the water market

**The Coca-Cola Co.** has introduced its long-anticipated bottled water, Dasani. Like Pepsi-Cola's fast-growing Aquafina brand, the product is a purified non-carbonated water. The Coca-Cola Co. says the water also contains added minerals for a fresh taste. The product will be packaged in 20-ounce single-serve, 1-liter and 1.5-liter PET sizes. It is expected to be priced on par with Great Brands of Europe's Dannon Natural Spring Water and Aquafina.

MARCH 99

> **Dasani**
> **The Coca-Cola Co., Atlanta**
> **Telephone:** 404/676-2121
> **Distribution:** Will be rolled out nationally during the first half of the year.
> **Ingredients:** Purified water, minerals

## Irish Vodka

**Shaw-Ross International Importers** will import Boru Irish Vodka, notable for being the only Irish vodka currently imported to the United States, and for its innovative packaging. Boru is packaged in both full-size 750-ml. bottles, and the "Trinity" package – three 200-ml. bottles stacked to look like a full-size bottle.

> **Boru Irish Vodka**
> **Shaw-Ross International**
> **Importers,** Miami
> **Telephone:** 305/625-6561
> **Distribution:** Selected U.S. markets
> **Ingredients:** Not available

The vodka is quadruple distilled and filtered through 10 feet of charcoal. The Trinity package combines the Original flavor, as well as Orange and Citrus flavors. Boru will be distributed to selected U.S. markets, and will retail for $22.99 per 750-ml. bottle, and $24.99 for the Trinity package.

## Total Zero

**The Beverage Network,** Chicago, is representing a new bottled water called Naturally Zero Spring Water. The product's name lets its content speak for itself – zero calories, zero carbonation, etc. Naturally Zero is a Canadian water product. For more information, call 847/673-4614.

**Corp.,** Salisbury, N.C., has revamped the packaging for its Blue Mist purified drinking water. The water, which is purified through

fee liqueur and cream. The product is intended to be used as part of frozen blender versions of the traditional white Russian...**Yakima Brewing & Malting Co.,**

# BLUE Springs W. Co.





January 12, 2003

Mr. Jeffery T. Dunn
Coca Cola Co.
P.O. Box 1734
Atlanta, Ga. 30301

Re: Gain the Unforgettable Marketing Edge

Dear Mr. Dunn:

After observing the encouraging response from the bottle water consumers , the Blue Springs W. Co. would like to take this opportunity to present a brief history about our water brand called " Naturally Zero". It's initial marketing theme "A Drink About The Nothing", which we promoted in 1999 and caught a significant attention by several trade publications.

We sent out a press release on February 18, 1999, to introduce our brand called 'Naturally Zero' for bottled water market. The product's marketing theme revolves around the word 'Nothing', which we emphasized strongly in our press release to promote the purity of the bottled water to members of the public. The press release was sent to major trade publications, and due to the exciting image of the brand for the consumer, we received a significant amount of coverage in the beverage magazines in 1999. After testing the consumer's passionate interest in the Naturally Zero brand, we needed a potential partner to launch the product nationally, while we kept selling the brand regionally and developed a partnership with a Canadian spring water bottling company.

Blue Springs has now taken a new direction to help a good cause by establishing a partnership with American Kidney Fund (AKF), a leading national voluntary health organization, to help raise funds for kidney patients in need. Our exclusive partnership with AKF is first of its kind in the bottled water market to raise public awareness about the causes of the kidney disease, which by some experts, is a perfect collaboration in the health care sector.

The Naturally Zero eye catching logo and its accomplishment in the bottle water market plus the brand's national publicity potential has encouraged us to write this letter about our five year marketing efforts. We look forward to having a positive communication to improve the benefits of the project. We believe that the copies enclosed speaks about the above mentioned facts, and your early response will help us make the future decisions. Meanwhile, we are asking other bottlers to join the program to gain the marketing edge and help the good cause.

**EXHIBIT "4"**

We are pleased to invite you to our websites www.naturallyzero.com and www.kidneyfund.org  to review the program, and look forward to hearing from you.


Sincerely,


Nad  Mirza
President & Creative Director
Blue Springs W. Co.
Email: health@waterforkidneys.org

Enclosure:

Soft Drink International, May 1999, page # 20
Beverage World, May 1999, Page # 28
Beverage Industry, March 1999, page # 18
Copy from AKF website

Case 1:04-cv-04206    Document 6-5    Filed 07/31/2008    Page 3 of 10

Stagnito Communications Inc./An MWC Company

# Beverage
# INDUSTRY

**Covering production, marketing, technology & distribution**



# ANNUAL
# SOFT DRIN
# REPOR

## Tea
## Soft Drinks
## Water



# Dasani hits the water market

**The Coca-Cola Co.** has introduced its long-anticipated bottled water, Dasani. Like Pepsi-Cola's fast-growing Aquafina brand, the product is a purified non-carbonated water. The Coca-Cola Co. says the water also contains added minerals for a fresh taste. The product will be packaged in 20-ounce single-serve, 1-liter and 1.5-liter PET sizes. It is expected to be priced on par with Great Brands of Europe's Dannon Natural Spring Water and Aquafina.

*MARCH 99*

**Dasani**
**The Coca-Cola Co.,** Atlanta
**Telephone:** 404/676-2121
**Distribution:** Will be rolled out nationally during the first half of the year.
**Ingredients:** Purified water, minerals

currently imported to the United States, and for its innovative packaging. Boru is packaged in both full-size 750-ml. bottles, and the "Trinity" package – three 200-ml. bottles stacked to look like a full-size bottle.

**Boru Irish Vodka**
**Shaw-Ross International**
**Importers,** Miami
**Telephone:** 305/625-6561
**Distribution:** Selected U.S. markets
**Ingredients:** Not available

The vodka is quadruple distilled and filtered through 10 feet of charcoal. The Trinity package combines the Original flavor, as well as Orange and Citrus flavors. Boru will be distributed to selected U.S. markets, and will retail for $22.99 per 750-ml. bottle, and $24.99 for the Trinity package.

# Total Zero

**The Beverage Network,** Chicago, is representing a new bottled water called Naturally Zero Spring Water. The product's name lets its content speak for itself – zero calories, zero carbonation, etc. Naturally Zero is a Canadian water product. For more information, call 847/673-4614.

# Irish Vodka

**Shaw-Ross International Importers** will import Boru Irish Vodka, notable for being the only Irish vodka



**Corp.,** Salisbury, N.C., has revamped the packaging for its Blue Mist purified drinking water. The water, which is purified through

fee liqueur and cream. The product is intended to be used as part of frozen blender versions of the traditional white Russian...**Yakima Brewing & Malting Co.,**



...CH ...ED ...ED ...MENT ...LLING ...LVES

**-Speed®**
...s will
...de filler
...mance for
..., Meyer,
...ishi, Seitz,
...Carballo,
...s and H&K
...illers.

...er thirty
...Universal
...ging has
... the soft
...ndustry with:
...rior Service

• 100% Satisfaction ...aranteed

...tegrity and ...erience

...ng speed ...%

...discuss ...needs.

# Soft Drinks
## International

**MAY 1999**



**GOING NATURAL**

**INTERPACK PREVIEW** ● **PRESERVATIVE USE** ● **JUICE BUYING** ● **SPONSORSHIP**

# *Soft Drinks* International

The leading English language magazine published in Europe, devoted exclusively to the manufacture, distribution and marketing of soft drinks, fruit juices and bottled water. Read each month by management in over 70 countries.



*Raise awareness through sponsorship – p32.*

## REGULAR FEATURES

**2** Editorial

**4** UK News

**5** UK Events

**6** Promotions

**8** Products

**10** Packaging

**12** People

**13** Environment

**14** Europe

**20** North America



*Water that has nothing– p20.*

**21** International Dateline

**24** Ingredients

**31** Juice News

**36** Patent Abstracts

**37** From The Past

**38** Buyers' Guide

**44** Classified

Front cover: photo courtesy Chr. Hansen A/S. See article on page 28.

## **17** Interpack '99

Over 2000 exhibitors will be at this global packaging fest in Düsseldorf. We highlight some of the new equipment being displayed.

## **26** Use of Preservatives

Jacques de Thouars shares some of the data from Cana-dean research into preservative use and its variance between European countries, soft drink categories and flavours.

## **28** Going Natural

There is a growing trend for the use of natural colours in the soft drinks industry, maintains Henning Villadsen. He looks at the opportunities provided by the three main product types.



*Perils of juice buying - p30.*

## **30** Who'd Be A Buyer?

The juice buying business is plagued by unreliable statistics and lies, leading to lucrative or highly damaging business. Christopher Morgan believes it's time for a new approach to the hard facts.

## **32** Emotive, Passionate And Relevant

That's what a sponsorship needs to be if you are to establish a meaningful relationship with consumers. Andy Fry discusses what can be achieved with this marketing tool.

## **34** A Piece Of The Action..

It doesn't have to be big but it has to be the right piece for sponsorship to pay. Glyn Yarnall explains why and offers some case studies in costing.



*More packaging equipment than you can shake a bottle at - p17.*

*Soft Drinks International* (1997), formerly *Soft Drinks Management International* (1988), was originally founded as the *Soft Drinks Trade Journal* in 1947, incorporating *The British & Colonial Mineral Water Trade Journal* (1888) with the *Soft Drinks & Allied Trade Review*, formerly the *Mineral Water & Allied Trade Review* (1873).



*Richard H. Davis is President, Beverage Marketing USA, Inc, 105 South Fifth St, Paris, Arkansas 72855. Fax: 00 1 501 484 1054.*

# Much ado about the 'nothing'

THE Beverage Network has launched a bottled water infused with 'nothing' called Naturally Zero Canadian Natural Spring Water. It aims to expand bottled water's appeal to generation X-ers as a Y2K (Year Two Thousand) drink.

Being first to market surely has an advantage. But it's even more important that the product offering fills an obvious need. One major development that helped start the bottled water craze in the mid-1800s was the bathing suit worn as a 'distinct piece of attire'. Prior to that time, recreational bathing was not a popular pastime; if a man or woman took a dip, it was in an undergarment or 'au naturel'.

European physicians in the 1800s began to advocate recreational bathing as a tonic for 'nerves' - a term that encompassed something as temporary as lovesickness, or as terminal as the plague. The cure was 'to take the waters' - mineral, spring or ocean. Europeans - who for centuries had equated full body bathing with death - waded, soaked and paddled in lakes, streams and surf. The bathing suits that emerged to fill this health need, inspired bathing beauties to lug back home some of the 'cure' in empty wine bottles; thus the beginnings of the US bottled water industry.

Nadeem Mirza Chief Execu-
*Continued on page 21*

## Richard H. Davis reports on Tropicana's latest juice addition, a water that boasts nothing and a bottling innovation which is truly flexible.

# Fortified with calcium

IN AN effort to sweeten orange and grapefruit juice appeal as a calcium-added alternative to milk, Tropicana Products Inc, has launched a line of Tropicana Pure Premium calcium fortified juices infused with FruitCal(R), a patented calcium source made from a combination of calcium and two organic acids naturally present in fruit; citric acid and malic acid.

Looking to jump on the $16 billion US juice and juice beverage bandwagon, PepsiCo, Inc, last year acquired the global Tropicana juice business from The Seagram Company Ltd for US$3.3 billion in cash. Pepsi has scored a hole in one with the purchase of Tropicana, the world's largest marketer and producer of branded juices.

It's either a sign of maturity or an indication of the growing taste acceptance of added calcium in orange juice that has prompted Tropicana to rethink its strategy in the calcium- fortified juice market by adding FruitCal (R) the brand name for calcium citrate malate (CCM). It is soluble in juice, does not affect its natural taste or appearance and is more readily absorbed by the body than calcium in milk or calcium carbonate (the calcium source used in leading supplements). Developed by Procter & Gamble and licensed exclusively to Tropicana for use in Pure Premium, FruitCal (R) has been clinically tested and shown to build stronger bones in children and adolescents as well as to help maintain bone mass in mature women.

### Bone benefit

"Calcium is like healthy bone insurance," said Lucy Gill-Simmen, President and publisher of *Nutraceutical News*.

"Today, women always ask for calcium-fortified orange juice as a way to get some assurance against osteoporosis." Research has linked calcium intake to decreased risk of osteoporosis, which affects 28 million Americans and is responsible for 1.5 million bone fractures a year. According to the National Academy of Sciences, a woman at age 50 today has nearly a one-in-two chance of developing osteoporosis in her remain-



ing years, while more than half of all elderly men and women over 75 develop osteoporosis.

"Nutrition experts recommend getting your nutrients through 'food first'. The good news is that consuming Tropicana Pure Premium calcium-fortified orange juice at breakfast and having a glass of Ruby Red Grapefruit Calcium grapefruit juice later in the day, provides 75% of the daily value for calcium, and goes a long way toward helping Americans meet their calcium requirements," said Dr Carla McGill, senior nutrition scientist at Tropicana. "Tropicana's calcium-fortified orange and grapefruit juices are convenient, fat-free sources of calcium. They are especially good for the millions of lactose intolerant Americans who may choose not to get their calcium from dairy products."

# Seagoing bag inspires sport bottle

LIKE a lifesaver bobbing on a turbulent sea, Nordic Water Supply (NWS) is using plastic water containers or bags to transport surplus water to Cyprus. The company delivers a powerful lifeline to drier regions of Cyprus, courtesy of its seamless water-filled bags made of polyester textiles with internal and external layers of vinyl specially designed for sea water.

Each bag has a volume of about 13,000 cubic yards of water and, with an upcoming new 'Moby Dick' bag design, the capacity is expected to increase to more than 26,000 cubic yards. Currently each tugboat is pulling several bags. "That is critical," a company spokesperson said, "because



*Quattro flexible bottle.*

the whale bag will prove that we can transport water so cost-effectively that desalinated sea water will never become competitive. We spend a lot of time thinking about solving chronic water shortage problems quickly and reliably."

So now that they're launched, why should you care about titanic water bags splashing about on the Mediterranean Sea? For most purposes, you probably don't need to care. Still, there are benefits by design. The same technologies that make the Norwegian seagoing water bags such a leap forward will also be available to the soft drinks industry. It's a little smaller and prototyped as the new answer to the
*Continued on page 21*

## ABOUT THE 'NOTHING'
continued

tive Officer and founder of Bluesprings Co's Naturally Zero, knew the exact ingredients he needed to create a bottled water brand - nothing - maintaining: "In terms of healthy drinking habits, there's nothing better than absolutely nothing. That's what 'Naturally Zero' emphasises: no calories, no fat, no carbonation, no cholesterol and no zebra mussel, just plain drinking pleasure."

His formula for a bottled water about 'nothing', or rather with 'nothing', is viewed as the right mix according to Russ Hopkins, President of The Beverage Network. "The Naturally Zero label is intriguing in that the brand name itself challenges the consumer to ask a key question concerning why people prefer bottled water over other drinks. The answer, in part, is that premium water does not offer any of the negative characteristics of many other beverages offering just plain ordinary refreshment. It appears to me that Naturally Zero's distinctive label design is likely to spark a good deal of consumer interest due to its unique, modern look and the valid message it projects."

The brand's initial promotional theme features a rather humorous, tongue-in-cheek claim, namely, 'unleaded, premium calorie-free' with the tag line 'Could you ask for anything less?'



*"Nothing but plain drinking pleasure."*

## SPORT BOTTLE
continued

needs of bottled water companies. Called Quattro, this new flexible bottle or bag, feels and stands like a bottle, unlike other standup bags or pouches. It lends itself especially for use as a sport bottle, with water ejection controlled through a sport cap.

Quattro has been introduced by Curwood Inc, of Oshkosh, Wisconsin, a wholly owned unit of The Bemis Co, a major producer of high barrier flexible packaging materials for products requiring extended shelf life protection. Because of its unique bottle-like design, the Quattro can be filled by a rotary bottle filler at significantly higher speeds than conventional stand-up equipment. On a Fogg rotary filler system, for example, using low

can be filled and capped at about 240 units per minute. Other sizes available are 1 litre and 750ml.

Quattro flexible bottles are supplied as complete preprinted containers with a spout, but do not include closures or tamper evidence elements. The product is shipped flat and is available in a wide variety of films, both clear and opaque. It is also airliner-friendly and stows flat. The company says it is easy to pack away in a briefcase, carryall or backpack, especially if partially empty.

Production capabilities include rotogravure and flexographic printing, film laminating by adhesive and extrusion, extrusion coating with nylon and ethylene-base polymers and self-manufacturing of oriented base film and coextruded sealants as well as

# INTERNATIONAL DATELINE

*Date: 6th - 12th May ... Location: Dusseldorf, Germany ... Event:* **Interpack, 99** the packaging event for a new millennium, takes place in Dusseldorf's exhibition halls. *Details:* Renata Born, International Trade Shows Link. Tel: +44 (0)1442 230033; Fax +44 (0) 1442 230012.

*Date: 10th - 12th May ... Location: Helsinki, Finland ... Event:* **Hygieneomics 99**, aimed at senior management and those responsible for hygiene and food safety at board level, takes place in Helsinki. *Details:* Hygieneomics 99, PO Box 99, London N4 1WS. Tel: +44 (0)181 880 8190; Fax: +44 (0)181 802 4189.

*Date: 11th - 13th May ... Location: Buenos Aires, Argentina ... Event:* **Food Ingredients South America**. *Details:* Miller Freeman BV, Industrieweg 54, P.O. Box 200, 3600 AE Maarssen, The Netherlands. Tel: +31 346 559444; Fax: +31 346 573811.

*Date: 12th - 16th May ... Location: Bogota, Colombia ... Event:* **Alimentec '99**, the international trade fair for food and kindred products, food technology and packaging machines. *Details:* ISC Köln Messe GmbH, Deutz-Mülheimer-Str. 30, D-50679, Köln. Tel: (02 21) 821-0; Fax: (02 21) 821-20 92.

*Date: 13th - 14th May ... Location: Orlando, USA ... Event:* **Improving Packaging Openability & Functionality**, a two day international packaging conference takes place at the Orlando World Center, Marriott, Florida. *Details:* Pira International & Reconaissance International. Tel: +44 (0)1372 802000; Fax: +44 (0)1372 802243.

*Date: 18th - 19th May ... Location: Brussels, Belgium ... Event:* **transpak 99**, the fourth international conference on transportation and packaging systems for fast moving consumer goods takes place at the Crowne Plaza Hotel, Brussels. *Details:* Ryder Strategies Ltd, 162 Goldhawk Road, London W12 8HL. Tel: +44 (0)181 749 0628.

*Date: 19 May ... Location: Brussels, Belgium ... Event:* **The NSF International Bottled Water Seminar** focusing on NSF Inspection and Audit Programmes, takes place at the Panorama Hotel, Hengstemberg 77, 3090 Overije. *Details:* Rita Conroy, NSF International, 148 Av. Grand Champ; B - 1150 Brussels, Tel: +32 2 7713654; Fax: +32 2 7630013.

*Date: 1st - 4th June ... Location: Singapore ... Event:* **SIAL Asia 99**, the premier international food and beverage exhibition for Asia, takes place at the new Singapore Expo exhibition centre. *Details:* SIAL Asia Pte Ltd, 20 Kallang Avenue, 2nd Floor, Pico Creative Centre, Singapore 339411. Tel: (65) 392 9269. Fax: (65) 392 9260.

*Date: 3rd - 4th June ... Location: Lincolnshire, Illinois, US ... Event:* **Stand-Up Pouches 99**, this year's leading stand-up pouch conference for packaging industry professionals takes place at Marriott's Lincolnshire Resort. *Details:* Annette S. LeMaire, Packaging Strategies, Inc. Tel: 00 1 610 436 4220; Fax: 00 1 610 436 6277.

*Date: 7th - 8th June ... Location: Sao Paulo, Brazil ... Event:* **Bev-Pak South America 99** takes place at the Renaissance Sao Paulo Hotel, just before the Fispal Fair of Food and Beverages and Packaging.. *Details:* Peter J. Weggeman, President Bev-Pak. Tel: 00 1 941 403 3771; Fax: 00 1 941 403 0787.

*Date: 8th - 11th June ... Location: Sao Paulo, Brazil ... Event:* **Fispal Fair of Food and Beverages and Packaging** takes place in Sao Paulo. *Details:* Ligia Castro, International Director, Sao Paulo. Tel: (55) 11 844 9111; Fax: (55) 11 844 9121.

*Date: 9th - 11th June ... Location: La Baule, France ... Event:* **5th European Symposium on Food Authenticity**, international collaboration in research and development. *Details:* Chantal Menard, Eurofins Scientific, Rue P.A. Bobierre, BP 44323 Nantes Cedex 3, France. Tel: +33 (0)251 83 21 04; Fax: +33



# BeverageWorld



**WORLD WIDE WET**

The beverage business
logs on for a Net gain

CLICK HERE
FOR MORE DETAILS

**28** BEVERAGE WORLD MAY 1999

# Bottled Water SCOPE



## They Say *Theirs* Is The Real Thing

RealPure is real sure consumers will be blown away by the natural nature of its bottled water. Billing it as "Straight from the Source," the Jackson, MS-based bottler explains, "Unlike water that must be transported to be bottled, RealPure Natural Spring Water is untouched by chemicals. Because it's bottled at the source, no chlorination or dechlorination are necessary for safety." **800/949-0392**

## Plenty Of Nothing



Counting down past one, Naturally Zero attempts to have it all by having nothing: "No calories, no fat, no carbonation, no cholesterol..." In other words, *nada* besides water. Well, there's something behind this Zero, namely the "fabled Blue Mountains of Canada" adorning the label. The source is meant to imply "cold, refreshing, pure." Guess there really is something there. **773/381-9693**



## New Chapter To Suntory Story

Not unlike McKesson Corporation, which bought Ephrata Diamond Spring, and Danone International, buyers of AquaPenn, Suntory Water Group is a Top 5 bottled water company that has turned to acquisition to enhance its domestic position. Joining the likes of Crystal Springs and Hinckley & Schmitt is Great Pines Water Company, a Houston-based entity in which Suntory has purchased two-thirds interest. Suntory says Great Pines "extends our presence in Texas to the Dallas/Fort Worth area...and is in line with our aggressive acquisition strategy." Indeed, earlier this year, Suntory bought Cloister Spring Water.

## AWFULLY OFFICIAL

Fountainhead Water may not be a stickler for procedure, but it sure likes its official designations. For example, the Marietta, GA-based bottler has been named official bottled water sponsor of "two of Atlanta's most highly anticipated events, the 1999 Music Midtown Festival and Nationwide Golf Championship." Fountainhead president Kevin McClanahan gushes, "These are both fantastic events for the Atlanta community, and we feel fortunate to be involved." **770/916-1010**

## Agua With An Accent

Peña Pura aims to taste good to tongues of all origin, but it does have a certain demographic in mind. According to the Houston-based company, "Hispanics keep the purity of their culture close at heart. When far from home it's what they yearn for." This bottler hopes it's Peña Pura's *agua purificada*—purified water—that quenches that desire. **800/322-6803**

## THE BLUES

Blue is never out of fashion when it comes to bottled water containers. Two examples:

• Dowser Spring Water uses a "cobalt blue bottle that distinguishes itself from every other spring water." As for the private-label–geared contents, "A Dowser finds the best water in a geographic location" and produces a "recognized spring water" in a distributor's or retailer's water. **914/562-5400**

• Oregon Pacific Bottling Company (Sixes, OR) is using "navy blue plastic bottles" and a "dark blue sports cap" to brighten up the prospects of Oregon Pacific: "We simply feel that the packaging looks richer and appears to be chilled." **800/472-9176**



### *The Coca-Cola Company*

COCA-COLA PLAZA
ATLANTA, GEORGIA

CHARLES H. MCCOY
VICE PRESIDENT, SUPPLY CHAIN NETWORK
HYDRATION BUSINESS UNIT
NORTH AMERICAN DIVISION

ADDRESS REPLY TO
ONE COCA-COLA PLAZA
ATLANTA, GA 30313
—
404 676-2353
FAX: 404 515-5006

February 7, 2003


Mr. Nad Mirza
President and Creative Director
Blue Springs W. Co.
5066 N. Elston Avenue
Chicago, IL 60630


Dear Mr. Mirza:

This letter is in response to your letter to Jeff Dunn dated January 12, 2003 regarding "Naturally Zero."

Thanks for sharing this opportunity with us.  We have reviewed the information you provided and have decided not to pursue this opportunity after addressing strategic priorities.

Good luck with your business and thanks again for sharing this opportunity with us.

*Charles H McCoy*

Charles H. McCoy


EXHIBIT "5"

# Trademark/Service Mark Application, Principal Register, with Declaration

**Serial Number: 78316078**
**Filing Date: 10/20/2003**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| MARK | SPRITE ZERO |
| OWNER | |
| NAME | The Coca-Cola Company |
| INTERNAL ADDRESS | NAT 1962 |
| STREET | One Coca-Cola Plaza, N.W. |
| CITY | Atlanta |
| STATE | GA |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | USA |
| PHONE | (404) 676-7492 |
| FAX | (404) 676-7682 |
| EMAIL | jodenton@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| LEGAL ENTITY | |
| TYPE | CORPORATION |
| STATE/COUNTRY OF INCORPORATION | Delaware |
| ATTORNEY | |
| NAME | Charles S. Murray, Jr. |
| FIRM NAME | The Coca-Cola Company |
| INTERNAL ADDRESS | NAT 1962 |
| STREET | One Coca-Cola Plaza, N.W. |
| CITY | Atlanta |
| STATE | GA |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | USA |
| PHONE | (404) 676-7492 |
| FAX | (404) 676-7682 |
| EMAIL | jodenton@na.ko.com |

**EXHIBIT "6"**

| AUTHORIZED EMAIL COMMUNICATION | Yes |
|---|---|
| OTHER APPOINTED ATTORNEY(S) | Eduardo Carreras, Caroline Pearlstein, Kamau King, Dolores Moro, Schuyla Goodson |
| **CORRESPONDENCE** | |
| NAME | Charles S. Murray, Jr. |
| FIRM NAME | The Coca-Cola Company |
| INTERNAL ADDRESS | NAT 1962 |
| STREET | One Coca-Cola Plaza, N.W. |
| CITY | Atlanta |
| STATE | GA |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | USA |
| PHONE | (404) 676-7492 |
| FAX | (404) 676-7682 |
| EMAIL | jodenton@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| **GOODS AND/OR SERVICES** | |
| INTERNATIONAL CLASS | 032 |
| DESCRIPTION TEXT | Beverages, namely carbonated soft drinks; syrups, concentrates and powders for making same. |
| FILING BASIS | Section 1(b) |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /csm/ |
| SIGNATURE DATE | 10/20/2003 |
| SIGNATORY NAME | Charles S. Murray, Jr. |
| SIGNATORY POSITION | Trademark Counsel |
| **PAYMENT** | |
| NUMBER OF CLASSES | 1 |
| NUMBER OF CLASSES PAID | 1 |
| SUBTOTAL AMOUNT | 335 |
| TOTAL AMOUNT | 335 |
| RAM SALE NUMBER | 372 |
| RAM ACCOUNTING DATE | 10/21/2003 |
| **FILING INFORMATION** | |
| SUBMIT DATE | Mon Oct 20 18:31:02 EDT 2003 |
| TEAS STAMP | USPTO/BAS-2051605230 -2003102018310210947 0 78316078 2009e3e43 |

242c7e4606d80ac5ff2c
3914-DA-372-20031020
180334775076

# Trademark/Service Mark Application, Principal Register, with Declaratio

**Serial Number: 78316078**
**Filing Date: 10/20/2003**

o the Commissioner for Trademarks:

**MARK:** SPRITE ZERO

he applicant, The Coca-Cola Company, a corporation of Delaware, residing at NAT 1962, One Coca-Cola Plaza, N.W., Atlanta, GA USA 30313, equests registration of the trademark/service mark shown on the drawing page in the United States Patent and Trademark Office on the Principal egister established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.

tent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

International Class 032: Beverages, namely carbonated soft drinks; syrups, concentrates and powders for making same.

he applicant, hereby appoints Charles S. Murray, Jr. and Eduardo Carreras, Caroline Pearlstein, Kamau King, Dolores Moro, Schuyla Goodson of he Coca-Cola Company, NAT 1962, One Coca-Cola Plaza, N.W., Atlanta, GA USA 30313 to submit this application on behalf of the applicant.

fee payment in the amount of $335 will be submitted with the application, representing payment for 1 class(es).

### Declaration

he undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 .S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, eclares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the ademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be ntitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to se the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection rith the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own nowledge are true; and that all statements made on information and belief are believed to be true.

ignature: /csm/   Date: 10/20/2003
ignatory's Name: Charles S. Murray, Jr.
ignatory's Position: Trademark Counsel
failing Address:
   Charles S. Murray, Jr.
   NAT 1962
   One Coca-Cola Plaza, N.W.
   Atlanta, GA 30313
AM Sale Number: 372
AM Accounting Date: 10/21/2003
erial Number: 78316078
nternet Transmission Date: Mon Oct 20 18:31:02 EDT 2003
EAS Stamp:
JSPTO/BAS-2051605230-20031020183102109470-78316078-2009e3e43242c7e4606d80ac5ff2c3914-DA-372-20031020180334775076

**FILING DATE:**

2003/10/20



**SERIAL NUMBER:**

78/316078



TRADEMARK APPLICATION

FEE RECORD SHEET

RAM SALE NUMBER: 372

RAM ACCOUNTING DATE: 20031021

| Description | Fee Code | Fee Amount | Number Of Classes | Total Fees Paid |
|---|---|---|---|---|
| New App | 7001 | 335 | 1 | 335 |

Drawing Page

**Drawing Page**

**Date/Time Stamp:**

**10/20/2003 18:03:3**

**Serial Number:**

**78316078**



**Mark:**

SPRITE ZERO

**Applicant:**
The Coca-Cola Company
One Coca-Cola Plaza, N.W. NAT 1962
Atlanta GA 30313
USA

**Date of First Use Anywhere: Intent-To-Use (Section 1(b))**
**Date of First Use In Commerce: Intent-To-Use (Section 1(b))**

**Goods and Services:**
Beverages, namely carbonated soft drinks; syrups, concentrates and powders for making

# Trademark/Service Mark Application, Principal Register

**Serial Number: 78476290**
**Filing Date: 08/31/2004**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **MARK SECTION** | |
| MARK | NOTHING IS LIGHTER THAN ZERO |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | NOTHING IS LIGHTER THAN ZERO |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **OWNER SECTION** | |
| NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza N.W. |
| CITY | Atlanta |
| STATE | GA |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| EMAIL | cpearlstein@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| **LEGAL ENTITY SECTION** | |
| TYPE | CORPORATION |
| STATE/COUNTRY OF INCORPORATION | Georgia |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 032 |
| DESCRIPTION | Non-alcoholic beverages, namely soft drinks, syrups and concentrates for making beverages, namely soft drinks. |
| FILING BASIS | Section 1(b) |
| **SIGNATURE SECTION** | |
| SIGNATURE | /ckp/ |
| SIGNATORY NAME | Caroline Pearlstein |
| SIGNATORY DATE | 08/31/2004 |
| SIGNATORY POSITION | Trademark Counsel |

**EXHIBIT "7"**

**PAYMENT SECTION**

| | |
|---|---|
| NUMBER OF CLASSES | 1 |
| NUMBER OF CLASSES PAID | 1 |
| SUBTOTAL AMOUNT | 335 |
| TOTAL AMOUNT | 335 |

**ATTORNEY**

| | |
|---|---|
| NAME | Caroline Pearlstein |
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza N.W. |
| CITY | Atlanta |
| STATE | GA |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL | cpearlstein@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| OTHER APPOINTED ATTORNEY(S) | Kamau King, Dolores Moro, Schuyla Goodson |

**CORRESPONDENCE SECTION**

| | |
|---|---|
| NAME | Caroline Pearlstein |
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza N.W. |
| CITY | Atlanta |
| STATE | GA |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL | cpearlstein@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |

**FILING INFORMATION**

| | |
|---|---|
| SUBMIT DATE | Tue Aug 31 12:28:02 EDT 2004 |
| TEAS STAMP | USPTO/BAS-20516053142-200 40831122802577159-7847629 0-200186380e8b59a9323af38 54307ea59ec1-CC-919-20040 831122416932147 |

**Trademark/Service Mark Application, Principal Register**

**Serial Number: 78476290**
**Filing Date: 08/31/2004**

**To the Commissioner for Trademarks:**

**MARK:** (Standard Characters, see mark)
The mark consists of standard characters, without claim to any particular font, style, size, or color.
The literal element of the mark consists of NOTHING IS LIGHTER THAN ZERO.
The applicant, The Coca-Cola Company, a corporation of Georgia, residing at One Coca-Cola Plaza N.W., Atlanta, GA, United States, 30313, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).
    International Class 032: Non-alcoholic beverages, namely soft drinks, syrups and concentrates for making beverages, namely soft drinks.
The applicant hereby appoints Caroline Pearlstein and Kamau King, Dolores Moro, Schuyla Goodson of The Coca-Cola Company, One Coca-Cola Plaza N.W., Atlanta, GA, United States, 30313 to submit this application on behalf of the applicant.
The USPTO is authorized to communicate with the applicant or its representative at the following email address: cpearlstein@na.ko.com.
A fee payment in the amount of $335 will be submitted with the application, representing payment for 1 class(es).

**Declaration**

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Signature: /ckp/  Date: 08/31/2004
Signatory's Name: Caroline Pearlstein
Signatory's Position: Trademark Counsel
Mailing Address:
    Caroline Pearlstein
    One Coca-Cola Plaza N.W.
    Atlanta, GA 30313
RAM Sale Number: 919
RAM Accounting Date: 08/31/2004
Serial Number: 78476290
Internet Transmission Date: Tue Aug 31 12:28:02 EDT 2004
TEAS Stamp: USPTO/BAS-20516053142-200408311228025771
59-78476290-200186380e8b59a9323af3854307
ea59ec1-CC-919-20040831122416932147

# NOTHING IS LIGHTER THAN ZERO



**EXHIBIT '8"**



**EXHIBIT "9"**

# Trademark/Service Mark Application, Principal Register

**Serial Number: 78580598**
**Filing Date: 03/04/2005**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **MARK SECTION** | |
| MARK | COCA-COLA ZERO |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | COCA-COLA ZERO |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **OWNER SECTION** | |
| NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL | cpearlstein@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| **LEGAL ENTITY SECTION** | |
| TYPE | CORPORATION |
| STATE/COUNTRY OF INCORPORATION | Delaware |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 032 |
| DESCRIPTION | Beverages, namely soft drinks; syrups and concentrates for the making of the same. |
| FILING BASIS | Section 1(b) |
| **ADDITIONAL STATEMENTS SECTION** | |
| PRIOR REGISTRATION(S) | Applicant claims ownership of U.S. Registration Number(s) 47189, 238145, 238146, and others. |

EXHIBIT "10"

| SIGNATURE SECTION | |
|---|---|
| SIGNATURE | /ckp/ |
| SIGNATORY NAME | Caroline K. Pearlstein |
| SIGNATORY DATE | 03/04/2005 |
| SIGNATORY POSITION | Trademark Counsel |
| **PAYMENT SECTION** | |
| NUMBER OF CLASSES | 1 |
| NUMBER OF CLASSES PAID | 1 |
| SUBTOTAL AMOUNT | 325 |
| TOTAL AMOUNT | 325 |
| **ATTORNEY** | |
| NAME | Caroline K. Pearlstein |
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL | cpearlstein@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| ATTORNEY DOCKET NUMBER | 263289 |
| OTHER APPOINTED ATTORNEY(S) | Dolores A. Moro, Schuyla M. Goodson, Kamau J. King |
| **CORRESPONDENCE SECTION** | |
| NAME | Caroline K. Pearlstein |
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL | cpearlstein@na.ko.com |

| AUTHORIZED EMAIL COMMUNICATION | Yes |
|---|---|
| **FILING INFORMATION** | |
| SUBMIT DATE | Fri Mar 04 16:15:34 EST 2005 |
| TEAS STAMP | USPTO/BAS-20516053142-200 50304161534472606-7858059 8-2004ca46e1d34b3eb1555e0 c3b667add7eb-DA-340-20050 304161226806012 |

# Trademark/Service Mark Application, Principal Register

### Serial Number: 78580598
### Filing Date: 03/04/2005

**To the Commissioner for Trademarks:**

**MARK:** (Standard Characters, see mark)

The mark consists of standard characters, without claim to any particular font, style, size, or color.

The literal element of the mark consists of COCA-COLA ZERO.

The applicant, The Coca-Cola Company, a corporation of Delaware, residing at One Coca-Cola Plaza, Atlanta, Georgia, United States, 30313, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.

Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

    International Class 032: Beverages, namely soft drinks; syrups and concentrates for the making of the same.

Applicant claims ownership of U.S. Registration Number(s) 47189, 238145, 238146, and others.

The applicant hereby appoints Caroline K. Pearlstein and Dolores A. Moro, Schuyla M. Goodson, Kamau J. King of The Coca-Cola Company, One Coca-Cola Plaza, Atlanta, Georgia, United States, 30313 to submit this application on behalf of the applicant. The attorney docket/reference number is 263289.

The USPTO is authorized to communicate with the applicant or its representative at the following email address: cpearlstein@na.ko.com.

A fee payment in the amount of $325 will be submitted with the application, representing payment for 1 class(es).

### Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Signature: /ckp/   Date: 03/04/2005

Signatory's Name: Caroline K. Pearlstein

Signatory's Position: Trademark Counsel

Mailing Address:
    Caroline K. Pearlstein
    One Coca-Cola Plaza
    Atlanta, Georgia 30313

RAM Sale Number: 340

RAM Accounting Date: 03/07/2005

Serial Number: 78580598
Internet Transmission Date: Fri Mar 04 16:15:34 EST 2005
TEAS Stamp: USPTO/BAS-20516053142-200503041615344726
6-78580598-2004ca46e1d34b3eb1555e0c3b66
add7eb-DA-340-20050304161226806012

# COCA-COLA ZERO

# Trademark/Service Mark Application, Principal Register

**Serial Number: 78620677**
**Filing Date: 05/02/2005**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **MARK SECTION** | |
| MARK | FANTA ZERO |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | FANTA ZERO |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **OWNER SECTION** | |
| NAME | The Coca-Cola Company |
| STREET | One Coca-Coca Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| AUTHORIZED EMAIL COMMUNICATION | No |
| **LEGAL ENTITY SECTION** | |
| TYPE | CORPORATION |
| STATE/COUNTRY OF INCORPORATION | Delaware |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 032 |
| DESCRIPTION | Beverages, namely soft drinks, syrups and concentrates for the making of the same. |
| FILING BASIS | Section 1(b) |
| **ADDITIONAL STATEMENTS SECTION** | |
| PRIOR REGISTRATION(S) | Applicant claims ownership of U.S. Registration Number(s) 0513565 and 0616935. |
| **SIGNATURE SECTION** | |
| SIGNATURE | /kjk/ |
| SIGNATORY NAME | Kamau J. King |

EXHIBIT "11"

| SIGNATORY DATE | 05/02/2005 |
|---|---|
| SIGNATORY POSITION | Trademark Attorney |

## PAYMENT SECTION

| NUMBER OF CLASSES | 1 |
|---|---|
| NUMBER OF CLASSES PAID | 1 |
| SUBTOTAL AMOUNT | 325 |
| TOTAL AMOUNT | 325 |

## ATTORNEY

| NAME | Kamau King |
|---|---|
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-3478 |
| AUTHORIZED EMAIL COMMUNICATION | No |
| OTHER APPOINTED ATTORNEY(S) | Schuyla Goodson, Dolores Moro, Caroline Pearlstein |

## CORRESPONDENCE SECTION

| NAME | Kamau King |
|---|---|
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-3478 |
| AUTHORIZED EMAIL COMMUNICATION | No |

## FILING INFORMATION

| SUBMIT DATE | Mon May 02 10:42:32 EDT 2005 |
|---|---|
| TEAS STAMP | USPTO/BAS-20516053142-200 50502104232461096-7862067 7-20051c12bbd4c598c95c8c5 8d8cb8213840-DA-862-20050 502104023476629 |

## Trademark/Service Mark Application, Principal Register

**Serial Number: 78620677**
**Filing Date: 05/02/2005**

**To the Commissioner for Trademarks:**

**MARK:** (Standard Characters, see mark)
The mark consists of standard characters, without claim to any particular font, style, size, or color.
The literal element of the mark consists of FANTA ZERO.
The applicant, The Coca-Cola Company, a corporation of Delaware, residing at One Coca-Coca Plaza, Atlanta, Georgia, United States, 30313, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).
        International Class 032: Beverages, namely soft drinks, syrups and concentrates for the making of the same.
Applicant claims ownership of U.S. Registration Number(s) 0513565 and 0616935.
The applicant hereby appoints Kamau King and Schuyla Goodson, Dolores Moro, Caroline Pearlstein of The Coca-Cola Company, One Coca-Cola Plaza, Atlanta, Georgia, United States, 30313 to submit this application on behalf of the applicant.
A fee payment in the amount of $325 will be submitted with the application, representing payment for 1 class(es).

### Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.
Signature: /kjk/   Date: 05/02/2005
Signatory's Name: Kamau J. King
Signatory's Position: Trademark Attorney
Mailing Address:
    Kamau King
    One Coca-Cola Plaza
    Atlanta, Georgia 30313
LAM Sale Number: 862
LAM Accounting Date: 05/02/2005
Serial Number: 78620677
Internet Transmission Date: Mon May 02 10:42:32 EDT 2005
TEAS Stamp: USPTO/BAS-20516053142-200505021042324610
6-78620677-20051c12bbd4c598c95c8c58d8cb
213840-DA-862-20050502104023476629

# FANTA ZERO



**EXHIBIT "12"**



**EXHIBIT "13"**



**EXHIBIT "13"(cont.)**



**EXHIBIT "16"**

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77176279**
**Filing Date: 05/09/2007**

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77176279 |
| **MARK INFORMATION** | |
| *MARK | COCA-COLA CHERRY ZERO |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | COCA-COLA CHERRY ZERO |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | The Coca-Cola Company |
| *STREET | One Coca-Cola Plaza |
| *CITY | Atlanta |
| *STATE (Required for U.S. applicants) | Georgia |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 30313 |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL ADDRESS | cpearlstein@na.ko.com |
| **LEGAL ENTITY INFORMATION** | |
| *TYPE | CORPORATION |
| *STATE/COUNTRY OF INCORPORATION | Delaware |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 032 |
| DESCRIPTION | Non-alcoholic beverages, namely soft drinks; syrups and concentrates for making non-alcoholic beverages, namely soft drinks |

**EXHIBIT "14"**

| FILING BASIS | SECTION 1(a) |
|---|---|
| FIRST USE ANYWHERE DATE | At least as early as 01/29/2007 |
| FIRST USE IN COMMERCE DATE | At least as early as 01/29/2007 |
| SPECIMEN FILE NAME(S) | \\TICRS2\EXPORT12\771\762\77176279\xml1\APP0003.JPG |
| SPECIMEN DESCRIPTION | Photograph of mark as used on product. |

## ADDITIONAL STATEMENTS SECTION

| PRIOR REGISTRATION(S) | The applicant claims ownership of U.S. Registration Number(s) 0238145 and 0238146. |
|---|---|

## ATTORNEY INFORMATION

| NAME | Caroline K. Pearlstein |
|---|---|
| ATTORNEY DOCKET NUMBER | 296109 |
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 30313 |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL ADDRESS | cpearlstein@na.ko.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| OTHER APPOINTED ATTORNEY | Dolores A. Moro, Kamau J. King, Dinisa H. Folmar, Paula Guibault |

## CORRESPONDENCE INFORMATION

| NAME | Caroline K. Pearlstein |
|---|---|
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 30313 |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |

| EMAIL ADDRESS | cpearlstein@na.ko.com |
|---|---|
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

### FEE INFORMATION

| NUMBER OF CLASSES | 1 |
|---|---|
| FEE PER CLASS | 325 |
| TOTAL FEE DUE | 325 |

### SIGNATURE INFORMATION

| SIGNATURE | /ckp/ |
|---|---|
| SIGNATORY'S NAME | Caroline K. Pearlstein |
| SIGNATORY'S POSITION | Trademark Counsel |
| DATE SIGNED | 05/09/2007 |

### FILING INFORMATION SECTION

| SUBMIT DATE | Wed May 09 11:54:36 EDT 2007 |
|---|---|
| TEAS STAMP | USPTO/BAS-205.160.53.134-20070509115436263593-7717 6279-370b38fb9be387138f07 c3d56a5c290816d-DA-1446-2 0070509114455054455 |

# Trademark/Service Mark Application, Principal Register

### Serial Number: 77176279
### Filing Date: 05/09/2007

## To the Commissioner for Trademarks:

**MARK:** COCA-COLA CHERRY ZERO (Standard Characters, see mark)
The literal element of the mark consists of COCA-COLA CHERRY ZERO. The mark consists of standard characters, without claim to any particular font, style, size, or color.
The applicant, The Coca-Cola Company, a corporation of Delaware, having an address of One Coca-Cola Plaza, Atlanta, Georgia, United States, 30313, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.
    International Class 032:  Non-alcoholic beverages, namely soft drinks; syrups and concentrates for making non-alcoholic beverages, namely soft drinks
Use in Commerce: The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, or the applicant's predecessor in interest used the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a), as amended.
In International Class 032, the mark was first used at least as early as 01/29/2007, and first used in commerce at least as early as 01/29/2007, and is now in use in such commerce. The applicant is submitting or will submit one specimen for *each class* showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Photograph of mark as used on product..
Specimen File1
The applicant claims ownership of U.S. Registration Number(s) 0238145 and 0238146.

The applicant hereby appoints Caroline K. Pearlstein and Dolores A. Moro, Kamau J. King, Dinisa H. Folmar, Paula Guibault of The Coca-Cola Company, One Coca-Cola Plaza, Atlanta, Georgia, United States, 30313 to submit this application on behalf of the applicant. The attorney docket/reference number is 296109.

Correspondence Information:            Caroline K. Pearlstein
                                       One Coca-Cola Plaza
                                       Atlanta, Georgia 30313
                                       404-676-5315(phone)
                                       404-598-5315(fax)
                                       cpearlstein@na.ko.com (authorized)

A fee payment in the amount of $325 will be submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Signature: /ckp/   Date Signed: 05/09/2007
Signatory's Name: Caroline K. Pearlstein
Signatory's Position: Trademark Counsel
RAM Sale Number: 1446
RAM Accounting Date: 05/09/2007
Serial Number: 77176279
Internet Transmission Date: Wed May 09 11:54:36 EDT 2007
TEAS Stamp: USPTO/BAS-205.160.53.134-200705091154362
63593-77176279-370b38fb9be387138f07c3d56
a5c290816d-DA-1446-20070509114455054455

# COCA-COLA CHERRY ZERO

# Trademark/Service Mark Application, Principal Register

**Serial Number:** 77175066
**Filing Date:** 05/08/2007

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 77175066 |
| **MARK INFORMATION** | |
| *MARK | COKE CHERRY ZERO |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | COKE CHERRY ZERO |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | The Coca-Cola Company |
| *STREET | One Coca-Cola Plaza |
| *CITY | Atlanta |
| *STATE (Required for U.S. applicants) | Georgia |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 30313 |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL ADDRESS | cpearlstein@na.ko.com |
| **LEGAL ENTITY INFORMATION** | |
| *TYPE | CORPORATION |
| *STATE/COUNTRY OF INCORPORATION | Delaware |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 032 |
| DESCRIPTION | Non-alcoholic beverages, namely soft drinks |
| FILING BASIS | SECTION 1(a) |

EXHIBIT "15"

| FIRST USE ANYWHERE DATE | At least as early as 01/29/2007 |
|---|---|
| FIRST USE IN COMMERCE DATE | At least as early as 01/29/2007 |
| SPECIMEN FILE NAME(S) | \\TICRS2\EXPORT12\771\750 \77175066\xml1\APP0003.JPG |
| | \\TICRS2\EXPORT12\771\750 \77175066\xml1\APP0004.JPG |
| SPECIMEN DESCRIPTION | Photograph of mark as used in connection with product. |

## ADDITIONAL STATEMENTS SECTION

| PRIOR REGISTRATION(S) | The applicant claims ownership of U.S. Registration Number(s) 1445485 and 2780369. |
|---|---|

## ATTORNEY INFORMATION

| NAME | Caroline K. Pearlstein |
|---|---|
| ATTORNEY DOCKET NUMBER | 296110 |
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 30313 |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL ADDRESS | cpearlstein@na.ko.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| OTHER APPOINTED ATTORNEY | Dolores A. Moro, Kamau J. King, Dinisa H. Folmar, Paula Guibault |

## CORRESPONDENCE INFORMATION

| NAME | Caroline K. Pearlstein |
|---|---|
| FIRM NAME | The Coca-Cola Company |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 30313 |
| PHONE | 404-676-5315 |

| | |
|---|---|
| FAX | 404-598-5315 |
| EMAIL ADDRESS | cpearlstein@na.ko.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 325 |
| TOTAL FEE DUE | 325 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /ckp/ |
| SIGNATORY'S NAME | Caroline K. Pearlstein |
| SIGNATORY'S POSITION | Trademark Counsel |
| DATE SIGNED | 05/08/2007 |
| **FILING INFORMATION SECTION** | |
| SUBMIT DATE | Tue May 08 09:43:32 EDT 2007 |
| TEAS STAMP | USPTO/BAS-205.160.53.134-20070508094332096774-7717 5066-3708ac13eb7efa11c558 32ea25ca6e547ff-DA-1307-2 0070508091320030162 |

# Trademark/Service Mark Application, Principal Register

**Serial Number: 77175066**
**Filing Date: 05/08/2007**

## To the Commissioner for Trademarks:

**MARK:** COKE CHERRY ZERO (Standard Characters, see mark)
The literal element of the mark consists of COKE CHERRY ZERO. The mark consists of standard characters, without claim to any particular font, style, size, or color.
The applicant, The Coca-Cola Company, a corporation of Delaware, having an address of One Coca-Cola Plaza, Atlanta, Georgia, United States, 30313, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.
       International Class 032:  Non-alcoholic beverages, namely soft drinks
Use in Commerce: The applicant is using the mark in commerce, or the applicant's related company or licensee is using the mark in commerce, or the applicant's predecessor in interest used the mark in commerce, on or in connection with the identified goods and/or services. 15 U.S.C. Section 1051(a), as amended.
In International Class 032, the mark was first used at least as early as 01/29/2007, and first used in commerce at least as early as 01/29/2007, and is now in use in such commerce. The applicant is submitting or will submit one specimen for *each class* showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Photograph of mark as used in connection with product..
Specimen File1

Specimen File2
The applicant claims ownership of U.S. Registration Number(s) 1445485 and 2780369.
The applicant hereby appoints Caroline K. Pearlstein and Dolores A. Moro, Kamau J. King, Dinisa H. Folmar, Paula Guibault of The Coca-Cola Company, One Coca-Cola Plaza, Atlanta, Georgia, United States, 30313 to submit this application on behalf of the applicant. The attorney docket/reference number is 296110.

Correspondence Information:                Caroline K. Pearlstein
One Coca-Cola Plaza
Atlanta, Georgia 30313
404-676-5315(phone)
404-598-5315(fax)
cpearlstein@na.ko.com (authorized)

A fee payment in the amount of $325 will be submitted with the application, representing payment for 1 class(es).

**Declaration**

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Signature: /ckp/   Date Signed: 05/08/2007
Signatory's Name: Caroline K. Pearlstein
Signatory's Position: Trademark Counsel
RAM Sale Number: 1307
RAM Accounting Date: 05/08/2007
Serial Number: 77175066
Internet Transmission Date: Tue May 08 09:43:32 EDT 2007
TEAS Stamp: USPTO/BAS-205.160.53.134-200705080943320
96774-77175066-3708ac13eb7efa11c55832ea2
5ca6e547ff-DA-1307-20070508091320030162

# COKE CHERRY ZERO

MIRZA N. BAIG
C/O AFTAB ALAM
APT# 514
EAST YORK
ONTARIO M4H 1E1

RE:    TRADE-MARK:       NATURALLY ZERO & DESIGN
       APPLICANT:        MIRZA N. BAIG
       FILE NO.          861998

**Application for Registration of a Proposed Trade-mark**

To: The Registrar of Trade-marks, Ottawa, Canada.

The applicant ___MIRZA N. BAIG_____ the full post office address of whose principal office or place of business is___2742 W. DEVON AVE._____
_____ CHICAGO, IL 60659, U.S.A

applies for the registration, in accordance with the provisions of the *Trade-marks Act*, of the trade-mark identified below.

The trade-mark is
_SHOWN IN THE ACCOMPANYING DRAWING BELOW._____

The applicant, by itself or through a licensee, or by itself and through a licensee, intends to use the trade-mark in Canada in association with ___SPRING WATER_____ and requests registration of the trade-mark in respect of such wares.

The applicant, by itself or through a licensee, or by itself and through a licensee, intends to use the trade-mark in Canada in association with _____ and requests registration of the trade-mark in respect of such services.

The applicant is satisfied that he is entitled to use the trade-mark in Canada in association with
_THE WARES_____        described above.

**EXHIBIT "17"**

RE: TRADE-MARK                    NATURALLY ZERO & DESIGN

APPLICANT;              MIRZA  N.  BAI
FILE NO.                861998

DISCLAIMERS


1. NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE  ''ALL READING MATERIAL, EXCEPT ''ZERO'', APART FROM THE TRADE-MARK PERSUANT TO SECTIONS 12 (1) b AND 35 OF TRADE MARKS ACT.


2. NO CLAIM IS MADE TO THE EXCLUSIVE RIGGHT TO USE  ''NATURALLY'' APART FROM THE TRADE-MARK AS SHOWN.


3. NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE  ''THE ELEVENPOINT MAPLE LEAF'' APART FROM THE TRADE-MARK AS SHOWN.

Application for Registration of a Proposed Trade-mark

The applicant _MIRZA N. BAIG_ the full post office address of whose principal office or place of business is _2742 W. DEVON AVE._ _CHICAGO, IL 60659, USA_ applies for the registration, in accordance with the provisions of the *Trade-marks Act*, of the trade-mark identified below.

The trade-mark is _SHOWN IN THE ACCOMPANYING DRAWING BELOW._

The applicant, by itself or through a licensee, or by itself and through a licensee, intends to use the trade-mark in Canada in association with _BOTTLED WATER_ and requests registration of the trade-mark in respect of such wares.

The applicant, by itself or through a licensee, or by itself and through a licensee, intends to use the trade-mark in Canada in association with _____ and requests registration of the trade-mark in respect of such services.

The applicant is satisfied that he is entitled to use the trade-mark in Canada in association with _BOTTLED WATER_ the described above.

Mirza N. Baig

11-9-97



**Office de la propriété intellectuelle du Canada**

Un organisme d'Industrie Canada

**Canadian Intellectual Property Office**

An Agency of Industry Canada

## Marques de commerce
### Certificat d'authenticité

## Trade-marks
### Certification of Authenticity

Le(la) soussigné(e) certifie par la présente que le document ci-joint est une copie authentique de l'enregistrement officel de la marque de commerce effectué sous le numéro 537,375 conformément à la Loi sur les marques de commerce.

The undersigned hereby certifies that the attached document is a true copy of the record of the registration of the trade-mark registered under No. 537,375 in accordance with the Trade-marks Act.

Conformément aux dispositions de la *Loi sur les marques de commerce*, la présente marque de commerce est enregistrée pour 15 années à compter de la date d'enregistrement ou de la dernière date de renouvellement indiquée dans le document ci-joint, qui contient tous les renseignements sur l'enregistrement.

In accordance with the provisions of the *Trade-marks Act*, this trade-mark is registered for 15 years from the registration date or the latest renewal date shown on the attached particulars of registration.

*L. Régimbal*

Agent certificateur / Certifying Officer

3 avr/Apr 2002

Date

**EXHIBIT "18"**



Canada



OPIC    CIPO

(CIPO 8)

**APPL'N/DEM. NO   861 998     REGISTRATION/ENREGISTREMENT NO TMA537,375**

FILING DATE/DATE DE PRODUCTION:                                                19 nov/Nov 1997
REGISTRATION DATE/DATE D'ENREGISTREMENT:                                20 nov/Nov 2000

**REGISTRANT/PROPRIÉTAIRE ORIGINAL:**
MIRZA N. BAIG
2742 W. DEVON AVE.
CHICAGO, IL 60659
UNITED STATES OF AMERICA

**REP FOR SERVICE/REP POUR SIGNIFICATION:**
MIRZA N. BAIG
C/O AFTAB ALAM
8 MILE POST PLACE
APT # 514
EAST YORK
ONTARIO M4H 1E1

**TRADE-MARK/MARQUE DE COMMERCE:**



**DISCLAIMER/DESISTEMENT:**

The right to the exclusive use of all the reading matter except the word ZERO and the representation of the eleven point maple leaf is disclaimed apart from the trade-mark.

**WARES/MARCHANDISES:**

Spring water.

**CLAIMS/REVENDICATIONS:**

Declaration of Use filed November 13, 2000 on wares.

# Trademark/Service Mark Application, Principal Register

**Serial Number: 78716556**
**Filing Date: 09/20/2005**

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **MARK SECTION** | |
| MARK | IT'S ONLY NATURAL |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | IT'S ONLY NATURAL |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **OWNER SECTION** | |
| NAME | CCDA Waters, L.L.C. |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL | cpearlstein@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| **LEGAL ENTITY SECTION** | |
| TYPE | CORPORATION |
| STATE/COUNTRY OF INCORPORATION | Delaware |
| **GOODS AND/OR SERVICES SECTION** | |
| INTERNATIONAL CLASS | 032 |
| DESCRIPTION | Spring water. |
| FILING BASIS | Section 1(b) |
| **SIGNATURE SECTION** | |
| SIGNATURE | /ckp/ |
| SIGNATORY NAME | Caroline K. Pearlstein |

EXHIBIT "19"

| | |
|---|---|
| SIGNATORY DATE | 09/20/2005 |
| SIGNATORY POSITION | Trademark Counsel |
| **PAYMENT SECTION** | |
| NUMBER OF CLASSES | 1 |
| NUMBER OF CLASSES PAID | 1 |
| SUBTOTAL AMOUNT | 325 |
| TOTAL AMOUNT | 325 |
| **ATTORNEY** | |
| NAME | Caroline K. Pearlstein |
| FIRM NAME | CCDA Waters, L.L.C. |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL | cpearlstein@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| ATTORNEY DOCKET NUMBER | 271417 |
| OTHER APPOINTED ATTORNEY(S) | Dolores A. Moro, Kamau J. King |
| **CORRESPONDENCE SECTION** | |
| NAME | Caroline K. Pearlstein |
| FIRM NAME | CCDA Waters, L.L.C. |
| STREET | One Coca-Cola Plaza |
| CITY | Atlanta |
| STATE | Georgia |
| ZIP/POSTAL CODE | 30313 |
| COUNTRY | United States |
| PHONE | 404-676-5315 |
| FAX | 404-598-5315 |
| EMAIL | cpearlstein@na.ko.com |
| AUTHORIZED EMAIL COMMUNICATION | Yes |
| **FILING INFORMATION** | |
| SUBMIT DATE | Tue Sep 20 14:36:46 EDT 2005 |

| TEAS STAMP | USPTO/BAS-20516053142-200<br>50920143646743261-7871655<br>6-2006af1bb6734acdc6657be<br>b90ab88da-DA-1559-2005092<br>0142337263446 |
| --- | --- |

# Trademark/Service Mark Application, Principal Register

**Serial Number: 78716556**
**Filing Date: 09/20/2005**

## To the Commissioner for Trademarks:

**MARK:** (Standard Characters, see mark)
The mark consists of standard characters, without claim to any particular font, style, size, or color.
The literal element of the mark consists of IT'S ONLY NATURAL.
The applicant, CCDA Waters, L.L.C., a corporation of Delaware, residing at One Coca-Cola Plaza, Atlanta, Georgia, United States, 30313, requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended.
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).
    International Class 032: Spring water.
The applicant hereby appoints Caroline K. Pearlstein and Dolores A. Moro, Kamau J. King of CCDA Waters, L.L.C., One Coca-Cola Plaza, Atlanta, Georgia, United States, 30313 to submit this application on behalf of the applicant. The attorney docket/reference number is 271417.
The USPTO is authorized to communicate with the applicant or its representative at the following email address: cpearlstein@na.ko.com.
A fee payment in the amount of $325 will be submitted with the application, representing payment for 1 class(es).

### Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Signature: /ckp/   Date: 09/20/2005
Signatory's Name: Caroline K. Pearlstein
Signatory's Position: Trademark Counsel
Mailing Address:
    Caroline K. Pearlstein
    One Coca-Cola Plaza
    Atlanta, Georgia 30313
RAM Sale Number: 1559
RAM Accounting Date: 09/20/2005
Serial Number: 78716556
Internet Transmission Date: Tue Sep 20 14:36:46 EDT 2005
TEAS Stamp: USPTO/BAS-20516053142-200509201436467432
61-78716556-2006af1bb6734acdc6657beb90ab
88da-DA-1559-20050920142337263446

# IT'S ONLY NATURAL

BLUE Springs W. Co.



November 12, 2004

Ms. Caroline Pearlstein
Trade Mark Counsel
One Coca-Cola Plaza
Atlanta, GA 30313

Dear Ms. Pearlstein:

As per our conversation on October 20, 2004, enclosed is a letter that I received from
Charles H. McCoy, vice president, supply chain network of Coca-Cola Company. This
letter was in response to our letter (Sub: Gain The Unforgettable Marketing Edge), dated
January 12, 2003, to Jeff Dunn, President of Coca-Cola. Prior to our letter, we had few
communications with Mr. Dunn, regarding our program and its marketing potential.

Thanks again for your positive and cooperative response on October 20, 2004. Again, we
would like to resolve this matter in a positive way (with the help of our legal advisor) that
is mutually beneficial to both companies.

Good luck with the arrival of your new addition!

Sincerely,

Nad Mirza
President & Creative Director
Blue Springs W. Co.



EXHIBIT "20"

*Attn:*
*David Kiesler*

# The Coca-Cola Company

COCA-COLA PLAZA
ATLANTA, GEORGIA

January 11, 2005

ADDRESS REPLY TO
P. O. BOX 1734
ATLANTA GA 30301
404 676-2121

LEGAL DIVISION

**_Via Facsimile (773) 283-6471_**

Mr. Mirza N. Baig
Blue Springs W. Company
5066 N. Elston Avenue
Chicago, Illinois 60630

    **Re:**   diet Sprite Zero
           <u>Our Reference No. 257416</u>

Dear Mr. Baig:

This is further to various conversations regarding the above noted matter.

As we have discussed, we are unaware of any basis for a claim of trademark infringement relating to the diet Sprite Zero product of The Coca-Cola Company. We are aware of your pending application to register the mark "NATURALLY ZERO CANADIAN NATURAL SPRING WATER plus Design" (the "NATURALLY ZERO Mark"), serial number 75-374,316, filed on October 14, 1997, but do not believe, based on the information available to us, that our use of "DIET SPRITE ZERO," "SPRITE ZERO" and/or "ZERO" in any way violates any rights you may have in the phrase NATURALLY ZERO or the NATURALLY ZERO Mark. The reasons for this conclusion are several.

First, it is our understanding that your application was based on intent to use, and that action on the application has been suspended by the Trademark Office since January 1999. As you may know, the pendency of an intent to use application affords no substantive rights to the applicant until such time as a registration, supported by evidence of actual trademark use, is issued based on the application.

Second, we are unaware of any evidence of actual sales by you (or any entity associated with you) of any product bearing the phrase "NATURALLY ZERO" or the NATURALLY ZERO Mark. Under the U.S. trademark laws, trademark rights are based on bona fide use of a mark in commerce.

Third, even if you had acquired rights in the phrase NATURALLY ZERO or the NATURALLY ZERO Mark, those rights would be extremely limited at most and would not be infringed by The Coca-Cola Company's use of "DIET SPRITE ZERO," "SPRITE ZERO" or "ZERO," for several reasons.



EXHIBIT "21"

January 11, 2005
Page 2

In the first instance, the NATURALLY ZERO Mark for which you have sought registration is a composite mark that includes a number of design elements in addition to the words "NATURALLY ZERO," and The Coca-Cola Company has not used any mark that, in its entirety, is confusingly similar to your composite mark. Your mark, moreover, is for "natural spring water," whereas The Coca-Cola Company has used "DIET SPRITE ZERO," "SPRITE ZERO" and "ZERO" in connection with carbonated soft drinks. In addition, the "SPRITE" and "DIET SPRITE" marks are well-established, famous marks. Their presence together with the word "ZERO" serves to clearly distinguish our products and ensure that there is no likelihood of confusion with other products that may utilize the word "ZERO."

Perhaps most importantly, however, there are many companies and entities that use marks that comprise or contain the word "zero" for food, beverage and other products and that all coexist with each other. As a result, no party has exclusive rights to the word "zero," and the element "zero" is the only element that your NATURALLY ZERO mark has in common with any phrase or mark used by The Coca-Cola Company. As a result of such concurrent use by many parties, each party's rights are defined by the precise combination of elements that comprise that party's mark, and would only be infringed by use of a mark that is, in its entirety, confusingly similar to that combination.

For these reasons, we do not believe that there is any basis for any claim of infringement of your rights by The Coca-Cola Company in this matter. Although we understand that you may have submitted certain materials to our company for consideration in 2003, we are unaware of any basis for any claim that could arise as a result of such submission. If you believe that there is such a basis, we would appreciate your forwarding to us copies of any additional materials other than those already forwarded by you to us, that you believe give rise to such a claim and sharing with us any facts that you believe support such a claim.

We trust that the above is responsive to your request for an explanation of The Coca-Cola Company's position in this matter, and that we can now consider this matter closed. If, however, you believe that there are additional facts that should be brought to our attention, we would be interested in having an opportunity to review and consider such facts.

Sincerely,

Caroline Pearlstein
Trademark Counsel
Coca-Cola North America

cc:    Michael J. Kline
       Bruce W. Baber
       Joel M. Neuman
       139187

DAVID J. KIESLER & ASSOCIATES, LLC

ATTORNEYS AT LAW

161 N. CLARK STREET

SUITE 2500

CHICAGO, ILLINOIS 60601

(312) 920-6666

(312) 920-6667—FAX

DJK@KIESLERJUSTICE.COM


March 12, 2008


Ms. Caroline K. Pearlstein, Esq.                    <u>Via Email and U.S. Mail</u>
The Coca-Cola Company
One Coca-Cola Plaza
Atlanta, GA 30313


Re:    <u>Baig, et.al. v. The Coca-Cola Company</u>
       Your Reference No.: 257416

Dear Caroline:

Our demand letter is as follows:

## I. <u>FACTS</u>

My client, Mirza N. Baig, was born in Pakistan on April 5, 1962. He attended college in Pakistan, but left for the States in 1985 before he completed his degree. When he arrived in Chicago, he attended DePaul University and thereafter worked in the computer field. He is married and has two young daughters. He became a United States citizen in 2003.

The relevant chronology begins in 1995 when Mr. Baig was introduced to Russell Hopkins, a marketer and distributor of various beverages who owns the Beverage Network in Chicago. At the time, Mr. Hopkins was a distributor of, amongst others, Crystal Canadian brand Canadian spring water manufactured by Echo Springs Corporate Brands, Inc., out of Mississauga, Ontario. Under Mr. Hopkins's training and guidance, Mr. Baig decided to enter the beverage industry and commenced retail sales of Crystal Canadian bottled water, purchased through Hopkins, in 1996. Baig's target market included local gas stations, mini-marts, grocery stores and other similar retail establishments in the greater Chicago land area. As sales and demand grew, Baig obtained space in a large Chicago warehouse to store his inventory.

Baig continued selling Crystal Canadian to retailers in 1997, enlarging the geographic bounds of his market into Wisconsin and Indiana. He pursued Echo

**EXHIBIT "22"**

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 2 of 32

Springs for the exclusive distributorship of Crystal Canadian in the greater Chicago land area, but Echo Springs would not commit. When Mr. Baig discovered that another company was distributing Crystal Canadian in the south suburbs of Chicago, he decided to stop selling Crystal Canadian and create his own private label brand of Canadian spring water, something he had always wanted to do since meeting Hopkins two years earlier. Baig saw great potential in bottled spring water since the nation was becoming extremely health conscious, the medical field was recommending a significant amount of daily water consumption, and since the purity and clean taste of Canadian spring water made it  a healthy and refreshing alternative to carbonated soft drinks loaded with artificial sweeteners and chemicals.

By the summer and early fall of 1997, Mr. Baig was planning all aspects of his new company, a company he had decided to name Bluesprings W. Co. after the fabled Blue Mountains of Canadian Rockies. He raised capital, designed his business model, and lined up Canadian bottlers. All he needed was a unique and distinct name for his product, one that would capture the purity and clean taste of his product, while also emphasizing its beneficial health aspects. He spent hours and days poring through dictionaries for unique words and combinations. He used scrabble pieces to assist. He spelled words backwards. Nothing clicked.

Struggling for a unique name, all Baig could think about, over and over, was one of his Crystal Canadian customers, an older Eastern Indian man who owned a local gas station. Whenever Baig would stop by to sell his bottled water, this customer would always criticize and belittle Baig's product to get a lower price. "It's only water…water is water," his customer would routinely tell Baig in a haggling way. These words would be played in his mind's ear dozens of times until one day in September, 1997, Baig thought to himself, "Water is water. Water is nothing. Nothing is nothing. Zero!" Instantly, Mr. Baig knew he had his name, and started to map out various marketing strategies and concepts with Hopkins's input and marketing expertise.

Mr. Baig knew that the design of the label would be critical to Zero's success. He spent weeks in the fall of 1997 sketching dozens upon dozens of drawings and revisions until he came up with not only a rough label design, but an entire marketing concept by which he would describe his pure spring water as "Naturally Zero" Canadian Natural Spring Water. (Exhibit "A"). When he was satisfied with his final product, he hired a graphic designer to fine tune the design. (Exhibit "B").

On October 14, 1997, Baig filed his U.S. Trademark application, seeking to register both the word mark, "NATURALLY ZERO" and the "NATURALLY ZERO" design. (Exhibit "C"). Baig filed an application to register his trademarks in Canada with the Canadian Intellectual Property Office on November 19, 1997. (Exhibit "D"). On May 5, 1999, Baig's Canadian Trademark application was

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 3 of 32

advertised. On November 20, 2000, Baig's Canadian Trademark for "NATURALLY ZERO" and design were registered. (Exhibit "E"). Significantly, Baig's Canadian registration granted him the exclusive right in Canada to use the word "ZERO" as a mark, or part thereof, for soft drinks: "The right to the exclusive use of all reading matter **except the word ZERO** and the representation of the eleven point maple leaf is disclaimed apart from the trade-mark." (Emphasis Supplied; Capitals Original).

In the early part of 1998, Baig refined the Naturally Zero logo and focused on manufacturing logistics. On March 12, 1998, he incorporated Bluesprings Water Co. under Illinois law to manufacture and sell Naturally Zero. He selected a Canadian bottler and label supplier, Breuvages Drummond out of Quebec, as his manufacturer and bottler. He arranged for more warehouse space in the Chicago. He collaborated with Hopkins on marketing ideas and concepts. In April, 1998, he was advised by his manufacturer that the final label design was ready and that production could start. "Naturally Zero" was officially born on May 14, 1998, when Baig received delivery of his first 80 cases. (Exhibit "F").

Baig became unhappy with the level of service he was receiving from Breuvages Drummond and decided to switch manufacturers. In the fall of 1998, Baig entered into an agreement with Echo Springs in Ontario to produce Naturally Zero. Baig also retained a new label manufacturer. By October, 1998, he was in full production, and would typically place orders for 1,000 to 1,500 cases of Naturally Zero at a time. (Exhibit "G"). His market was growing, both geographically and in sales volume. Attached hereto as Exhibit "H" are two typical orders Baig would place with Echo Springs for his Naturally Zero water.

In early 1999, Baig knew he needed to focus on the marketing aspects of his product since his ultimate goal of going national would require significant regional exposure. It was at this time that Baig collaborated closely with Hopkins to develop a strategic marketing plan that consisted of press releases, trade shows, exposure in trade publications and advertising. Due in part to Hopkins' connections in the beverage industry, Naturally Zero got its first big break when it appeared in the March 1999 volume of <u>Beverage Industry</u> magazine:

> "Total Zero. The Beverage Network, Chicago, is representing new bottled water called Naturally Zero Spring Water: The product's name lets its content speak for itself – zero calories, zero carbonation, etc. Naturally Zero is a Canadian water product. For more information, call 847/673-4614" (Exhibit "I").

Interestingly, a promo for the release of "Dasani" brand purified water sits on the same page, right next to the spot for Naturally Zero: "Dasani hits the water

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 4 of 32

market. The Coca-Cola Co. has introduced its long-anticipated bottled water, Dasani…" I suspect more than one executive in the North America Hydration Division at Coca-Cola Company observed the spot about Naturally Zero.

Two months later, Baig got a huge break when the May, 1999, volume of Soft Drinks International contained a feature Article on Naturally Zero. (Exhibit "J"). Atlanta beat writer and president of Beverage Marketing USA, Richard Davis, interviewed Baig for the article, entitled "Much ado about 'nothing'", stating:

- "The Beverage Network(Hopkins) has launched a bottled water infused with 'nothing' called Naturally Zero Canadian Natural Spring Water…It aims to expand bottled water's appeal to generation X-ers as a Y2K drink."

- "**Being the first to market surely has an advantage.** But it's even more important that the product offering fills an important need."

- "Nadeem Mirza Chief Executive Officer and founder of Bluesprings Co's Naturally Zero knew the exact ingredients he needed to create a bottled water brand – nothing…"

- "His formula for a bottled water about 'nothing', or rather with 'nothing', is viewed as the right mix according to Russ Hopkins, President of The Beverage Network. 'The Naturally Zero label is intriguing in that the brand name challenges the consumer to ask a key question concerning why people prefer bottled water over other drinks,' according to Hopkins. 'It appears to me that Naturally Zero's distinctive label is likely to spark a good deal of consumer interest due to its unique, modern look and the valid message it projects,' according to Hopkins."

- "The brand's initial promotional theme features a rather humorous, tongue-in-cheek claim, namely, 'unleaded, premium calorie-free' with the tag line 'Could you ask for anything less?'"

As confirmation that good things come in threes, Naturally Zero was featured in the May 15, 1999 volume of Beverage World magazine as "Plenty of Nothing":

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 5 of 32

- "Counting down past one, Naturally Zero attempts to have it all by having nothing: 'No calories, no fat, no carbonation, no cholesterol...'"

- "In other words, *nada* besides water. Well, there's something behind this Zero, namely, the 'fabled Blue Mountains of Canada' adorning the label."

- "The source is meant to imply 'cold, refreshing, pure.' Guess there really is something there. 773/381-9693." (Exhibit "K").

Baig's marketing and promotion of Naturally Zero were paying off as his sales in 1999 were increasing and his geographic market was growing. It had expanded beyond state lines and well into Wisconsin and Indiana. Baig needed to increase his warehouse space as well.

By early 2000, Baig felt that partnering with a national charitable organization that supported and promoted health-oriented eating and healthy lifestyles would be an excellent way of increasing Naturally Zero's exposure and getting its message out, while helping a worthy cause at the same time. He initially approached the National Kidney Foundation and met with certain officers who were very interested in a partnership. He and his product were enthusiastically received, and he was told that the NKF had agreed to grant a licensing agreement to Bluesprings Water Co., and that it was just a matter of formal board approval. Baig then had a special label designed containing the NKF logo. (Exhibit "L"). Unfortunately, and for reasons never explained to him, Baig's contacts at the NKF advised Baig that the board would not agree to partner with Bluesprings.

Undeterred, Baig approached the American Kidney Fund in the fall of 2000, and ultimately met with its Director of Special Gifts, Kathleen Richmond. Baig's presentation was extremely well received. In a letter to Baig dated December 8, 2000, Ms. Richmond stated, "We are very excited about the partnership opportunities with 'Naturally Zero.'" (Exhibit "M"). Negotiations commenced and were completed a few weeks later. On December 27, 2000, Baig executed a Royalty License Agreement with the AKF under which Bluesprings was granted the right to display the AKF logo on bottles of Naturally Zero in exchange for payment of 4% of gross receipts. (Exhibit "N"). Baig re-designed the Naturally Zero label and obtained approval from the AKF. (Exhibit "O").

On February 27, 2001, the AKF published a press release, stating, in part:

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 6 of 32

"(Rockville, MD) Most consumers know that drinking 8 to 10 glasses of water per day is a universal prescription for healthy living. The medical expert's advice is particularly true in maintaining good kidney health, so the American Kidney Fund (AKF) and Bluesprings Company have teamed up to educate the public about the causes, treatment and prevention of Kidney failure.

Nadeem Mirza, President of Bluesprings Company, says each bottle of its 'Naturally Zero Spring Water' will feature the American Kidney Fund logo, as well as information about AKF and its programs. 'Naturally Zero Spring Water' will be distributed everywhere bottled water is sold, with a special emphasis on health-oriented locations such as clinics and hospitals. A portion of the proceeds from the sales of the water go to support the American Kidney Fund.

Expressing confidence that consumers will get the AKF message, Mirza said, 'When called upon, members of the business community and other institutions will do their part in making 'Naturally Zero' widely available to consumers. This will advance our public awareness campaign and will provide AKF with much-needed funds to directly help kidney patients.'"(Exhibit "P").

In early 2002, with the goal of expanding sales into Canada, Bluesprings W. Co. entered into a sublicense agreement with Clarus Canadian Springs Company whereby Baig granted Clarus the right, with the AKF's approval, to allow Clarus to market and sell Naturally Zero in Canada in exchange for a percentage of gross sales. (Exhibit "Q"). Clarus thereafter commenced selling Naturally Zero in the greater Winnipeg area.

Baig was coming closer to his dream of taking his Naturally Zero national. His targets included gas station chains, grocery stores, chain stores, a variety of retail partners and soft drink companies. Baig was constantly strategizing with Hopkins and taking advantage of Hopkins' contacts in the industry. In fact, one of Hopkins business contacts was The Coca-Cola Company's former president of its North American Division and Hydration Unit, Jeff Dunn.

In December, 2002, Hopkins phoned Dunn for the purpose of discussing and promoting the entire concept of Naturally Zero and to sow the seed for its potential sale to Coca-Cola. According to Hopkins, Mr. Dunn sounded extremely interested and, at the end of their phone call, enthusiastically asked Hopkins to send him some promotional material. Hopkins quickly relayed the contents of the phone conversation to Baig, who was extremely excited by the thought of

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 7 of 32

sending a letter and promotional information on his "child" – the child that he spent the last 5-6 years of his life nurturing and developing - to the beverage division president of the largest soft drink company on the planet.

On January 12, 2003, Baig prepared his letter to Jeff Dunn. (Exhibit "R"). In the letter, Baig started with a brief history of his product, "Naturally Zero," and its initial marketing theme regarding "A drink about nothing." Baig explained that in the company's February 1999 press release, the major theme was simply "nothing." This was intended to promote the purity of bottled Canadian spring water. Baig then referenced the trade publications which had written about Naturally Zero, and enclosed copies of the articles from <u>Soft Drink International</u>, <u>Beverage World</u> and <u>Beverage Industry</u> (Exhibits "I", "J" and "K"). He also enclosed a print out of a page of the AKF's website where Bluesprings and the Naturally Zero affiliation was discussed. (Exhibit "S").

Baig's hopes and dreams, unfortunately, were short-lived. By letter dated February 7, 2003, Mr. Charles H. McCoy, Coca-Cola's Vice President of Supply Chain Network, advised Baig that his letter was "in response to your letter to Jeff Dunn dated January 12, 2003 regarding 'Naturally Zero.'" (Exhibit "T"). After thanking Mr. Baig for "sharing this opportunity" with The Coca-Cola Company, McCoy, regretfully, wrote: "We have reviewed the information you provided and have decided not to pursue this opportunity after addressing strategic priorities."

This letter from Mr. McCoy, the original of which and its envelope we still maintain, is critical since it establishes two very important facts. First, it confirms that Dunn received Baig's package since he had to have given it to McCoy with instructions to write Baig and disclaim any interest. Second, it proves, simply, that The Coca Cola Company executives very high up the ladder knew of "Naturally Zero," which is contrary to your claim that no one at The Coca-Cola Company knows anything about Mr. Baig's trademark or product.

On October 20, 2003, obviously unbeknownst to Baig, The Coca-Cola Company filed its application with the PTO to register its claimed "SPRITE ZERO" trademark on an intent to use basis. On August 31, 2004, Coca-Cola filed an application in the PTO to register the word mark, "Nothing is lighter than Zero." However, the tag lines and slogans Baig started using years earlier with his Naturally Zero marketing literature included, "A drink about nothing," "There's nothing better than absolutely nothing" and "Could you ask for anything less?" (Exhibit "U"). I submit that the distinct similarities and confusingly similar meanings amongst the slogans were not a coincidence.

Baig's plans came to a screeching halt on September 3, 2004, when he was driving southbound on I-294 in Chicago near O'Hare airport. When he looked at one of the numerous billboards along the expressway, he saw an advertisement for "Diet Sprite Zero." All he could focus on was the "ZERO." He

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 8 of 32

was stunned, shocked and in disbelief. The very name he had invented, developed, marketed, placed on a label, manufactured and sold, and had devoted 7 years of his life to building, and **the very name he had presented to The Coca-Cola Company the year before**, was appearing on a nationally known soft drink manufactured by the largest beverage company in the world. The circumstances were just too suspicious for Baig to believe that Coca-Cola developed the name coincidentally. Seconds later, while driving past the billboard, he thought to himself that Coca-Cola had stolen his Naturally Zero trademark by using, verbatim, the dominant feature of his mark- "ZERO"-- and simply inserting it after the word, "Sprite." He was outraged.

When he discussed the issue with Hopkins that same day, Hopkins, without hesitation, concurred that Coca-Cola had stolen his trademark and brand name. Baig was devastated. He knew that Coca-Cola's use of the name Zero on Diet Sprite had effectively eliminated any chance, whatsoever, that Baig had of selling the product to a national retailer. What retailer, in its right mind, would buy trademark rights to a product named "Naturally Zero" and have to take on the Coca-Cola Company, a company known to zealously protect its famous marks, in an infringement claim based on the "Sprite Zero" trademark? His plan was virtually dead.

But, if any doubts remained about Naturally Zero's ability to thrive, grow and become a national brand in the post-Sprite Zero era, they would be eliminated during the following spring (of '05) when The Coca-Cola Company launched Coca-Cola Zero with a massive advertising and publicity campaign that surely cost well into the tens of millions of dollars worldwide. And, to be sure, Coca-Cola Zero was followed by the launch of Coca-Cola Cherry Zero, Coca-Cola Vanilla Zero, Sprite Zero, Fanta Zero, Pibb Zero and Vault Zero, to name a few.

In October, 2004, an associate of Mr. Baig's left a message with you to discuss the issue of Diet Sprite Zero's infringement of Baig's trademark rights in Naturally Zero. You ultimately spoke with Mr. Baig on October 20, 2004. Mr. Baig followed up with a letter to you dated November 12, 2004. (Exhibit "V"). Fiona Orr responded with a letter dated December 14, 2004. (Exhibit "W"). You sent Mr. Baig a letter dated January 11, 2005, in which you detailed numerous reasons why you felt that Baig did not have a basis for a claim of trademark infringement. (Exhibit "X"). You concluded by asking Mr. Baig to forward any additional material he had that would form a basis for his claims.

At this same time, Baig was experiencing serious health problems. His right ear had become very painful and was draining fluid. Years earlier, Baig had developed a cyst inside of his left ear and had undergone surgery which left him practically deaf in the left ear. Baig feared he was developing the same problem in his right ear. In early 2005, Baig's right ear problem became so bad that he

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 9 of 32

went to an otolaryngologist who confirmed Baig's suspicion -- that he had developed an inner ear cyst known as Cholesteatoma. Baig underwent tympnomastoidectomy and tympanoplasty surgery on March 29, 2005. (Exhibit "Y"). His surgeon subsequently told Baig that it had been a very difficult surgery since his sigmoid and facial nerves had been exposed, he had a hole in his dura (the membrane covering the brain) and since the surgeon had to cut two holes, instead of one, in his auditory canal.

On March 4, 2005, 3 ½ weeks before Baig underwent surgery, Coca-Cola filed its application in the PTO to register "Coca-Cola Zero." On May 5, 2005, Coca-Cola filed its application in the PTO to register "Fanta Zero."

In May, 2005, Baig left the States for an extended trip to Pakistan hoping to regain his health. His ear was still ailing him. He was constantly dizzy and was still experiencing balance problems. He had virtually no hearing in his left ear and diminished hearing in his right ear.

On June 28, 2005, Coca-Cola filed its application to register "Coca-Cola Zero" with the Canadian Intellectual Property Office. On July 6, 2005, Coca-Cola Company filed its application to register "Coke Zero" with the PTO.

Mr. Baig returned to the United States in December, 2005, still having problems with his balance and dizziness. In February, 2006, Baig travelled to India to undergo surgery to his left ear to improve his hearing. He was not able to afford health insurance at the time, and the same surgery in India was significantly less expensive than in the States. The surgery was a success and Baig returned to Chicago in the spring of 2006.

Defeated, practically penniless, and with a wife and two children to support, Baig began working at a local gas station to make ends meet. He consulted with a few attorneys about pursuing his claims against Coca-Cola Company but all wanted hefty retainers that Baig simply could not afford. Mr. Baig's last contact with you, before hiring our firm, occurred in the spring of 2007 when one of Mr. Baig's friends, a Mr. Kamal, had a discussion with you about Mr. Baig's claims. Of course, I sent you an introduction letter dated October 29, 2007.

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 10 of 32

## II.    BAIG'S TRADEMARK OWNERSHIP RIGHTS

### A.    Common Law Trademark Rights and Rights under Federal Law -
### Lanham Act 15 U.S.C. §§ 1057(c), 1125(a) and 1127

Traditionally, trademark rights have been based on first and continuous use of a mark in commerce in connection with goods or services. Common law trademark rights, therefore, arise through the use of a mark in connection with one's goods or services. Indeed, Section 1057(c) of the Lanham Act provides that a prior user without a trademark registration has rights that are superior to any rights of a subsequent registration owner. Section 1127 defines "use," for goods, as a *bona fide* sale of marked products. Ownership of federal trademark registration is not necessary to enforce trademark rights, and the owner may sue for infringement under 15 U.S.C. § 1125(a). Two Pesos, Inc. v. Taco Cabana, Inc., 112 S. Ct. 2753 (1992).

The facts set forth above clearly establish that Baig began using his "NATURALLY ZERO" trademark in commerce in early 1998 and continued using it several years thereafter, with the ultimate business plan of going national through its sale or licensing to a large retailer. Since Baig sold hundreds of thousands of bottles of Naturally Zero during this time frame, he has clearly "used" his trademark in commerce by making *bona fide* sales of his product containing the Naturally Zero mark. Moreover, Baig started selling Naturally Zero in 1998, a time well before The Coca-Cola Company commenced selling any of its Zero products on the market and well before it filed its applications to register any of its purported Zero trademarks. Baig therefore has common law trademark rights that are superior to The Coca Cola Company's rights and is entitled to seek redress under § 1125(a) of the Lanham Act for Coca-Cola's infringement of his trademark, and for unfair competition.

While Baig's 1997 application filed with the PTO to register "Naturally Zero" was ultimately deemed abandoned years later, the PTO's handling of his application, and its legal position on certain issues, are very interesting. Baig personally prepared and filed his "Naturally Zero" application for U.S trademark registration on October 3, 1997. (Exhibit "C"). In response to his application, the PTO sent Baig a request for office action dated April 6, 1998, refusing registration, in part, under Section 2(d) of the Trademark Act, since the examining attorney felt that Baig's use of "Naturally Zero" in connection with the sale of his bottled water was likely to cause confusion with respect to "Zero Tea," a registered trademark used by a company which manufactured dietary supplements for weightlifters, including its Zero Tea, a sports drink.

In addition, the examining attorney felt that there may be a likelihood of confusion regarding a previously filed application for the mark, "Canadian Naturelle Spring Water." Baig did an admirable job responding to the office action request, writing a legal brief addressing the likelihood of confusion and other issues such as the disclaimer of certain words. Significantly, however, the examining attorney **did not** require Baig to disclaim the use of the terms "Zero" or "Naturally Zero."

The PTO replied to Baig's response by office action dated January 28, 1999. The examining attorney continued her Section 2(d) refusal on the ground that the dominant portion of both Baig's "Naturally Zero" mark and "Zero Tea" was the term "Zero" which she felt was still likely to cause confusion, even though Baig showed that the channels of trade were different. Nonetheless, the examining attorney concluded that her research showed that water and sports drinks are commonly sold under the same trademark. There was also concern there could still be a likelihood of confusion between Baig's product and the application for "Canadian Naturelle Spring Water." The PTO ultimately suspended Baig's application pending the disposition of this application.

Baig did not receive any further correspondence from the PTO for the next **six years** until he received a request for office action dated April 19, 2005, only three weeks after his surgery. For some inexplicable reason known only to perhaps the examiner, the PTO's prior Section 2(d) refusal based on the "Canadian Naturelle Spring Water" and "Zero Tea" marks was withdrawn. Even more surprising was the PTO's request for an amended disclaimer of the words "Naturally Zero" and the numeral "0" apart from the mark as shown.

Of almost improbable coincidence, however, is the fact that The Coca-Cola Company filed its application to register its "Coca-Cola Zero" mark on March 4, 2005. One could certainly make the argument that the PTO's "about face" on the likelihood of confusion regarding "Naturally Zero," and its decision to now require the disclaimer of "Naturally Zero," greatly benefitted The Coca-Cola Company and its application to register "Coca-Cola Zero," whether the benefit was intended or not.

Baig was devastated when he received this request for action. He was being told that the original, eye-catching design of his Naturally Zero trademark, which had never been used to identify and market bottled water in the past, and which was the entire theme of Baig's product and marketing campaign, could not be protected. In fact, Baig's idea was so original that, other than Zero Tea, no other soft drink or bottled water manufacturer had ever even used the term "Zero" as part of its mark before Baig filed his application in 1997.

Baig was in no physical condition to respond to this action request. When he did become healthy and strong enough to respond, protecting his dream

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 12 of 32

seemed hopeless. The PTO was not letting him register "Naturally Zero" as a trademark and The Coca-Cola Company was now pouring millions of dollars into its Zero advertising campaign and launching a new Zero product almost monthly. As a result, he saw his efforts as completely futile and did not respond. On November 15, 2005, he received a notice of abandonment for his application.

### B.  Trademark Rights Under Canadian Law- The Trade- marks Act - R.S., c. T-10, s. 19

Baig filed his application to register the "Naturally Zero" mark and design with the Canadian Intellectual Property Office on November 19, 1997. (Exhibit "D"). Significantly, Baig was not required to disclaim the right to the exclusive use of the word "Zero," demonstrating, at least from the CIPO's analysis and research, that the word "zero," and certainly in conjunction with the adjective "Naturally," was distinctive and unique enough from the name of **any** other beverage previously registered under the Canadian Trade-marks Act and was thus unlikely to cause confusion. After two requests for action on Baig's part by CIPO, and Baig's satisfactory compliance, he was allowed to publish his request in the Canadian national Register on May 12, 1999. Baig's Canadian trademark registration for "NATURALLY ZERO" and design were granted on November 20, 2000. (Exhibit "E").

Under Section 19 of the Canadian Trade-marks Act, the registration of a trademark with the CIPO with respect to wares or services gives the trademark owner the exclusive right to use the trademark throughout Canada with respect to those goods or services. R.S., c. T-10, s. 19. Regarding Baig's usage of his trademark in Canada, Section 4(3) of the Act states that a trademark that is marked in Canada on wares or on the packages in which they are contained, is deemed to be used when the goods are exported from Canada.

Here, the majority of the Naturally Zero bottled water manufactured by Baig's Canadian Suppliers was marked with Naturally Zero trademark in Canada and was exported from Canada to the United States. The remainder of the water was bottled in Canada with Baig's trademark for the sale in Canada through Baig's Canadian distributor, Clarus Canadian. Accordingly, Baig clearly used his trademark in Canada for several years after it was registered. Finally, since five years have elapsed since the time that Baig's trademark was registered, it has become incontestable under Section 17(2) subject to certain exceptions.

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 13 of 32

# III. CAUSES OF ACTION

### A.    Trademark Infringement by Reverse Confusion
### Lanham Act §43(a) - 15 U.S.C. § 1125(a)

Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a), which affords protection for both registered and unregistered marks, provides in part:

> "(a) **Civil action**
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...
>
> \*            \*            \*            \*
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

To prove trademark infringement, a plaintiff must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services.

In assessing the likelihood of consumer confusion, the 7th Circuit considers seven factors: (1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the complainant's mark, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its product as that of another. At the same time, although no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important considerations. Eli Lilly & Company v. Natural Answers, Inc., 233 F.3d 456 (7th Cir. 2000).

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 14 of 32

The showing of proof plaintiff must make on the likelihood of confusion depends on whether the goods or services offered by the trademark owner and the alleged infringer are in direct competition. "Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." <u>Fisons Horticulture, Inc. v. Vigoro Industries, Inc.</u>, 30 F.3d 466, 472 (3rd Cir. 1994). Moreover, likelihood of confusion may be found where the infringer's use of plaintiff's mark results in confusion as to the origin of **plaintiff's product**, namely, reverse confusion. <u>Fuji Photo Film Company, Inc., v. Shinohara Shoji Kabushiki Kaisha</u>, 754 F.2d 591, 596 (5th Cir. 1985). Trademark infringement occurs also "when the use sought to be enjoined is likely to confuse purchasers with respect to ... [the products'] endorsement by the plaintiff, or its connection with the plaintiff." <u>Id</u>. at 596.

The case involving Mr. Baig and The Coca-Cola Company is a classic, textbook case of reverse confusion. With forward infringement cases, one expects that the new or junior user of the mark will use to its advantage the reputation and good will of the senior user by adopting a similar or identical mark. Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services. <u>Sands, Taylor & Wood Company v. The Quaker Oats Company</u>, 978 F.2d 947, 957-958 (7th Cir. 1992); <u>Fisons Horticulture, Inc. v. Vigoro Industries, Inc.</u> , 30 F.3d 466, 474-475 (3rd Cir. 1994).

> "In reverse confusion, the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. **The result is that the senior user loses the value of the trademark--its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets**." <u>Id</u>. at 474-475. (Emphasis Supplied).

Without the recognition of reverse confusion, smaller senior users would have little protection against larger, more powerful companies who want to use identical or confusingly similar trademarks. <u>Fisons Horticulture, Inc. v. Vigoro Industries, Inc.</u> , 30 F.3d at 475. The logical consequence of failing to recognize reverse confusion would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor. If the law is to limit recovery to passing off, anyone with adequate size and resources can adopt

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 15 of 32

any trademark and develop a new meaning for that trademark as identification of the second user's products. Id. at 475.

The objectives of the Lanham Act--to protect an owner's interest in its trademark by keeping the public free from confusion as to the source of goods and ensuring fair competition--are as important in a case of reverse confusion as in typical trademark infringement. Were reverse confusion not a sufficient basis to obtain Lanham Act protection, a larger company could with impunity infringe the senior mark of a smaller one.

Placing this case in the proper context, the significant factors used by the courts to assess likelihood of confusion will now be addressed.

## 1.    The similarity between the marks in appearance and suggestion

It beyond argument that the salient or dominant feature of Mr. Baig's "NATURALLY ZERO" trademark is the word "ZERO" which appears in large capital letters centered in the "0":



Compare Baig's label to the first incarnation of the initial misappropriation of The Coca-Cola Company of Baig's "NATURALLY ZERO" trademark:

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 16 of 32



Compare Baig's "NATURALLY ZERO" label to some of the later ZERO designs for the Coca-Cola family:



Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 17 of 32

Whether the product is Sprite Zero or Coca-Cola Zero or Fanta Zero, the salient, incontestably dominant, features of Coke's products is "Zero." In fact, the PTO examiner who reviewed Baig's Naturally Zero application said it perfectly:

> "Likelihood of Confusion
>
> The marks in question are NATURALLY ZERO CANADIAN NATURAL SPRING WATER and design, and ZERO TEA. The dominant portion of the applicant's mark is ZERO, which is further emphasized by the large number zero that appears in the mark. ZERO is also the dominant element of the registrant's mark…"

The PTO went on to hold that where the dominant parts of the parties' marks were identical, the likelihood of confusion existed.

In comparing two marks to determine whether they are confusingly similar, the 7th Circuit follows the rule that "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." Meridian Mutual Insurance Company v. Meridian Insurance Group, Inc., 128 F.3d 1111, 1115 (7th Cir. 1997). In determining whether two marks are similar, the comparison is made in light of what happens in the marketplace, and not merely by looking at the two marks side-by-side. Id. at 1115.

There is little doubt that Diet Sprite Zero and Coca-Cola Zero were in direct competition with Naturally Zero in the relevant markets. Carbonated soft drinks and bottled water have fought for the same customer base for over a decade, namely, customers who are purchasing liquid refreshment and frequently choose between pop and water on any given day. Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself to determine likelihood of confusion. In that regard, the patent similarities between the "ZERO" in the NATURALLY ZERO design and the various incarnations of The Coca-Cola Company's ZERO designs are evident. No additional argument is really required on this point with the exception of one parting comment. A strong argument can be made that to appear as though Coca-Cola did not steal Baig's "ZERO" mark, Coca-Cola deliberately designed its "Zero" logo slightly different--with a capital "Z" but with the "e", "r" and "o" in lower case; Baig's design used all upper case letters.

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 18 of 32

## 2.   The similarity of the products

The products here, unequivocally, are similar. Both are non-alcoholic beverages people drink for taste and hydration. Coca-Cola is likely 98.87% water by volume. Hence, both Sprite Zero and Coca-Cola Zero consist of 98.87% of the identical chemical that makes up Naturally Zero - water. The products have near identical uses. Even if soft drinks is technically a separate market from bottled water, modern trademark law prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be "closely related" to the senior user's. International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1089 (7th Cir. 1988).

A "closely related" product is one "which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner. Sands, Taylor & Wood Company v. The Quaker Oats Company, 978 F.2d 947 (7th Cir. 1992); Fuji Photo Film Company, Inc., v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591 (5th Cir. 1985)(Goods are so closely related that purchasers of the respective products could reasonably expect them to have a common source in view of a similarity of the marks).

Little imagination is really required from the average consumer on this test since both The Coca-Cola Company and PepsiCo already manufacture their own brands of bottled water. Therefore, the reasonable consumer would have no problem looking at a bottle of "Naturally Zero" brand Canadian Spring water and, through reverse confusion, believe it to be just another in a long line of Coca-Cola Zero products, perhaps Coca-Cola's venture into Canadian spring water in addition to its purified Dasani brand water.

Protecting the trademark owner's interest in capitalizing on the good will associated with its mark by moving into new markets is especially compelling in the context of a reverse confusion case, where the junior user so overwhelms the senior user's mark that the senior user may come to be seen as the infringer. Such a scenario is particularly likely if the senior user were to attempt to expand into the precise field where the junior user has created a strong association between its product and the senior user's mark. Sands, Taylor & Wood Company v. The Quaker Oats Company, 978 F.2d 947 (7th Cir. 1992).

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 19 of 32

### 3.    The area and manner of concurrent use of the products

For the reasons set forth in the preceding sub-section, both Naturally Zero and Coca-Cola Zero have nearly identical areas and manners of concurrent use.

### 4.    The degree of care likely to be exercised by consumers

A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusion. "[B]uyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse." <u>Sally Beauty Company, Inc. v. Beautyco, Inc.</u>, 304 F3d 964, 975 (10th Cir. 2002). Accordingly, items purchased on impulse are more likely to be confused than expensive items, which are typically chosen carefully. <u>Id</u>. The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase.

I believe we can agree that purchasers of soda pop or bottled water exercise little, if any, care in selecting beverages.

### 5.    The strength of the complainant's mark

This factor is to be weighed much differently and has far less significance is a case of reverse confusion. As the <u>Fisons</u> Court explained:

> "[In] a case of reverse confusion, the evidence of commercial strength is different from what we expect in a case of forward confusion, where the junior user tries to palm off his goods as those of the senior user. In forward confusion, the junior user trades on the senior user's good name; it is therefore saved much of the expense of advertising to create market recognition of its mark. In reverse confusion, the junior user is typically a wealthier, more powerful company who can overwhelm the market with advertising. An aggressive junior user may thereby achieve greater commercial strength in a short period of time than the senior user has after years of marketing its product." <u>Fisons Horticulture, Inc. v. Vigoro Industries, Inc.</u>, 30 F.3d at 479.

Thus, in reverse confusion, the mark of the senior user is typically weaker commercially than that of the junior user. The above quote describes the precise factual scenario which occurred in the instant case. Mr. Baig spent years

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 20 of 32

developing and marketing Naturally Zero. Then, after seizing the opportunity (and the concept), a much more powerful and significantly wealthier newcomer used the identical portion of Baig's trademark - the dominant portion of that mark - in conjunction with its own famous marks and positively overwhelmed the market with millions of dollars of advertising.

As evidence of the genesis of this marketing blitz -- which is still in mid-stream — Baig would cite to The Coca-Cola Company's response to PTO office action dated May 3, 2004, in its application to register the "SPRITE ZERO" mark, Serial Number 78/316078.

6.    **Any evidence of actual confusion**

We expect evidence on this issue in the future.

7.    **The defendant's intent to palm off its product as that of another**.

The courts have made clear that the element of intent, while of critical importance in all infringement cases, is also assessed differently in a case of reverse confusion. In the forward confusion setting, the junior user tries to palm off his product as that of the more famous, senior user. But, with reverse confusion, the junior user does not seek to trade on the good will and name of the senior user; instead he misappropriates the mark of the senior user and overwhelms it. Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d at 479-480.

When it can be shown that the defendant selected its mark with the intent to exploit plaintiff's mark, this will **almost always be strong evidence of a likelihood of confusion, and may lead to a presumption of infringement** Sally Beauty Company, Inc. v. Beautyco, Inc., 304 F3d at 973 (proof of intent leads to a presumption of likelihood of confusion). Bad faith alone may support a claim for infringement. Fuji Photo Film Company, Inc., v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d at 596-597. As 7th Circuit has observed:

> "The fact that one actively pursues an objective greatly increases the chances that the objective will be achieved, and we have no doubt that this general principle applies here. For this reason, a defendant's intent is an 'important factor,' and can even be weighed more heavily than other factors." Eli Lilly

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 21 of 32

& Company v. Natural Answers, Inc., 233 F.3d 456, 465 (7th Cir. 2000).

Direct evidence of intentional copying is not necessary to prove intent. Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center, 109 F.3d 275, 286 (6th Cir.1997). Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying. Id. Thus, a defendant's actual knowledge of plaintiff's mark may prove bad-faith intent to trade on the plaintiff's mark, particularly when the plaintiff's mark is strong and the parties' products are similar. However, even if a defendant adopted a confusingly similar mark in good faith, it is still liable for infringement since good faith is not a defense to trademark infringement. Id. Thus, Baig is under no obligation to submit evidence of The Coca-Cola Company's bad faith or intent to infringe.

It is crystal clear in this case that even ignoring the element of Coca-Cola's intent, the likelihood of confusion between the subject marks is manifest. The similarity of the marks, the similarity of the products, the area and manner of their concurrent use, the low degree of care exercised by those buying the products and the strength of Baig's mark lead to practically only one conclusion, and that conclusion is more than adequate to support a claim for substantial damages against The Coca-Cola Company under Section 43(a).

But, when evidence of The Coca-Cola's Company's bad faith and deliberate intent to steal Baig's trademark, concept slogans and marketing ideas is factored into the analysis, The Coca-Cola Company's liability for infringement, I submit, will be a certainty. While it will be interesting to see if Mr. Dunn tells the truth, it matters not. There will be evidence, at least from our side, that Mr. Hopkins had a very positive phone call with your former president, Jeff Dunn, in December of 2002, about the "Naturally Zero" brand of bottled Canadian spring water. Dunn specifically requested Hopkins to send information to his attention. In fact, Dunn told Hopkins something very specific and somewhat private during this conversation that will lend much credibility to Hopkins' testimony- a fact that can be corroborated from Dunn's personnel file.

Of course, the Hopkins' phone call and the receipt of Baig's package sent to Dunn can be denied by Coca-Cola. What can't be denied is Mr. McCoy's letter to Baig a month later, a letter which confirms Coca-Cola's and Dunn's receipt of Baig's package and that it dealt with "Naturally Zero" Canadian Spring Water.

I submit that this direct evidence that executives of The Coca-Cola Company had actual knowledge of Baig's product and trademark creates solid circumstantial evidence of The Coca-Cola Company's intent to simply take Baig's trademark as **THE perfect name** for a no-calorie drink that it had already

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 22 of 32

formulated, or as the perfect name and concept for a new no-calorie drink that it could invent to take advantage of the name, one that would avoid the stigma associated with "diet" drinks. At the very least, this evidence of intent is more than enough to defeat a summary judgment motion.

## B.    Trademark Infringement Under the Canadian Trade-marks Act - R.S., c. T-10, s. 7

Sections 7 and 8 of the Canadian Trade-marks Act provide, in pertinent part:

"7. No person shall

*          *          *          *

(b)  direct public attention to his wares, services or business in such a way as to cause or be likely to cause confusion in Canada, at the time he commenced so to direct the attention to them, between his wares, services or business and the wares, services or business of another;

(c) pass off other wares or services as and for those ordered or requested;

*          *          *          *

(e) do any other act or adopt any other business practice contrary to honest industrial or commercial usage in Canada.

8.   Every person who in the course of trade transfers the property in or the possession of any wares bearing, or in packages bearing, any trade-mark or trade-name shall, unless before the transfer he otherwise expressly states in writing, be deemed to warrant, to the person to whom the property or possession is transferred, that the trade-mark or trade-name has been and may be lawfully used in connection with the wares." R.S., c. T-10, ss. 7 and 8.

Section 6(2) of the Act provides that the use of a trade-mark causes confusion with another trade-mark "if the use of both trade-marks in the same area would be likely to lead to the inference that the wares or services associates with those trade-marks are manufactured, sold, leased, hired, or performed by the same person, whether or not the wares or services are of the same general

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 23 of 32

class." Section 6(5) lists the following factors used to determine whether trade marks are confusing:

> (a) the inherent distinctiveness of the trade-marks and the extent to which they have become known;
>
> (b) the length of time the trade-marks have been in use;
>
> (c) the nature of the wares, services or business;
>
> (d) the nature of the trade;
>
> (e) the degree of resemblance between the trade-marks in appearance or sound or in the ideas suggested by them.

Baig's "NATURALLY ZERO" design and trademark were registered in Canada on November 20, 2000. His registration became incontestable on November 20, 2005. R. S., c. T-10, s. 17. I submit that the analysis set forth above under the Lanham Act has equal merit under the substantially similar Canadian Act.

## IV.    THE COCA-COLA COMPANY'S CLAIMED DEFENSES

Before addressing damages, I wanted to respond to some of the defenses you raised in your letter to Mr. Baig of January 11, 2005, and yours to me of November 8, 2007.

### A.    Application on Intent to Use/Application Suspended by PTO Since January 1999

In your letter to Mr. Baig, you made it sound like his intent to use application had been suspended due to his failure to use the mark in commerce. He started using the trademark in 1998 with the sale of his first case of "Naturally Zero" Canadian spring water. The PTO suspended the application pending the outcome of the Naturelle Canadian Spring Water application.

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 24 of 32

### B.    No Evidence of Use - Unaware of Evidence of Actual Sales

We have provided this evidence in this letter.

### C.    Any Rights Would Be Extremely Limited And Not Infringed by The Coca-Company's use of "Diet Sprite Zero," or even "Zero"

#### 1.    Naturally Zero is a Composite Mark That Includes a Number of Design Elements in Addition to the Words, "Naturally Zero"

The main component of Baig's trademark is "ZERO" which is the main component of SPRITE ZERO, COCA-COLA ZERO, PIBB ZERO and others. A consumer confronted with a Coke extension product, having heard of "Coca-Cola" for his entire lifetime, obviously will immediately latch onto the modification or extension of the Coca-Cola name and focus on that new part, wondering what it means and how it's different from other "Cokes." If there is a likelihood of confusion between "ZERO TEA" and "NATURALLY ZERO" Spring water, then a likelihood of confusion obviously exists between "NATURALLY ZERO" and "SPRITE ZERO," "COCA-COLA ZERO" or any other zero brands. And, you never addressed the effect of our Canadian registration regarding the sale of Coca-Cola Zero products in Canada.

#### 2.    Coca-Cola Has Not Used any Mark, in its Entirety, That is Confusingly Similar to "Naturally Zero"

See section immediately above.

#### 3.    Natural Spring Water vs. Carbonated Soft Drinks

There is no legitimate argument to be made that these products are not substantially similar and competitive. The PTO ruled that bottled spring water and Zero Tea, an energy drink, were close enough to result in a likelihood of confusion.

#### 4.    "Diet Sprite" and "Sprite" Marks Are Well-established, Famous Marks and Their Presence With the Word "ZERO" Distinguishes Coca-Cola's Products from other Products that May Utilize "ZERO"

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 25 of 32

This argument ignores reverse confusion. By utilizing the strength of the "SPRITEZ" mark, The Coca-Cola Company was able to appropriate the main element of Baig's trademark - "ZERO" - saturate the market with advertising touting its name and the product, and then claim that no one would confuse "SPRITE ZERO" with "NATURALLY ZERO" due to Sprite Zero's fame

### D. **We Can All Live In Harmony and Peacefully Coexist**

In your letter to Mr. Baig, you stated that perhaps the most important reason that Mr. Baig did not have a claim of infringement against Coca-Cola is that there are many companies that use the word "zero" as part of their marks for food, beverages and other products that all coexist with each other. "As a result," you stated, "no party has the exclusive rights to the word 'zero,'"

Again, The Coca-Cola Company should be judicially estopped from making this argument when it has filed legal documents in the PTO taking the exact opposite legal position, namely, that it should not be required to disclaim the word "zero" apart from its mark. Or, stated otherwise, it should be able to have the exclusive right to use the word "zero" in trademarks or brand names for its soft drinks.

You also argued to Mr. Baig that due to such concurrent use by many parties, each parties' rights are defined by the precise combination of elements that comprise that party's marks. Again, this argument is inconsistent with the Coca-Cola Company's prior conduct in litigation. Nor is it consistent with your opposition to the mark "Café Zero" and many other trademarks containing the word "ZERO," even where a beverage is not involved.

Finally, no attention was given to Mr. Baig's Canadian registration giving him the exclusive right in Canada to use the word "ZERO" in a trademark identifying a soft drink.

### E.  **11/15/05 - Baig Abandoned the Application for Failure to Disclaim the Word "ZERO" and Number "0" Apart From Mark Since the PTO Deemed Them Descriptive**

Baig abandoned the application because he did not have the resources to take on the PTO and its incorrect disclaimer requirement. You folks are absolutely judicially estopped from making a "descriptive" argument when you argued precisely the opposite position to the PTO in your Request for Reconsideration filed in June 2006 in the Coca-Cola Zero application, S/N

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 26 of 32

78/580598. When the examining attorney required your company to disclaim its exclusive right to the term "ZERO" apart from the mark, your counsel wrote a lengthy brief showing why and how "SPRITE ZERO" was suggestive and not descriptive.

**F.    Baig's Claim of Misappropriation is Unsubstantiated – Coca-Cola Company has Evidence in its Files to Support the Independent Creation of the Trademark "ZERO" and "0" in the Year 2000**

....which still post-dates the (1) March 1999 volume of <u>Beverage Industry</u> magazine in which Dasani and Naturally Zero articles sat side-by-side; (2) Baig's sale of Naturally Zero bottled water in 1998 and 1999; and (3) Baig's filing of his U.S. and Canadian registration applications in 1997. Moreover, even in the unlikely event The Coca-Cola Company does have evidence in its files having any probative value that it somehow came up with the Zero idea on its own, it simply does not matter since the "independent creation" defense, nothing other than a claim of good faith, is not a defense to infringement.

**G.    Baig Never Provided What He Provided Dunn and Coca-Cola Company Has No Evidence Either**

This letter and its attachments have been produced herein as Exhibits "I", "J", "K", "R", and "S."

# V. <u>DAMAGES</u>

## A. <u>Damages Under Lanham Act – 15 U.S.C. § 1117</u>

As you know, the Lanham Act allows three categories of damages for trademark infringement or misappropriation: (1) damages sustained by the trademark owner due to the infringement; (2) profits of the defendant-infringer; and (3) litigation costs, in exceptional circumstances. 15 U.S.C. § 1117. This section also gives the court guidance on the appropriate measure of recovery:

> "The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing

profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a)(3).

Where damages sustained by the plaintiff from the infringement are difficult or impossible to calculate to any degree of certainty, the proper measure of damages is the profits earned by the infringing party under a theory that the infringer should not be unjustly enriched through its misappropriation of another's mark. Roulo v. Russ Berrie & Co., Inc, 886 F.2d 931, 941(7th Cir. 1989). There is no express requirement that the parties be in direct competition or that the infringer wilfully infringe the trademark to justify an award of profits. Id. As noted in Roulo, profits are an important part of any infringement case since "the trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." Id. Accordingly, an award of profits serves the dual purpose of deterrence and the prevention of unjust enrichment.

While Baig's annual sales of Naturally Zero never reached the six or seven figure mark, he certainly sold more than a negligible amount. By the year 2000, he had annual sales of more than $30,000. During the six year period from 1998 through 2004, Baig's sales totaled more than $150,000, amounting to roughly 500,000 bottles of Naturally Zero water sold over a 6 year period.

Baig's goal of selling his product to a national retailer was effectively and forever destroyed by The Coca-Cola Company when it launched Diet Sprite Zero in September, 2004, Coca-Cola Zero six months later, and all the Zero drinks that followed. With the sale of its Zero soft drinks, and its massive advertising campaigns, The Coca-Cola Company took away any chance that Baig ever had to continue to expand into new markets and ultimately take his bottled water national. It is beyond reality to think that that any retailer would buy into a trademark lawsuit from The Coca-Cola Company by purchasing the Naturally Zero brand water. Thus, it would be very difficult to assess or predict the amount of damages Baig actually sustained since it will never be known with any degree of certainty whether Baig could have taken his product national. In such a setting, the proper measure of damages is the amount of profits the infringer reaped from

using the plaintiff's mark, especially where the defendant's conduct is the reason that plaintiff's damages have become difficult to calculate.

Thus, the relevant inquiry becomes the total amount of profits earned by The Coca-Cola Company from all of its Zero brand beverages from September 2004 to the present, approximately 3 ½ years.[1] Since The Coca-Cola Company does not publish annual sales figures for its individual brands, a rough estimation process will be used, though this process will demonstrate with precision the damages Mr. Baig is entitled to. One simple method limited to Coca-Cola Zero's profits is based on a market share analysis. In an October 28, 2007 article written by Theresa Howard of USA Today, entitled, "Coke finally scores another winner," Ms. Howard reported that Coca-Cola's third quarter results showed sales volume of Coca-Cola Zero up a staggering 34%. These same results showed that Coca-Coca Zero had captured an amazing nearly 1.3% share of the $90 billion North American carbonated beverage business.

One could logically conclude, therefore, that gross revenue from sales of Coca-Cola Zero in North America, for the fiscal year ending 9/30/07, amounted to approximately 1,170,000,000 (One Billion, One Hundred Seventy Million Dollars). This figure is in accord with page 10 of your 2007 Annual Review showing that Coca-Cola Zero has joined the $1 Billion Club. The Coca-Cola Company's profit margin has been in the 64% range the last few years, so an educated estimate of gross profit from the sale of Coke Zero in the U.S. and Canada for 2007 would be approximately $749,000,000 (Seven Hundred Forty-Nine Million Dollars).

Another tack which seems just as reliable starts with 2007 worldwide gross profit of $18,451,000,000 (Eighteen Billion, Four Hundred Fifty-One Million Dollars). This figure is reduced by 20% for Coca-Cola's non-beverage sales, to $14,761,000,000 (Fourteen Billion, Seven Hundred Sixty-One Million Dollars). According to the chart on page 30 of the 2007 Coca-Cola Company Annual Report, 25% of the unit cases of beverages sold worldwide is sold in North America. Hence, gross profits from North American beverage sales for 2007 were approximately $3,690,000,000 (Three Billion, Six Hundred Ninety Million Dollars).

Now, if I knew what percentage of total beverage sales that all Coca-Cola Zero products accounted for, I could apply this figure to the $3.69 Billion figure to arrive at gross profit from Zero sales. I don't have the percentage, but I did recently do a highly controlled, analytical and complex market analysis of allotted

---

[1] I understand an argument can be made that U.S. profits should be limited to the geographic area in which plaintiff sold his goods and reasonably would have expanded since his trademark was not federally registered. However, there is case law and opposing arguments to support profits earned on a nationwide basis, especially for taking away Baig's opportunity for future growth. In any event, whether profits are based on sales within the entire U.S. or just the greater Chicago land area has no effect on Baig's demand.

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 29 of 32

shelf space for Coca-Cola Zero and Non-Zero beverages at the Grand Plaza Jewel Food store located at 540 N. State Street, Chicago, Illinois. Looking at only the allotted shelf space for 12-packs for all Coca-Cola and related Beverages (Pibb, Vault, Fanta but excluding Dasani), by far the most prevalent form of packaging, I counted total available space at 226 12-packs. Of the total, 54 12-packs or 23.89% was allotted for Zero products.

If it is assumed that the amount of shelf spaced allocated to Coca-Cola's Zero products compared to space for all Coca-Cola beverage products roughly approximates its Zero product's percentage of total sales of all of its soft drink beverages, then this figure can be applied to the $3.69 Billion figure to arrive at 2007 estimated gross profits for all sales of zero products in North America, or $882,000,000 (Eight Hundred Eighty-Two Million Dollars). This figure is consistent with the $750,000,000 estimate for profits from Coke-Zero alone, as I suspect Coca-Cola Zero comprises the substantial majority of all Zero sales.

This same analysis using 2006 figures results in profits attributable to sales from Zero products of $760,000,000 (Seven Hundred Sixty Million Dollars). 2005 figures show estimated gross profit in the amount of $712,000,000 (Seven Hundred Twelve Million Dollars). Thus, even if we exclude profits from the fourth quarter of 2004 when the open infringement commenced with the sale of Diet Sprite Zero, and the 1st quarter of 2008, **total approximate profit The Coca-Cola Company derived from its use of Mr. Baig's trademark amounts to $2,354,000,000 (Two Billion, Three Hundred Fifty Four Million Dollars).** Under the Trademark laws of the United States and Canada, Mr. Baig is entitled, at a maximum, to recover the sum of approximately $2.354 Billion from the Coca-Cola Company.

### B. Damages Under Canadian Trade-marks Act- S. 53.2

Like Section 1117 of the Lanham Act, Section 53.2 of the Canadian Trade-marks Act allows for three categories of damages:

> "Where a court is satisfied, on application of any interested person, that any act has been done contrary to this Act, the court may make any order that it considers appropriate in the circumstances, including an order providing for relief by way of injunction and the recovery of damages or profits and for the destruction… of any offending wares…"

The profit analysis set forth in the above section applies equally to damages under the Canadian Act. Since trademarks are territorial and governed strictly by each country's law, a federal district court would obviously have to apply the Canadian Act's damages provision to Baig's claim for infringement occurring in Canada. Since the damages provisions under each act are virtually identical, the court would be applying the same measure – profits of The Coca-Cola Company -- to assess damages.

# V. **DEMAND**

The settlement value of Mr. Baig's claim to The Coca-Cola Company, I would respectfully submit, should not be judged strictly by Coca-Cola's past profits from the sale of its Zero line or a percentage thereof, but also by the devastating, perhaps irreparable, financial blow The Coca-Cola Company would suffer from a permanent injunction prohibiting the U.S. and Canadian sale of its Zero products into the foreseeable and distant future. Coca-Cola's use of Baig's trademark, coupled with your formula for a tasty, sugar free alternative to Diet-Coke, and an enormous marketing blitz resulted in Coca-Cola's Company's "most successful beverage launch in 25 years." (2007 Annual Report, page 4).

Countless articles about Coca-Cola Zero's past, present and projected future success demonstrate just how valuable the Zero concept and product line is to Coca-Cola. Mary Jane Credeur, in an April 18, 2007, article for Bloomberg News, wrote that Coca-Cola's 1st quarter 2007 profits rose 14%, as demand for Coca-Cola Zero "led to its biggest sales increase since 1994." She also pointed out that "sales jumped 17 percent to $6.1 billion on Coca-Cola Zero's gain of more than 10 percent in North America." In light of this information, total profit attributable to Zero sales from 2005-2007 may well be higher than my $2.354 Billion estimate.

Given the absolutely immeasurable value of the Coca-Cola Zero products which have miraculously lifted the standing and the profits of the company, at a fiscal time when surely needed with North American sales stagnant, it would seem the last thing that The Coca-Cola Company would want to do is take a legal course that could in any way jeopardize the good will of its line or tarnish its products in the eye of the always-wary consumer. Rest assured that if we do not promptly settle this case for a fair and reasonable amount, I will take every conceivable legal and ethical means available to make public the issues contained in this lawsuit which, quite frankly, are absolutely intriguing, if not downright "Grisham-esque."

I strongly suspect The Coca-Cola Company's goodwill and public relations would suffer enormously from the adverse publicity a federal lawsuit would

Ms. Caroline K. Pearlstein, Esq.
March 12, 2008
Page 31 of 32

garner - one by a little "David" seeking to defeat and obtain just compensation from a huge Goliath who was given the little guy's idea and name on a silver platter only month's earlier, denied any interest in the product, yet one who then appropriated it all for its own use without compensating or even acknowledging the real creator.

If it were not for Baig's letter to Mr. Dunn and its enclosures, and Mr. McCoy's acknowledgment of same and his express reference to Mr. Baig's Naturally Zero water in his rejection letter, I could understand a claim by your public relations and legal departments that Mr. Baig's dream was just a pipe dream, that The Coca-Cola Company spent millions of dollars in marketing and ad campaign's, and that the striking similarities between the name of Baig's product, slogan's and trademarks to those of The Coca-Cola Company's Zero line were merely a profound coincidence. However, when the public views all of the exhibits that will be attached to Baig's complaint and hence public record, I submit the public will view any such rhetoric with a very suspicious eye.

For these reasons, it is very important that your company understand Mr. Baig is extremely serious about this case even though his health and financial means prevented him from immediately asserting his rights. Mr. Baig is prepared to file suit and aggressively litigate this case to its conclusion if it cannot be resolved amicably and expediently.

I am perhaps wise enough to know that that no trial judge in this country or in Canada would award Mr. Baig the sum of $2.354 Billion as damages (or uphold a jury's verdict in that amount). While such an award would of course have a deterrent effect on your company, it would surely be deemed excessive or punitive. However, when a company actually earns the staggering sum of Two Thousand Three Hundred Fifty-Four Million dollars over 36 months from a product it created from the legal property rights of another, the amount of damages necessary to serve as a deterrent effect becomes much more than a few, or ten or even fifty million dollars, a mere 2.12 % of total profits. If a kid can earn $100 a day by stealing corn from the farmer's field and selling it, will he stop if he has to pay the farmer back $2.12 per day? Frankly, I don't think he'd be deterred by paying $4.25 either, but I'm not sure a court would allow significantly more.

Hence, Mr. Baig's demand to settle his lawsuit against The Coca-Cola Company is the sum of **$100,000,000 (One Hundred Million Dollars)**, or approximately 4.24 % of Coca-Cola's approximate profit derived from the sale of its Zero line for the relevant three years in question.

We look forward to your response.

Ms. Caroline R. Pearlstein, Esq.
March 12, 2008
Page 32 of 32

Very truly yours,

DAVID J. KIESLER & ASSOCIATES, LLC

By: _____

David J. Kiesler

DJK/as
Encs.

DAVID J. KIESLER & ASSOCIATES, LLC

ATTORNEYS AT LAW

161 N. CLARK STREET

SUITE 2500

CHICAGO, ILLINOIS 60601

(312) 920-6666

(312) 920-6667-FAX

DJK@KIESLERJUSTICE.COM

June 5, 2008

Mr. Bruce W. Baber, Esq.                                Via Email and U.S. Mail
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA 30309-3521

      Re: Baig, et.al. v. The Coca-Cola Company

Dear Mr. Baber:

      There are three reasons for this letter: (1) to apprise you and your client that we are dead serious about filing suit; (2) to give your client a final opportunity to settle before suit is filed; and (3) to demonstrate (a) the patent weaknesses of the arguments and factual assertions contained in your denial letter of May 6, 2008 and (b) to emphasize its obvious omissions. By far, the most glaring omissions are your failure to address or even acknowledge Mr. Baig's registered, 100% - **currently- valid** Canadian trademark ownership rights, and his **choice** of damages under both the Lanham Act and the Trade-marks Act (the plaintiff's own lost profits **or** the infringer's **profits** during the period of infringement).

## I. YOUR LETTER OF MAY 6, 2008

### A. MISINTERPRETATION of "MISAPPROPRIATION"

      On page two of your letter, you start your substantive arguments by pointing out the obvious - that my 3/12/08 demand letter seeks recovery based solely on trademark infringement and not on theories of "'theft'" or misappropriation of trade secrets. You then go on to argue, in fair detail, why we have not alleged recovery under these latter theories. Your stated reason for addressing this non-issue is that I have made "repeated reference to allegations of 'misappropriation' and 'theft' of 'concepts'" in my letters to Caroline of 10/29/07 and 3/12/08.

EXHIBIT "23"

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 2 of 15

Caroline's file will show I have never written that The Coca-Cola Company ("Coca-Cola") secretly copied Baig's confidential or proprietary information, trade secrets or any other enforceable intellectual property right. I used the term "misappropriation" once in my 10/29 letter. In context – "The factual and legal grounds are centered around the Coca-Cola Company's apparent misappropriation and use of the term 'Zero' in its trademark of 'Sprite Zero' and 'Coca-Cola Zero'" – I was using the words "misappropriation" and "theft" synonymously with the deliberate or intentional copying and use of another's trademark, or portion thereof, in one's own trademark.

Indeed, even your client Caroline used the term, not mockingly in quotes, but in its legal sense:

> "[Y]our client's claim of **misappropriation** is unsubstantiated. The Coca-Cola Company has evidence in its files to support its independent creation of the **trademarks** 'ZERO' and '0' in the year 2000, approximately three years prior to the time in which your client contacted The Coca-Cola Company for a meeting." (Emphasis Supplied).

## B. THE "CONCEPT" OF A SMOKED "RED HERRING"

You have also ascribed in your denial letter a hyper-technical, perhaps legal, meaning to the word "concept" in my two letters to Caroline, a meaning I obviously did not intend if context plays any role here. Rather, I was using the word colloquially, and not to connote a separate item of vested property. As you will see in my letters, I typically used the word "context" in tandem with the sale (or theft) of Baig's U.S. and Canadian trademark rights in Naturally Zero:

- "[S]ix months later, [Baig] was in total disbelief that your company could use his idea, **concept** and trademark…"

- "I did, in that letter, solicit any documentary evidence you cared to share with me that would prove your client's claim it did not steal my client's **concept**, idea and Canadian trademark.

- "Then, after seizing the opportunity (and the **concept**), a much more powerful and significantly wealthier newcomer (Coca-Cola) used the identical portion of Baig's trademark - the dominant portion of that mark - in conjunction with its own famous marks and positively overwhelmed the market with millions of dollars of advertising."

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 3 of 15

- "But, when evidence of The Coca-Cola's Company's bad faith and deliberate intent to steal Baig's trademark, **concept** slogans and marketing ideas is factored into the analysis, The Coca-Cola Company's liability for infringement, I submit, will be a certainty."

- "I submit that this direct evidence that executives of The Coca-Cola Company had actual knowledge of Baig's product and trademark creates solid circumstantial evidence of The Coca-Cola Company's intent to simply take Baig's trademark as **THE perfect name** for a no-calorie drink that it had already formulated, or as the perfect name and **concept** for a new no-calorie drink that it could invent to take advantage of the name, one that would avoid the stigma associated with 'diet' drinks.'"

- "Countless articles about Coca-Cola Zero's past, present and projected future success demonstrate just how valuable the Zero **concept** and product line is to Coca-Cola."

There is a very valid and clearly admissible reason for clustering the entire "concept" of Naturally Zero with Baig's trademark ownership rights, slogans and marketing plan, none of which assert that Baig's unique and original concept, by itself, was a protectable intellectual property right. Quite to the contrary, by your repeated reference to the term "concept," and then arguing why Baig cannot recover for the theft of a concept, you have created a diversionary smokescreen or red herring in an attempt to keep the focus off the weakness of the remainder of your legal positions.

## C. BAIGS ALLEGED ABANDONMENT OF TRADEMARK RIGHTS

I submit that the Seventh Circuit has already rejected your abandonment argument in Roulo v. Russ Berrie & Co., Inc, 886 F.2d 931 (7th Cir. 1989). There, the jury awarded plaintiff, Georgia Roulo, $4.3 million for infringement of her copyright and trade dress rights in a greeting card line known as "Feeling Sensitive ("FS")." Roulo first introduced her FS cards to the public in July 1977 and promoted them for the next four months until October, 1977.[1] She then entered into a 2-year distribution agreement with defendant by which defendant would exclusively manufacture, distribute and sell Roulo's card line. In exchange, defendant agreed to remit 10% of gross sales to Roulo as compensation for the use of her intellectual property rights in her cards, while Roulo retained the ownership of her copyright and trade dress rights.

Pursuant to this agreement, defendant sold the FS cards from April 1978 to April 1980. Roulo told defendant in late 1979 that she did not intend to renew

---

[1] The opinion is silent as to whether Roulo, herself, ever made any sales of her TS cards.

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 4 of 15

the contract, prompting defendant to begin development of a comparable greeting card line to be known as "Touching You"("TY") to substitute for the lost FS product. Defendant introduced its new line in July 1980 at the Chicago Gift Show. Roulo, who was also present at the show, observed the TY line while she was promoting a new line of greeting cards. In April, 1982, Roulo filed suit for infringement of her FS line under the Lanham and Copyright Acts.

Defendant appealed the verdict on several grounds, one of which was abandonment.[2] In a lengthy discussion particularly apt to our case, the court reasoned (with citations omitted):

"Of slightly more merit is [Defendant] Berrie's assertion that Roulo abandoned her trade dress. After Roulo's contract with Berrie ended in April of 1980, she did not attempt to market the FS cards again but instead sought to publish a book of verse in the spring of 1980 which proved unsuccessful. Upon the termination of her contract with Berrie, Roulo was entitled, but declined, to receive the lists of distributors who had carried the FS cards and to receive any unsold inventory of the cards at Berrie's cost. At the Chicago Gift Show in the summer of 1980, Roulo had brought a new line of emotional verse cards to market when she discovered Berrie's TY cards. Later in January of 1981, Roulo released this new line of emotional verse greeting cards and marketed them until 1983.

"A prima facie case of abandonment was established by Roulo's failure to use the FS trade dress for more than two years. 15 U.S.C. Sec. 1127. However, this presumption may be rebutted by evidence explaining the nonuse or demonstrating the lack of an intent not to resume use. Some courts require the owner of the trade dress not used for over two years to demonstrate the intent to resume use. Other courts require the owner to prove the presumably lesser showing of the absence of an intent to abandon. **We think the proper approach is to require evidence to demonstrate the intent not to resume use.** This reading comports with the language of the statute and the seeming intent of Congress to prevent hoarding of trademarks where the owner has no intent to abandon, although no intent to resume use of the trademark within the reasonably foreseeable future. Intent to abandon connotes a permanent intent not to resume use

---

[2] Roulo is also directly on point in refuting your damages and laches arguments. Roulo v. Russ Berrie & Co., Inc, 886 F.2d at 940-942.

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 5 of 15

which would be virtually impossible to prove. Our interpretation is consistent with the legislative history indicating that Congress substituted the present phrase 'intent not to resume use' for the phrase 'intent to abandon.' As noted in Exxon, this distinction is pivotal where the trademark or trade-dress owner is attempting to "hoard" the mark or dress with no intent to resume meaningful commercial use.

"However, in contradiction to defendant's contention that the plaintiff must also bear the burden of persuasion on this affirmative defense, **the owner of the trademark need only produce evidence to rebut the presumption** while the **ultimate burden of persuasion rests on the defendant**. ('A proprietor who temporarily suspends use of a mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable [sic] future'). Therefore it was not erroneous to refuse to give Berrie's proposed instruction No. 37 which would have placed the burden of proof on Roulo. The trial judge properly instructed the jury that the defendant must prove by a preponderance of the evidence that plaintiff abandoned the FS trade dress, that abandonment is found when use has been discontinued with intent not to resume use, and that such intent may be presumed from nonuse for two consecutive years. …

"**As evidence of her intent to resume use within the reasonably foreseeable future, Roulo testified that she would have marketed the FS cards if the TY cards had not been developed.** She cites her presence at the 1980 Chicago Gift Show as evidence of this intent. Berrie weakly contends that Roulo's failure to begin marketing her FS cards immediately or to purchase the remaining inventory indicates an intent not to resume use. Given that the evidence is meager on either side of the issue, the jury's special verdict that Roulo did not abandon her trade dress is not against the weight of the evidence. It was within the jury's prerogative to credit plaintiff's testimony against abandonment." Id. 938-939. (Emphasis supplied).

As you know, 15 U.S.C. § 1127 was amended subsequent to Roulo to enlarge the time period to three years of nonuse in order to obtain the rebuttable presumption of *prima facie* abandonment. However, Mr. Baig need only present some probative evidence of his intent to resume use in order to nullify the

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 6 of 15

presumption. The burden of persuasion still rests with your client to prove Mr. Baig's intent not to resume use.

I am not about to provide you with, on the eve of filing, additional evidence we have to prove Mr. Baig's intent to resume use, especially given the fact that you have not provided us with one shred of documentary evidence to support all of your factual assertions. **However, just as in <u>Roulo</u>, Baig would have continued selling Naturally Zero in 2005 and beyond if Coca-Cola had not infringed his trademark by copying the dominant, salient feature of his mark – Zero – thereby forever destroying his ability to sell his trademark, business, designs and slogans to a national retailer.** This fact alone should be enough to burst the presumption bubble, but we have much more.

Finally, I haven't the slightest idea where you came up with these incorrect concrete statements of fact:

- "Mr. Baig **discontinued** any further plans for marketing his of his NATURALLY ZERO product **in** and around late **2004**."

- Mr. Baig "has taken no steps since that time – **and does not plan to take any steps in the future** – to utilize the NATURALLY ZERO name."

Your use of the term "discontinued" connotes a voluntary act on the part of Mr. Baig when no such thing occurred. I will be using the phrases "forced out of business" or "destroyed" to address the same issue. Moreover, Mr. Baig absolutely did not formulate plans to "discontinue" the use of the Naturally Zero mark **in** 2004, or any time thereafter, as we will prove by much more than a preponderance. Your statement that Mr. Baig does not plan to take any steps in the future to utilize the Naturally Zero name can only be the product of mindreading as I certainly never made that comment in any of my letters or emails to your predecessors.

Coca-Cola's intentional copying and infringement of Mr. Baig's U.S and Canadian trademarks which rendered worthless and destroyed these rights, coupled with Mr. Baig's numerous health setbacks and lack of capital to start his business back up, will be more than ample evidence to get to the jury which is all we will need. Perhaps the most important argument is that Mr. Baig is hardly trying to hoard trademarks with no intention of ever using them.

You also recite, without citation to any authority, the alleged rule of law that since Mr. Baig allegedly abandoned his trademarks, any rights to pursue a claim for past infringement, even when he held these rights during the period of infringement, are no longer enforceable. As you state otherwise, "Any claim of trademark infringement must be based on current, valid exclusive rights."

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 7 of 15

With due respect, this legal proposition is absurd. If a person was the legal owner of common law usage or registered trademark rights, and another infringed on those rights for a period of years during which the trademark owner still owned the trademark rights, what possible relevance does a subsequent divestiture, even by abandonment, have on the enforceable, vested right to recover for past infringement? If a person's car is damaged by another and the owner pays the repair costs out of his own pocket, but abandons his legal ownership of the car by selling it six months later, he most certainly does not lose the right to sue the tortfeasor for repair costs even though he no longer owns the car.

In fact, Roulo refutes your claim that a case of reverse confusion must be premised on current trademark rights and on the senior user's product in the marketplace.    How many of Roulo's Feeling Sensitive cards were in the marketplace when the defendant stole Roulo's trade dress and launched its Touching You line? None. The infringement was actionable not because Roulo owned "currents" trademark rights when she filed suit two years after the infringement started, but because the defendant's new line of cards essentially destroyed the viability of the FS line and all but prevented (if not substantially reduced) future FS sales. Until I see a Seventh Circuit or Supreme Court opinion that says a plaintiff must still own trademark rights **at the time he files suit** to recover for **past** infringement, I will disregard your legal assertion.

## D.  ALLEGED LACHES

In a related argument, you claim that Mr. Baig's delay in asserting his (non-existent) rights bars his claim under the equitable doctrine of laches. For no other reason, this defense will be summarily denied on the equitable maxim that one who seeks equity must do so with clean hands. I am very confident that after we put on our case - in - chief, your laches defense will vanish as quickly as your abandonment defense.

Going back to Roulo, the defendant argued that Roulo's claim was barred by laches since Roulo had knowledge of the infringement 21 months before she filed suit and unreasonably delayed filing which caused defendant to rely to its detriment and suffer prejudice. In response, the court first noted the trend in the Seventh Circuit that "A two year delay in filing an action following knowledge of the infringement has rarely been held sufficient to constitute laches." Roulo v. Russ Berrie & Co., Inc, 886 F.2d at 942. Roulo explained that her delay in filing suit was due to her inquiry into the facts of the case to determine the merit of her claim against Berrie, clearly one of Mr. Baig's reasons for delaying the start of this litigation. More importantly, as in this case, the court found the complete absence of any detrimental reliance on the part of defendant:

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 8 of 15

> "Berrie has not cited any conduct to indicate that it actually
> relied to its detriment on Roulo's failure to bring suit sooner
> except for the actual marketing of the TY cards. Since Berrie
> began its promotion of the TY cards prior to any knowledge of
> Roulo or her purported acquiescence, Berrie cannot assert
> that its distribution of the TY line was made in actual reliance
> on Roulo's conduct. The jury's verdict was not against the
> weight of this evidence." Id. at 942.

Similarly, in our case, it is quite comical to think that Coca-Cola relied to its
detriment on Baig's delay in filing suit. Coca-Cola was going to trademark and
manufacture Diet Sprite Zero and Coca-Cola Zero irrespective of anything Mr.
Baig did or did not do, **and did so at its own peril**. Will you be able to look
straight-faced at the jury and argue that Coca-Cola would have put all of its Zero
marketing plans on hold and spent zero on advertising if Baig had filed suit
earlier? Moreover, Caroline's claim that Coca-Cola did not have the Dunn letter
in its files, along with Caroline's repeated advice to Mr. Baig he did not have a
viable claim, is evidence that Coca-Cola gave no thought to Baig's claim and was
going to do, and did do, whatever it wished, including investing "substantial
resources in the marketing and sale of its ZERO products..."

Finally, my demand letter to Caroline never stated Mr. Baig was "back"
and fully recovered as you state. And, Mr. Baig has not been represented by
counsel for the past three years. I can assure you I am the only attorney he has
ever hired, and that he hired me shortly before my initial letter to Caroline of
10/29/07.

### E.  COCA-COLA'S INTENTIONAL COPYING OF "ZERO"

As you know, we do not have to prove that Coca-Cola, with knowledge of
Mr. Baig's trademarks, deliberately copied them, or parts of them, to recover
damages based on your client's clear-cut infringement. However, if we do put
forth evidence of knowing and deliberate copying, we are entitled to certain
extremely beneficial evidentiary presumptions, and other proof may be dispensed
with. I realize you claim in your letter several times that Coca-Cola did not use
any of the material Mr. Baig sent to Jeff Dunn in his 1/13/03 letter. However, I am
not obligated to take your client's word at face value, especially when I asked
Caroline months ago for any evidence that supported your client's defense and
neither she, nor you, has produced any. Moreover, it is a difficult task to prove a
negative, especially with all of the contradictory evidence we will be putting on.

By far, the most important rule of law in Baig's favor provides that **direct
evidence** of intentional copying is **not necessary to prove intent.** Daddy's
Junky Music Stores, Inc. v. Big Daddy's Family Music Center, 109 F.3d 275, 286

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 9 of 15

(6th Cir.1997). Rather, the defendant's use of a contested mark **with knowledge** of the protected mark at issue can support a finding of intentional copying. Id.

As set forth in my demand letter, but perhaps ignored, when it can be shown that the defendant selected its mark with the intent to exploit plaintiff's mark, this will **almost always be strong evidence of a likelihood of confusion, and may lead to a presumption of infringement** Sally Beauty Company, Inc. v. Beautyco, Inc., 304 F3d at 973 (proof of intent leads to a presumption of likelihood of confusion). Bad faith alone may support a claim for infringement. Fuji Photo Film Company, Inc., v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d at 596-597. As the Seventh Circuit has observed:

> "The fact that one actively pursues an objective greatly increases the chances that the objective will be achieved, and we have no doubt that this general principle applies here. For this reason, a defendant's intent is an 'important factor,' and can even be weighed more heavily than other factors." Eli Lilly & Company v. Natural Answers, Inc., 233 F.3d 456, 465 (7th Cir. 2000).

A few more of your assertions on the subject of your client's intent, or the alleged lack thereof, bear further dissection, particularly the following statements:

- "While the materials Mr. Baig sent to Mr. Dunn were **received by Mr. Dunn** in TCCC's North America group, they were not used in any way."

- "[O]ur investigation to date has not produced any information suggesting that the materials sent by Mr. Baig to Mr. Dunn played any role whatsoever in TCCC's adoption its family of marks."

To me, the issue of whether Mr. Dunn or Coca-Cola ever received Mr. Baig's 1/12/03 letter and its contents is absolutely fascinating. Chronologically, Mr. Baig had his first contact with Coca-Cola on October 20, 2004, only one month after he saw the Diet Sprite Zero billboard ad, when he spoke with Caroline over the phone. In that discussion, he made it clear to Caroline that Coca-Cola had improperly copied a portion of his trademark. He also pointed out that well prior to Diet Sprite Zero's unveiling in September, 2004, he had sent a letter to Mr. Dunn with product literature on Naturally Zero, but that Mr. McCoy had written him a rejection letter shortly thereafter.

Mr. Baig then sent Caroline a letter dated November 12, 2004, enclosing the McCoy letter and confirming that this letter was in response to his 1/12/03

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 10 of 15

submission to Mr. Dunn. Fiona Orr, presumably on behalf of Caroline, responded to Baig's letter by hers dated December 14, 2004. In this letter, Fiona wrote, "[T]o date, we have been unable to find any further information related to the submission [to Dunn]..."

Mr. Baig and Caroline then had a few additional phone calls which Caroline followed up by fax letter dated January 11, 2005. As part of her denial, Caroline wrote, "Although we understand that you **may** have submitted certain materials to our company for consideration in 2003, we are unaware of any basis for any claim that could arise as a result of such submission."  Two and a half years later in her letter to me of November 8, 2007, Caroline seemed to have become more certain her employer and client never received Baig's proposal, perhaps adopting Fiona's position:

> "While we have made numerous requests of your client, both in writing and by telephone, since 2004, to ascertain exactly what written materials your client claims he provided to Mr. Jeff Dunn to support the sale of 'the concept of 'Zero,' as you put it in your letter, your client has never produced such documents, **and we can find no record that such documents exist.**" (Emphasis Supplied).

Caroline's letter to me, of course, preceded my demand letter and attached exhibits, one of which was Baig's 1/12/03 letter to Dunn and its attachments. Amazingly, when I received Coca-Cola's written response to our demand, I learned that Coca-Cola now admits that not only did management in Coca-Cola North America receive the letter, but that Mr. Jeffrey Dunn, himself, its president, also received the letter.

Putting myself in my opponent's shoes, it seems the last thing I would admit, if I was not legally or ethically bound to do so, is that Dunn received Baig's letter. This judicial admission in your denial letter guarantees we get to the jury and defeats summary judgment should you choose that frivolous route. Therefore, I was quite puzzled by this admission in light of Caroline's repeated denials that Coca-Cola ever received the letter since "**we can find no record that such documents exist.**"

Caroline's letters to Mr. Baig made it obvious that she dearly wanted Baig to send her a copy of the Dunn letter and any other information he had. The question is why?  Two scenarios come to mind. Did Caroline actually have a copy of the Dunn letter, or even its original, and was she trying to determine whether Baig had retained a copy, so she could continue her denials if it turned out that Baig did not have a copy? Or, did Caroline actually not have a copy of the letter and want to determine whether its contents could have affected her decision to continue her course of absolute denial?

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 11 of 15

In any event, the fact that you so promptly made this admission suggests one of four possibilities: (1) Caroline did have the letter all along; (2) Caroline could not locate a copy of the letter but did have some document or electronic information confirming Coca-Cola's (or Dunn's) receipt of the letter; (3) You did the highly improbable and interviewed Jeff Dunn, after I did, and he admitted receiving the letter; or (4) You decided to admit Dunn's receipt of the letter, after receiving authority from Caroline to do so, even though you don't have the slightest clue if Dunn received the letter, based solely on the fact that we still possess the original McCoy letter and envelope.

I have an impossible time believing number 4. Scenario number 3 seems almost as unlikely given what I have recently learned. I honestly do not believe that Caroline would put her law license on the line by lying to us that Coca-Cola never received the letter when a copy of it was in her file, ruling out number 1. Thus, number 2 seems by far the most likely scenario, and we look forward to receiving this evidence in discovery.

By the bye, since Dunn did receive the letter and its fairly voluminous contents, where did they go? If my evidence and argument is accepted by the jury that Coca-Cola knowingly used and thereby infringed Baig's trademarks, would the jury (or any rationale person) honestly expect Coca-Cola (Charlie McCoy) to have kept a copy of the materials (or admit to anyone in Coca-Cola legal that he had them)?

Caroline's denials, followed by your recantation, coupled with the unsupported conclusion that Coca-Cola never stole Baig's trademark or used it in any way, has me really questioning the strength of your apparent good faith defense. If Coca-Cola originally did not have the Dunn letter, and did not know what it said until March 12, 2008, how could Caroline and, hence, you, be so sure that Coca-Cola never used Baig's materials? It's rhetorical.

The following statements also cause major concern:

- "The Coca-Cola Company has evidence in its files to support its independent **creation of the trademarks** "ZERO" and "0" in the year **2000**…"

- "Moreover, the **possible use** of 'zero' as a part of a mark for TCCC's products was hardly new in early 2003, and had been suggested during the course of TCCC internal project**s** at least several years prior to that time."

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 12 of 15

- "[T]he **genesis** of TCCC's ZERO marks clearly refutes any suspicion that Mr. Baig's materials were involved in any way. TCCC's first **uses** of 'zero' originated and were made in countries outside the United States and outside North America by individuals who, to the best of our knowledge, had no contact with Mr. Baig…"

What I gather from above is that Coca-Cola couldn't have intentionally stolen Baig's trademark or his slogans since Coca-Cola came up with the mark "Diet Sprite Zero" all by itself - the so-called good faith defense. I do have a few questions. If Coca-Cola does have evidence in its files supporting the independent creation of its "Zero" trademark in 2000, why didn't Caroline provide this information which I expressly asked her for months ago? Give the disastrous effects this lawsuit could have on your client's good will and public opinion, I would have expected, at the very least, for its seasoned outside counsel to have supplied this evidence as potential dissuasion.

The latter two statements above from your denial letter appear internally inconsistent and contradictory to Caroline's admission that Coca-Cola invented "Zero" in 2000. One of your statements references Coca-Cola decision makers discussing the possible use of "Zero" as part of a new mark "several years" before early 2003. What does "several years" mean in this context? I typically modify the term "years" with "several" when I haven't a clue as to the exact number, or the exact number hurts my client's position. In any event, were you referring to the year 2000 when the trademark was independently created, as Caroline has committed to? Or, was "several years prior" referring to the time period in which certain unidentified individuals in foreign lands came up with the idea of "Diet Sprite Zero"?

And, finally, how exactly did Coca-Cola's "first uses of 'zero'" originate outside the United States when we all know that Diet Sprite Zero was your client's first Zero drink and the PTO documents show that your client first used the trademark in September, 2004 when it launched this new product in the United States? Wouldn't the Parent Corporation, or at least North America, know about the project or have any (tainted) input? Or, was Charlie McCoy on assignment in Costa Rica?

Of course, these questions are all rhetorical and answers are not expected. I simply wanted you and your client to be fully aware of the plaintiff's theories and what to expect in written discovery and depositions. Moreover, by admitting that Mr. Dunn received Mr. Baig's proposal in January, 2003, **nine months before** you folks filed to register Diet Sprite Zero in the U.S., we will be entitled to an instruction, as a matter of law, that the **use** of a contested mark **with knowledge** of the protected mark at issue may be considered as "some evidence" on the issue of Coca-Cola's intentional copying.

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 13 of 15

## F. REVERSE CONFUSION TRADEMARK INFRINGEMENT

Perhaps the most blatantly false and legally unsupported claim made in your entire letter is the first clause of the first sentence of the third paragraph of page two. I am simply perplexed that you can outright state that Baig's letter and accompanying materials received by Dunn did not constitute an offer by Baig to "sell any mark…" If one were to raise the issue of Rule 11 sanctions, as you have boldly threatened me with if "David" dares to file suit against "Goliath," then you had better be ready to defend a Rule 11 claim "back at ya" based on the above inane statement you have made. Clearly, in conjunction with Russell Hopkins' phone conference with Dunn in December 2002, Baig sent his proposal to Dunn for the **sole purpose** of selling outright his entire business and every imaginable property right he and his company held, period. In exchange, Coca-Cola would theoretically pay Baig a fair monetary sum based on the estimated present and future value to Coca-Cola of Baig's intellectual property rights.[3]

Now, can you credibly tell me that Baig's obvious offer to your client did not include (a) his common law use rights dating back to March 1998 in, at the very least[4], the greater Chicago land area, Southern Wisconsin and Northwestern Indiana and (b) the **ENTIRE COUNTRY** of Canada, based on his registered, statutorily incontestable and **EXCLUSIVE RIGHT** in Canada to use the word "Zero" in a trademark for a soft drink or hydration beverage, a right that Mr. Baig holds "currently."

I will also need an explanation of your interpretation of the legal effect of Baig's proposal to Dunn. Specifically, I am unsure what an "invitation to TCCC to participate, on a non-exclusive basis, in Mr. Baig's then-current marketing program" means. Are you suggesting that Baig wanted Coca-Cola and other companies and individuals to help him market his Naturally Zero Canadian Spring Water? And was that with or without remuneration?

On the issue of the likelihood of confusion between the Naturally Zero and Coca-Cola Zero or Sprite Zero marks, I am sure, given our professions, you and I could both argue until the cows come home, whatever that phrase may mean. You will continue to take the position that there wasn't, and could not be, the likelihood of reverse confusion since your client's products using my client's "Zero" are "all in the format '[BRAND] ZERO' where the '[BRAND]' is an

---

[3] No one could have possibly envisioned the overwhelming, multi-faceted success that the Coca-Cola Zero products have had. Hence, any 7 or even 8 figure amount Coca-Cola had theoretically agreed to pay Baig for the purchase of his clear intellectual property rights would have been almost unconscionable in hindsight.

[4] You will soon learn why and how Baig is entitled to Coca-Cola's profits from September 2004 through the time of trial, in the **entire** United States.

established, famous TCCC brand such as COCA-COLA, SPRITE or FANTA…" I presume the implication is that these famous brands of Goliath's, even though containing the term "Zero," could never be confused with David's.

I, on the other hand, would argue that Coca-Cola's "Alleged Mark [COCA-COLA] ZERO, when used in connection with [Coca-Cola's] Goods, so resembles [Baig's] ZERO Marks as to be likely to cause confusion, or to cause mistake, or to deceive with respect to the source or origin of [Baig's] Goods, with respect to [Coca-Cola's] sponsorship thereof or in connection or affiliation therewith, and/or in other ways." I would also argue that "[Baig] would be damaged by registration of [Coca-Cola's] Alleged Mark because such registration would constitute prima facie evidence of [Coca-Cola's] exclusive right to use [Coca-Cola's] Mark for and in connection with [Coca-Cola's] Goods, which would be inconsistent with and detrimental to [Baig's] **prior and superior rights** in and to [Baig's] ZERO Marks." (Emphasis Supplied).

The only problem with making these arguments is that someone has beaten me to the punch. And, that someone and his client will be unquestionably judicially estopped from trying to take a position in this case 180 degrees opposite from the clear and unequivocal legal position you, Bruce Baber, wrote in your response to the PTO's office action you electronically signed on January 25, 2007.

Lastly, if the arguments contained in your denial letter are correct – that no one would confuse Naturally Zero and Coca-Cola Zero, and that the term "Zero" is not the salient, predominant feature of both our client's marks and not entitled to protection–then please explain to me why you, Bruce Baber, have filed, on behalf of Coca-Cola, an opposition to Ben & Jerry's application to register the trademark for its proposed new coffee drink, "Café Zero"? To refresh your recollection, you wrote in an opposition electronically signed and filed on January 16, 2008, that Ben & Jerry's "Alleged Mark CAFÉ ZERO, when used in connection with [Ben & Jerry's] Goods, so resembles [Coca-Cola's] ZERO Marks as to be likely to cause confusion, or to cause mistake…" You know the rest.

## G. DAMAGES

The law is so well established in this area that no further comment is necessary. I will also save paper by refraining from the string cites, but refer you to Roulo.

I suspect that discovery of your client's complete audited and unaudited financials, and product-specific sales figures for each and every Coca-Cola Zero product sold from September 2004 through the time of trial will dwarf my estimate of $2.54 billion. Our current demand of $100,000,000.00 (ONE HUNDRED

Mr. Bruce W. Baber, Esq.
June 5, 2008
Page 15 of 15

MILLION) positively pales in comparison to $3 to $4 billion, the likely profit amount the jury is entitled to assess against your client.

## H. CAUSE OF ACTION UNDER CANADIAN TRADE-MARKS ACT

I have written nothing about filing suit in Canada.

## II. <u>FINAL OPPORTUNITY TO SETTLE</u>

You will be receiving by email tomorrow, January 6, 2008, before the close of business, a courtesy copy of **the** complaint we will be filing electronically next Friday, June 13, 2008, at 1:13 p.m. CST in the United States District Court for the Northern District of Illinois, Eastern Division. The press conference will start in my conference room, after I click "enter," at 1:14 p.m. If your client has an honest, good faith desire to avoid a potential debacle of cataclysmic proportions, please contact me prior to the afternoon of Friday the 13th.

Thank you.

Very truly yours,

DAVID J. KIESLER & ASSOCIATES, LLC

By: David J. Kiesler

DJK/as

ORIGINAL

FILED IN CLERK'S OFFICE
U S D C  Atlanta

JUN 1 2 2008

JAMES N  HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA GEORGIA

| | | |
|---|---|---|
| THE COCA-COLA COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| v. | ) | |
| | ) | |
| MIRZA N. BAIG and | ) | |
| BLUESPRINGS WATER CO., | ) | 1:08-CV-2010 |
| | ) | NO. _____ |
| Defendants. | ) | |

TWT

## COMPLAINT FOR
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

NOW COMES THE COCA-COLA COMPANY ("TCCC"), plaintiff herein,

and, by and through its undersigned counsel and in accordance with 28 U.S.C.

§ 2201 et seq. and the Federal Rules of Civil Procedure, files this complaint for

declaratory judgment and injunctive relief against defendants MIRZA N. BAIG

and BLUESPRINGS WATER CO. (collectively "Defendants") and in support

thereof respectfully shows as follows:

EXHIBIT "24"

## NATURE OF THE ACTION

1.     This is an action for declaratory judgment and injunctive relief, arising as a result of the delayed, repeated, unfounded, and unmeritorious threats and claims by defendants Mirza N. Baig and Bluesprings Water Co. against TCCC. TCCC seeks a declaratory judgment that TCCC has not misappropriated any intellectual property of Defendants or infringed any intellectual property rights of Defendants, including but not limited to any trademark rights of Defendants, by adopting and using TCCC's COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, VAULT ZERO and POWERADE ZERO trademarks or any of the other trademarks used by TCCC that include ZERO. TCCC also seeks injunctive relief restraining and enjoining Defendants from asserting any such claims of misappropriation or infringement against TCCC in any forum.

## PARTIES AND JURISDICTION

2.     Plaintiff The Coca-Cola Company is a corporation organized and existing under the laws of the State of Delaware having its principal place of business located at One Coca-Cola Plaza, Atlanta, Georgia 30313.  TCCC is a

manufacturer of beverage products, including syrups and concentrates for the manufacture of sparkling beverages, sports drinks, and other beverage products.

3.     Defendant Mirza N. Baig ("Baig") is, upon information and belief, a native of Pakistan, is currently a resident of the State of Illinois, and is the principal, President and agent for service of defendant Bluesprings Water Co. Upon information and belief, defendant Baig has also used the names "Nadeem Mirza" and "Nad Mirza," and has a residence and/or place of business at 2742 West Devon Avenue, Chicago, Illinois 60659.

4.     Defendant Bluesprings Water Co. ("Bluesprings") is, upon information and belief, a corporation organized and existing under the laws of the State of Illinois, having a place of business at 2742 West Devon Avenue, Chicago, Illinois 60659. Upon information and belief, defendant Bluesprings has also been known and/or referred to in the past as "Bluesprings Co.," "Blue Springs W. Co." and/or "Bluesprings W. Co."

5.     This Court has jurisdiction over the subject matter of this action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367, as plaintiff's claims under federal law arise under the trademark laws of the United States, 15 U.S.C. § 1051 et seq., and the Declaratory Judgments Act, 28 U.S.C. § 2201 et seq., and

plaintiff's claims under state law are substantial and are so related to plaintiff's federal claims that they form part of the same case or controversy.

6.      This Court has jurisdiction over the persons of Baig and Bluesprings as a result of the activities of Baig and Bluesprings in and directed towards the State of Georgia and this Judicial District, including but not limited to telephone conversations with individuals in Atlanta, Georgia regarding the matters at issue herein; the sending to Atlanta, Georgia of materials relating to this matter; the transmittal to Atlanta, Georgia of repeated letters, demands and threats regarding this matter; and/or the attendance at and participation in a meeting in Atlanta, Georgia regarding this matter.  Defendants and their counsel have purposely directed their actions to TCCC in Atlanta, Georgia; have specifically targeted TCCC in Atlanta, Georgia; and have caused and are threatening to cause injury and damage to TCCC in Atlanta, Georgia.  A substantial portion of the events giving rise to this action occurred in Atlanta, Georgia.  Defendants are therefore subject to the jurisdiction of this Court.

7.      Venue in this Court is proper in accordance with 28 U.S.C. § 1391.

## FACTS GIVING RISE TO THIS ACTION

8.    In or about September of 2004, TCCC introduced in the United States a beverage product named DIET SPRITE ZERO.  DIET SPRITE ZERO was the first TCCC product sold in the United States that included ZERO in the name of the product.  Prior to September of 2004, TCCC had used ZERO in the name of products sold outside the United States.

9.    In or about June of 2005, TCCC introduced in the United States a beverage product named COCA-COLA ZERO and COKE ZERO.  Since the time COCA-COLA ZERO / COKE ZERO was introduced, TCCC has introduced in the United States a number of other beverage products that include ZERO in the product name, including but not limited to SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO.

10.    For nearly the past four years, Defendants have sporadically threatened TCCC with alleged claims relating to the use by TCCC of its ZERO family of marks.  Commencing in approximately October of 2004, defendants Baig and Bluesprings, directly or through intermediaries or representatives, began contacting TCCC for the purpose of asserting claims and making threats of filing suit against TCCC for violations of Defendants' rights allegedly arising out of the use by TCCC of marks that include ZERO.  Defendants Baig and Bluesprings or

- 5 -

persons acting on their behalf have contacted TCCC on multiple occasions since October of 2004, and have done so by telephone, by electronic mail and by letter.

11. In approximately October of 2004, defendants Baig and Bluesprings contacted TCCC directly, by way of a telephone call by defendant Baig to TCCC in Atlanta. A representative of TCCC spoke with Baig and responded to the inquiries made by Baig.

12. In approximately November of 2004, defendants Baig and Bluesprings again contacted TCCC, by way of a letter dated November 12, 2004 from defendant Baig to a representative of TCCC in Atlanta. In December of 2004 and January of 2005 TCCC responded, in writing, to Baig's letter.

13. Later in 2005, defendants Baig and Bluesprings contacted TCCC a third time, through a telephone call from an attorney representing Defendants. A representative of TCCC spoke with Defendants' attorney, responded to his inquiries on behalf of Defendants, and provided copies of certain documents requested by the attorney. The attorney indicated that he would follow up in writing on behalf of Defendants, but no such follow up from the attorney was ever received by TCCC.

14.    Following the contacts between TCCC and both Baig and Defendants'
counsel in late 2004 and early 2005, Defendants took no action against TCCC and
did not commence any proceedings of any kind against TCCC.

15.    In approximately September of 2005, a different attorney acting on
behalf of defendant Baig filed with the U.S. Patent and Trademark Office
("USPTO") a request for an extension of the time within which Baig could oppose
TCCC's application to register the mark NOTHING IS LIGHTER THAN ZERO.
A ninety-day extension of time was granted to Baig, but no opposition was filed by
or on behalf of Baig.

16.    In early 2007, defendants Baig and Bluesprings contacted TCCC yet
again, by way of a telephone call to TCCC by an individual claiming to be a
representative of Defendants.  A representative of TCCC spoke with Defendants'
representative and responded to the inquiries of Defendants' representative.

17.    Following these further contacts on behalf of Defendants with TCCC
in early 2007, Defendants took no action against TCCC and did not commence any
proceedings of any kind against TCCC.

18.    In October of 2007, defendants Baig and Bluesprings contacted TCCC
a further time, by way of an "introductory" letter to TCCC sent by a different
attorney representing Defendants.  In that attorney's letter to TCCC on behalf of

defendants Baig and Bluesprings dated October 29, 2007, counsel for Defendants advised TCCC that Defendants planned to commence an opposition proceeding with respect to TCCC's application for a federal trademark registration for the mark SPRITE ZERO, which application had been published for opposition by the USPTO on October 23, 2007.

19.    On November 18, 2007, Defendants' counsel filed with the USPTO a request for an extension of the time within which Baig could oppose TCCC's application to register the mark SPRITE ZERO. A thirty-day extension of time was granted to Baig, but neither defendant Baig nor defendant Bluesprings timely commenced such an opposition proceeding with respect to the TCCC application to register the SPRITE ZERO mark.

20.    Following these further contacts on behalf of Defendants with TCCC in late 2007, Defendants took no action against TCCC and did not commence any proceedings of any kind against TCCC.

21.    Most recently, defendants Baig and Bluesprings have contacted TCCC for the sixth time, by way of a formal "demand letter" sent to TCCC on March 12, 2008 by the same attorney for Defendants who had communicated with TCCC in October of 2007. On May 6, 2008, counsel for TCCC responded to Defendants' demand letter.

22.    On Thursday, June 5, 2008, counsel for Baig and Bluesprings sent TCCC's counsel a letter, in which Baig's counsel asserted that Baig was "dead serious about filing suit." Baig's counsel further advised TCCC's counsel that he would send to TCCC's counsel, not later than the close of business on Friday, June 6, 2008, a copy of a complaint that he would file on behalf of Baig and Bluesprings on Friday, June 13, 2008, if TCCC did not accede to the demands of Baig and Bluesprings prior to that time.

23.    Counsel for Baig and Bluesprings did not forward to TCCC's counsel a complaint on Friday, June 6. Instead, Defendants' counsel advised TCCC's counsel on June 10 that Defendants' arbitrary deadline of June 13 for TCCC to meet Defendants' demands remained unchanged but that Defendants' counsel would not send a copy of Defendants' complaint to TCCC's counsel prior to that time.

24.    The most recent threats and communications to TCCC made on behalf of Baig and Bluesprings have included demands for the payment by TCCC to Baig and/or Bluesprings of one hundred million dollars ($100,000,000) and other substantial sums of money. Defendants have also made threats to the effect that Defendants will seek to intentionally damage TCCC through extensive "adverse

publicity" that Defendants will seek to generate in support of their threatened lawsuit.

25.     Notwithstanding Defendants' repeated threats and demands, Defendants have not formally asserted any claims or commenced any proceedings in any court or before the U.S. Patent and Trademark Office against TCCC as of the date hereof.

26.     Based on Defendants' communications to TCCC, TCCC has a reasonable apprehension that Defendants will continue to pursue their unfounded claims against TCCC by filing a lawsuit at some time in the near future.

27.     As a result of Defendants' repeated threats and demands, there is a live, actual and justiciable controversy between TCCC and Defendants regarding whether the use by TCCC of its trademarks that include ZERO infringe or violate any rights of Defendants or breach any duties to Defendants.

28.     For the reasons more fully set forth below, TCCC has not infringed or violated any rights of Defendants or breached any duties to Defendants, and is not liable to Defendants, or either of them, for any reason.  TCCC is therefore entitled to a declaratory judgment that TCCC has not misappropriated any intellectual property of Defendants, has not breached any contractual obligations to Defendants, has not infringed any intellectual property rights of Defendants, and

has not unfairly competed with Defendants or violated any rights of Defendants. TCCC is also entitled to injunctive relief preventing Defendants from asserting against TCCC any such claims of misappropriation, breach of contract, infringement, unfair competition or violation of Defendants' rights.

## BACKGROUND FACTS

29.    On or about October 14, 1997, defendant Baig filed with the USPTO an application to register an alleged mark that included the words NATURALLY ZERO CANADIAN NATURAL SPRING WATER, together with a numeral "0" and other design elements, as a trademark for "natural spring water" (the "Baig Application").

30.    In connection with their threats and communications to TCCC, Defendants Baig and Bluesprings have asserted that, at some point prior to December 2002, they created and began the sale of a bottled natural spring water product named NATURALLY ZERO CANADIAN NATURAL SPRING WATER.

31.    In connection with their threats and communications to TCCC, Baig and Bluesprings have asserted that Baig and Bluesprings sold their NATURALLY ZERO CANADIAN NATURAL SPRING WATER product beginning in

approximately May of 1998 and continuing for some period of time thereafter, until approximately October of 2004.

32.    In connection with their threats and communications to TCCC, Baig and Bluesprings have asserted that their total sales of their NATURALLY ZERO CANADIAN NATURAL SPRING WATER product between 1998 and 2004 were less than one hundred fifty thousand dollars ($150,000).

33.    In connection with their threats and communications to TCCC, Baig and Bluesprings have asserted that their sales of their NATURALLY ZERO CANADIAN NATURAL SPRING WATER product between 1998 and 2004 were made in a limited geographic area consisting of the metropolitan Chicago, Illinois area and some areas geographically proximate thereto in the states of Illinois, Wisconsin and Indiana.

34.    In approximately December of 2002, an individual acting on behalf of Baig and Bluesprings contacted TCCC in Atlanta and inquired whether TCCC was interested in participating in the marketing and/or distribution of Defendants' NATURALLY ZERO CANADIAN NATURAL SPRING WATER bottled water product.  In approximately mid-January of 2003, Baig forwarded to TCCC in Atlanta copies of publicly-available materials regarding Defendants' NATURALLY ZERO CANADIAN NATURAL SPRING WATER product.

35. TCCC believes that Baig and a second representative of Defendants met with representatives of TCCC in Atlanta in or about late January or early February of 2003, and discussed with the representatives of TCCC Defendants' NATURALLY ZERO CANADIAN NATURAL SPRING WATER bottled water product.

36. On or about February 7, 2003, TCCC advised Defendants, in writing, that TCCC was not interested in participating in the marketing or distribution of Defendants' NATURALLY ZERO CANADIAN NATURAL SPRING WATER bottled water products.

37. In connection with TCCC's development, adoption and use of TCCC's trademarks that include ZERO, TCCC made no use of any materials or information submitted or provided by Defendants to TCCC.

38. TCCC has never entered into any contractual relationship of any kind with Defendants, and TCCC and Defendants never entered into any confidentiality agreement or other agreement regarding the discussions between TCCC and Defendants in late 2002 and early 2003.

39. On or about November 15, 2005, the Baig Application to register NATURALLY ZERO CANADIAN NATURAL SPRING WATER and Design as a trademark with the USPTO was abandoned.

40.    Upon information and belief, Defendants have not sold any products

bearing the name NATURALLY ZERO CANADIAN NATURAL SPRING

WATER or the name NATURALLY ZERO for at least three years prior to the

date hereof.

41.    Upon information and belief, Defendants have no intent to resume use

of the NATURALLY ZERO CANADIAN NATURAL SPRING WATER and/or

NATURALLY ZERO names.

## COUNT I

### DECLARATORY JUDGMENT OF NO
### MISAPPROPRIATION OF INTELLECTUAL PROPERTY

42.    TCCC realleges and incorporates by reference as if fully set forth

herein the allegations of paragraphs 1 through 41 above.

43.    TCCC has not misappropriated any intellectual property of

Defendants and has not breached any contractual relationship with Defendants in

connection with TCCC's development, adoption and use of TCCC's trademarks

that include ZERO.

44.    TCCC is entitled to a judgment declaring that TCCC has not

misappropriated any intellectual property of Defendants and has not breached any

contractual relationship with Defendants in connection with TCCC's development, adoption and use of TCCC's trademarks that include ZERO.

## COUNT II

### DECLARATORY JUDGMENT OF
### NO TRADEMARK INFRINGEMENT

45. TCCC realleges and incorporates by reference as if fully set forth herein the allegations of paragraphs 1 through 44 above.

46. Upon information and belief, any rights of Defendants in or to the names NATURALLY ZERO CANADIAN NATURAL SPRING WATER and/or NATURALLY ZERO for bottled water have been abandoned.

47. The use by TCCC of TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and TCCC's other trademarks that include ZERO is not likely to cause confusion.

48. The use by TCCC of TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and TCCC's other trademarks that include ZERO does not infringe any valid trademark rights of Defendants to the names NATURALLY ZERO CANADIAN NATURAL

- 15 -

SPRING WATER, NATURALLY ZERO, and/or or any other alleged name or mark.

49.     TCCC is entitled to a judgment declaring that the use by TCCC of TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and TCCC's other trademarks that include ZERO does not infringe any valid trademark rights of Defendants to the names NATURALLY ZERO CANADIAN NATURAL SPRING WATER, NATURALLY ZERO, or any other alleged name or mark, and that any rights that Defendants may have had to such names have been abandoned.

## COUNT III

### DECLARATORY JUDGMENT
### OF NO UNFAIR COMPETITION OR
### OTHER VIOLATION OF DEFENDANTS' RIGHTS

50.     TCCC realleges and incorporates by reference as if fully set forth herein the allegations of paragraphs 1 through 49 above.

51.     The development, adoption and use by TCCC of TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and

- 16 -

TCCC's other trademarks that include ZERO does not constitute unfair competition with Defendants or otherwise violate any rights of Defendants.

52.    TCCC is entitled to a judgment declaring that the development, adoption and use by TCCC of TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and TCCC's other trademarks that include ZERO does not constitute unfair competition with Defendants or otherwise violate any rights of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, having fully asserted its claims against Defendants, plaintiff The Coca-Cola Company respectfully prays for relief against Defendants as follows:

(1)    entry of a judgment declaring that:

(a)    TCCC has not misappropriated any intellectual property of Defendants and has not breached any contractual relationship with Defendants in connection with TCCC's development, adoption and use of TCCC's trademarks that include ZERO;

(b)     any rights that Defendants may have had to the names NATURALLY ZERO CANADIAN NATURAL SPRING WATER and/or NATURALLY ZERO have been abandoned;

(c)     the use by TCCC of TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and TCCC's other trademarks that include ZERO does not infringe any valid trademark rights of Defendants to the names NATURALLY ZERO CANADIAN NATURAL SPRING WATER, NATURALLY ZERO, or any other alleged name or mark; and

(d)     the development, adoption and use by TCCC of TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and TCCC's other trademarks that include ZERO does not constitute unfair competition with Defendants or otherwise violate any rights of Defendants;

(2)     entry of an order enjoining and restraining Defendants and all persons in active concert or participation with Defendants from asserting against TCCC or any party or entity associated with or related to TCCC any claim in any forum that TCCC or any such party or entity has misappropriated any intellectual property of Defendants, breached any contractual relationship with Defendants, infringed any valid trademark rights of Defendants, competed unfairly with Defendants, or otherwise violated any rights of Defendants by developing, adopting or using TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and TCCC's other trademarks that include ZERO;

(3)     an award of costs and reasonable attorneys' fees to TCCC; and

(4)     such other and further relief as the Court deems just and proper.

Respectfully submitted,

KING & SPALDING LLP

Bruce W. Baber
   (GA Bar No. 030050)
Jill Wasserman
   (GA Bar No. 739662)

1180 Peachtree Street
Atlanta, Georgia  30309
Telephone:  404-572-4600
Facsimile:  404-572-5100

Attorneys for Plaintiff
THE COCA-COLA COMPANY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA GEORGIA

THE COCA-COLA COMPANY,   )
   )
   Plaintiff,   )
   )   CIVIL ACTION FILE
   v.   )
   )   NO. 1:08-cv-2010-TWT
MIRZA N. BAIG and   )
BLUESPRINGS WATER CO.,   )
   )
   Defendants.   )

## JUDGMENT BY DEFAULT

This matter having come before the Court on plaintiff's Motion For Entry Of

Judgment By Default, filed by plaintiff The Coca-Cola Company ("TCCC") on

July 24, 2008; and

It appearing that each of defendants Mirza N. Baig and Bluesprings Water

Co. is in default, and that on July 18, 2008 the clerk entered the default of each of

the defendants in accordance with Rule 55(a) of the Federal Rules of Civil

Procedure;

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND

DECREED AS FOLLOWS:



EXHIBIT "25"

1.    Entry of judgment by default in favor of plaintiff The Coca-Cola Company and against each of defendants Mirza N. Baig and Bluesprings Water Co. for the relief requested in plaintiff's Complaint is proper in accordance with Rule 55(b) of the Federal Rules of Civil Procedure.

2.    This Court has jurisdiction over the subject matter of this action and over the persons of the Defendants, and venue in this Court is proper.

3.    Plaintiff's Complaint states valid claims against defendants for declaratory and injunctive relief.

4.    In accordance with 28 U.S.C. § 2201 et seq., the Court hereby enters judgment declaring that:

(a)    plaintiff The Coca-Cola Company has not misappropriated any intellectual property of Defendants and has not breached any contractual relationship with Defendants in connection with the development, adoption or use of TCCC's trademarks that include ZERO;

(b)    any rights that Defendants may have had to the names NATURALLY ZERO CANADIAN NATURAL SPRING WATER and/or NATURALLY ZERO have been abandoned;

(c) the use by plaintiff The Coca-Cola Company of TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and TCCC's other trademarks that include ZERO does not infringe any valid trademark rights of Defendants to the names NATURALLY ZERO CANADIAN NATURAL SPRING WATER, NATURALLY ZERO, or any other name or mark; and

(d) the development, adoption and use by plaintiff The Coca-Cola Company of TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO trademarks and TCCC's other trademarks that include ZERO does not constitute unfair competition with Defendants or otherwise violate any rights of Defendants.

5. Defendants Mirza N. Baig and Bluesprings Water Co., and all persons in active concert or participation with them, are hereby PERMANENTLY and PERPETUALLY RESTRAINED and ENJOINED from asserting against plaintiff The Coca-Cola Company or any party or entity associated with or related to The Coca-Cola Company any claim in any forum that The Coca-Cola Company or any

such party or entity has misappropriated any intellectual property of Defendants, breached any contractual relationship with Defendants, infringed any valid trademark rights of Defendants, competed unfairly with Defendants, or otherwise violated any rights of Defendants by developing, adopting or using TCCC's DIET SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO or VAULT ZERO trademarks or any of TCCC's other trademarks that include ZERO.

6.    In accordance with Rule 54 of the Federal Rules, plaintiff The Coca-Cola Company shall be entitled to an award of costs as the prevailing party in this action.

SO ORDERED, this 25th day of July, 2008.


/s/ Thomas W. Thrash
THOMAS W. THRASH, JR.
UNITED STATES DISTRICT JUDGE