**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MIRZA N. BAIG AND BLUE SPRINGS** | ) | |
| **WATER CO.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case no. 08-cv-4206** |
| **v.** | ) | |
| | ) | **Hon. John Z. Lee** |
| **THE COCA-COLA COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Mirza Baig and Blue Springs Water Co. allege that Defendant The Coca-Cola Company has infringed upon Plaintiffs' trademark for "Naturally Zero" spring water through its use of the mark "ZERO" in connection with products such as "Sprite ZERO." Plaintiffs argue under U.S. trademark law and Canadian trademark law that Defendant's use of the "ZERO" mark results in reverse confusion to consumers. Defendant denies all wrongdoing and has counterclaimed seeking a declaratory judgment that, *inter alia*, it has neither infringed nor misappropriated any of Plaintiffs' trademark rights. Defendant now moves for summary judgment, arguing that Plaintiffs have abandoned their trademark for "Naturally Zero," and even if not, that the mark is not entitled to protection. For the reasons set forth below, the Court grants Defendant's motion, enters judgment in its favor on Count[s] I of Plaintiffs' Complaint, and dismisses Count II without prejudice.

## Facts[1]

Plaintiff Mirza N. Baig ("Baig") was the principal, President, and sole owner of plaintiff Bluesprings Water Co. ("Bluesprings"). Def.'s LR 56.1(a)(3) Stmt. ¶ 1. Bluesprings was a corporation organized under the laws of the State of Illinois; it is no longer in good standing with the Illinois Secretary of State office. *Id.* ¶¶ 2, 3. Defendant The Coca-Cola Company ("TCCC") is a manufacturer of sparkling beverages and sports drinks. *Id.* ¶¶ 4, 5.

Plaintiffs assert rights to the mark "Naturally Zero" for bottled water in the United States and Canada. *Id.* ¶ 8. Plaintiffs' claim is based upon their manufacture of bottled water in Canada and sales of such bottled water in the greater Chicago area and other nearby locations, all of which took place between 1998 and 2004. *Id.* ¶¶ 8, 23. Plaintiffs assert that Defendant's use of marks that include the word "ZERO," including COCA-COLA ZERO, COKE ZERO, and SPRITE ZERO, infringes upon Plaintiffs' rights in the "Naturally Zero" mark in the U.S. and Canada. *Id.* ¶ 9.

### A. The "Naturally Zero" Product

During the 1990s, while working as a distributor for Crystal Canadian bottled water, Baig decided to create his own bottled water and conducted market research to see what other brands of bottled water were available. *Id.* ¶ 10. At his deposition, Baig testified that after one of his Crystal Canadian customers told Baig that he was charging too much for a product that had nothing in it, Baig looked at "the ingredients of the bottled water also, and then I just click into my mind the word zero, and I thought that it would be the perfect brand to promote the bottled water brand." *Id.* ¶ 11. Baig further testified that he selected the name "Naturally Zero" because the name communicated the "quality of the water, purity, no sugar, no calories, you know, a drink about nothing" and "highlight[ed] the quality of the product," and he decided to use the

---

[1]  Unless otherwise stated, the following facts are undisputed.

word "naturally" because "it comes from the nature" and "the water is the gift of nature." *Id.* ¶ 12. Russell Hopkins ("Hopkins"), a retired beverage industry consultant who assisted Baig to develop the product, testified at his deposition that he believed that the name "Naturally Zero" was a good choice because "Zero" immediately communicated to consumers certain attributes of the water, such as the fact it had no calories, no additives, no sweeteners, and no harmful, artificial ingredients. *Id.* ¶ 13. Between 1998 and 2004, Baig imported from Canada bottled water bearing the label "Naturally Zero." *Id.* ¶ 14. The bottles prominently featured a logo design with a large numeral "0" and the word "zero" on the labels. *Id.* ¶ 15; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 15.



### 1. Naturally Zero Sales

Between 1998 and 2004, Baig primarily sold the Naturally Zero water door-to-door to gas stations located in the greater Chicago area during the summer months. *Id.* ¶¶ 16, 19. During this time period, Plaintiffs produced and sold about 500,000 bottles of Naturally Zero water, in 16.9 ounce, 20 ounce and 1 liter sizes. *Id.* ¶ 17. Additionally, between 2000 and 2003, wholesalers sold approximately twenty-five to thirty pallets of Naturally Zero water in the greater Chicago area. *Id.* ¶ 20. Baig estimates that his total gross sales of Naturally Zero water between 1998 and 2004 were less than $150,000.00. *Id.* ¶ 18.

Baig also sold limited amounts of Naturally Zero water outside of the Chicagoland area. From 2000 to 2003, Baig made two to three trips each year to the Milwaukee area, selling

approximately 100 cases of water each trip. *Id.* ¶ 21. During that same time period, Baig made approximately 12 trips each year to sell Naturally Zero water to gas stations in Munster and Hobart, Indiana, selling approximately 12 to 15 cases each time. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22. While Baig does not contend that he sold Naturally Zero product anywhere else in the United States other than the Chicagoland area, Hobart and Munster, Indiana, and the Milwaukee, Wisconsin area, he testified that he believed that a distributor may have sold some product in Canada.[2] *Id.* ¶ 23. Plaintiffs have provided no documentation or other proof of any sales of Naturally Zero in Canada. Def.'s LR 56.1(a)(3) Stmt. ¶ 25; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 25.

Plaintiffs admit that no Naturally Zero water has been sold since October 3, 2004. Def.'s LR 56.1(a)(3) Stmt. ¶ 48. Moreover, since October 2004, no remaining inventory of Naturally Zero water has been maintained. *Id.* ¶ 49. No Naturally Zero water has been bottled since the spring of 2004. *Id.* ¶ 50.

Plaintiffs made no attempts to resume sales of Naturally Zero until 2010. *Id.* ¶ 55. At that time, Plaintiffs either entered into negotiations or an agreement (the parties are in dispute as to this point) with an individual in Chicago named Robert Corr regarding launching a line of soft drink products named "Naturally Zero Cola." *Id.*; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 55.

## 2. Naturally Zero Marketing Efforts

On February 18, 1999, with Hopkins' assistance, Plaintiffs issued a press release announcing Naturally Zero water, which was distributed to beverage industry publications. Def.'s LR 56.1(a)(3) Stmt. ¶ 26. Following the issuance of the press release, in 1999, articles regarding Naturally Zero water appeared in three trade publications. *Id.* ¶ 27. Plaintiffs also exhibited Naturally Zero water at three separate trade fairs: a beer wholesalers trade show in Las

---

[2]     Defendants dispute that any Naturally Zero water was ever sold in Canada, pointing to Plaintiffs failure to produce documents to substantiate such sales. *Compare* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 23-24 with Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 24.

Vegas in 1999; a health fair in Chicago sponsored by the American Kidney Fund in 2001; and a Chicago food show in 2002. *Id.* ¶ 28. Plaintiffs have never had a written business plan for the Naturally Zero business. *Id.* ¶ 52.

While Plaintiffs admit that they never engaged in any newspaper, print, television, radio, billboard or other media advertising for their Naturally Zero water, the parties dispute whether Plaintiffs ever produced any magazine advertising, point-of-sale, or any other retail or consumer-facing marketing materials for Naturally Zero water. Def.'s LR 56.1(a)(3) Stmt. ¶ 29; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 29. Plaintiffs created "brochures" or flyers regarding the Naturally Zero water, which were sent to potential distributors. *Id.* ¶ 30. And, while the parties agree that Plaintiffs at one time operated an Internet website, www.naturallyzero.com, which included a link to the website of the Canadian manufacturer Clarus Canadian, they dispute the length of time the website remained operational. Def.'s LR 56.1(a)(3) Stmt. ¶ 31; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 31. Moreover, Plaintiffs have provided no records of whether, how frequently, or by whom the website was accessed or visited, and have provided no evidence that any Naturally Zero water was ever ordered or purchased through the website. Def.'s LR 56.1(a)(3) Stmt. ¶ 31. The website domain name is currently for sale. *Id.* ¶ 58.

As for licensing of the Naturally Zero product, in 2000, Plaintiffs entered into a license agreement with the American Kidney Fund ("AKF") providing for use of the AKF name on the label of Naturally Zero water. In return, AKF was promised a royalty of four percent of gross sales. *Id.* ¶ 32. Also in 2000, the American Kidney Fund issued one press release about Naturally Zero water. *Id.* ¶ 33. In 2002, Bluesprings sublicensed its rights under the AKF license to Clarus Canadian, a company in Canada that was bottling the water for Plaintiffs. *Id.* ¶ 34. The amount of Naturally Zero water sold bearing the AKF label was very minimal. *Id.* ¶ 35.

Neither Baig nor Bluesprings ever paid any royalties to the AKF under the license agreement and, to the best of Baig's knowledge, Clarus never paid a royalty to either the AKF or Bluesprings under the sublicense agreement. *Id.* ¶ 36.

### B. Trademark Proceedings

On October 14, 1997, Baig filed an intent-to-use application with the United States Patent and Trademark Office ("USPTO") seeking to register the mark NATURALLY ZERO CANADIAN NATURAL SPRING WATER along with a label image, for "natural spring water." *Id.* ¶ 37.



On April 6, 1998, the USPTO initially refused Baig's application, which was then suspended between January 28, 1999 and April 19, 2005. *Id.* ¶ 38. Baig later sought to delete the words "CANADIAN NATURAL SPRING WATER" from the mark and amend his application to only a mark featuring the words "NATURALLY ZERO" with a large "0" as the design. *Id.* ¶ 39.



On April 19, 2005, the Trademark Examining Attorney issued an Office Action refusing to allow the amendment and requiring a disclaimer of "NATURALLY ZERO" apart from the

mark as shown.  *Id.* ¶ 40.  The Office Action stated as follows:  "the term "ZERO" and the numeral "0" are widely used in connection with water beverage drinks to describe and promote the naturally or inherently "zero" calorie, or "zero" carbohydrate, or "zero" sodium, or "zero" additive nature of water beverages in today's market. In view of this widely used and recognized merely descriptive nature of the terms "zero" and the numeral "0" for water beverages, and in view of the generic significance of the term NATURALLY, the applicant must submit an amended disclaimer statement in which the terms "NATURALLY ZERO" and the numeral "0" are also disclaimed apart from the mark as a whole."  *Id.*  Baig failed to respond to the April 19, 2005, Office Action and his application was deemed abandoned on November 15, 2005.  *Id.* ¶ 42.

On November 19, 1997, Baig filed an application with the Canadian Intellectual Property Office ("CIPO") seeking to register in Canada the mark NATURALLY ZERO with a label design using the terms "Naturally ZERO" and featuring a design with a numeral "0" and mountains in the background.  *Id.* ¶ 43.  On November 20, 2000, CIPO issued Registration Number TMA537375 for this design.  *Id.* ¶ 44.  However, Baig's Canadian registration was later the subject of a non-use expungement proceeding under Section 45(4) of the Canadian Trade-marks Act.  *Id.* ¶ 45.  In connection with the Canadian expungement proceeding, Baig submitted an affidavit dated June 10, 2008, to CIPO stating that the last sales of "Naturally Zero" occurred in October 2004.  *Id.* ¶ 46.  On June 17, 2009, the Canadian registration was expunged.  *Id.* ¶ 47.

### C.    Defendant's Use of the "ZERO" Mark

In December 2002, Hopkins, acting on behalf of Plaintiffs, contacted Defendant to enter into business negotiations regarding the "Naturally Zero" brand.  *Id.* ¶ 61; Pl.'s LR 56.1(b)(3)(B) ¶ 61.  In mid-January 2003, Baig forwarded to Defendant copies of publicly-available materials

regarding Plaintiffs' Naturally Zero water. Def.'s LR 56.1(a)(3) Stmt. ¶ 62. On February 7, 2003, Defendant advised Plaintiffs, in writing, that it was not interested in participating in the marketing or distribution of Plaintiffs' Naturally Zero water. *Id.* ¶ 63.

At least as early as April 2002, Defendant began using "ZERO" in connection with its product DIET SPRITE ZERO in Greece. *Id.* ¶ 64; Pl.'s LR 56.1(b)(3)(B) ¶ 64. In September 2004, Defendant introduced in the United States a beverage product named DIET SPRITE ZERO, which was the first product it sold in the United States that included ZERO in its name. Def.'s LR 56.1(a)(3) Stmt. ¶ 65. In June 2005, Defendant introduced beverage products named COCA-COLA ZERO and COKE ZERO in the United States. *Id.* ¶ 66. In January 2007, Defendant introduced beverage products named COCA-COLA CHERRY ZERO and COKE CHERRY ZERO. *Id.* Defendant later introduced a number of other beverage products that included ZERO in the name, including but not limited to SPRITE ZERO, FANTA ZERO, PIBB ZERO, POWERADE ZERO and VAULT ZERO. *Id.* Defendant also has used ZERO as a part of marks that include its well-known brand names such as COCA-COLA, SPRITE and FANTA. *Id.* ¶ 67. Defendant has sold beverage products in Canada bearing the SPRITE ZERO, COCA-COLA ZERO and POWERADE ZERO marks, and owns the Canadian trademark registrations for DIET SPRITE ZERO, SPRITE ZERO, COCA-COLA ZERO, COKE ZERO, and POWERADE ZERO. *Id.* ¶ 69.

<u>Discussion</u>

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## I.       Lanham Act Claim (Count I)

### A.       Legal Standard

In order to prevail in a trademark infringement case, a plaintiff must prove "(1) that [he] has a protectible trademark, and (2) a likelihood of confusion as to the origin of the defendant's product.'" *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) (quoting *International Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988)). Where a defendant challenges a trademark on the grounds that it is descriptive and not entitled to legal protection at the summary judgment stage, the burden is on "Defendant[] to provide enough evidence to create no doubt that [the mark] should be classified as descriptive and no genuine dispute of fact exists otherwise." *Box Acquisitions, LLC v. Box Packaging Prods., Inc.*, No. 12 C 4021, 2014 WL 1245264, at *4 (N.D. Ill. Mar. 26, 2014).

### B.       Protectable Trademark

A trademark is descriptive where "it does more than merely name a brand; it describes the product category to which the brand belongs." *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 483 (7th Cir. 2007). While a "descriptive mark is not a complete description . . . it picks out a product characteristic that figures prominently in the consumer's decision whether to buy the product or service in question." *Id.* Descriptive trademarks are not protectible if they lack secondary meaning, *i.e.*, they do not become "uniquely associated with the original seller." *See*, *e.g.*, *Custom Vehicles*, 476 F.3d at 483-84 ("unless and until" a descriptive mark "achieved secondary meaning . . . it could not be a legally protected trademark."); *Timelines, Inc. v. Facebook, Inc.*, 938 F. Supp. 2d 781, 793 (N.D. Ill. 2013) ("Without this secondary meaning associated with a descriptive mark, the mark is not entitled to trademark protection."). The rationale behind this prohibition is to prevent a seller from "appropriat[ing] as the name of its

brand a term by which the public knows the product category to which the brand belongs, for that would make it difficult for other sellers of the same product to describe their brands, and this would impair competition." *Custom Vehicles*, 476 F.3d at 483. The Court therefore must first determine the proper classification of the mark, and then, if it proves descriptive, determine whether it has acquired secondary meaning. Each issue is addressed in turn below.

### 1. Mark Classification

Courts of this Circuit classify trademarks "into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992)). "In general, the level of trademark protection available corresponds to the distinctiveness of the mark." *Id.* "A generic term is one that is commonly used and does not identify any particular source and, therefore, is not entitled to any trademark protection. *Id.* (citing *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986)). The next classification, "descriptive" marks, "describe[] the ingredients, qualities, or characteristics of an article of trade or a service" and generally are not protectible "because a merely descriptive mark is a 'poor means of distinguishing one source of services from another.'" *Id.* (quoting *M.B.H. Enters. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir. 1980)). As stated, a descriptive mark may still be protectable "if it acquires secondary meaning 'in the collective consciousness of the relevant community.'" *Id.* (quoting *Mil–Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1157 (7th Cir. 1996). Suggestive, arbitrary, and fanciful marks are inherently distinctive and thus "automatically entitled to trademark protection." *Id.* (citing *Two Pesos*, 505 U.S. at 767–68).

Defendant contends that the "Naturally Zero" mark is descriptive, because it merely describes the ingredients and qualities of natural spring water, and thus is not protectable. Plaintiffs respond that the mark is suggestive, and therefore inherently distinctive and protectable. Moreover, according to Plaintiffs, Defendant itself has consistently argued to the USPTO that "ZERO" is a suggestive mark in connection with its own trademark applications, and is judicially estopped from arguing otherwise. Defendant replies that the term is descriptive as applied to natural spring water, and that Plaintiffs and their witnesses testified at their depositions that the mark immediately conveyed information about the product. Having considered the record, the Court concludes that the mark is descriptive.

"Naturally Zero" immediately conveys to the Court that the spring water sold by Plaintiffs contains no calories or additives. "No operation of the imagination is necessary for the Court to connect" that description with the physical qualities of the product at issue. *Box Acquisitions*, 2014 WL 1245264, at *4. Indeed, as Baig testified, he chose the name "Naturally Zero" for his spring water product precisely because the name communicated the "quality of the water, purity, no sugar, no calories, you know, a drink about nothing" and "highlight[ed] the quality of the product." Def.'s LR 56.1(a)(3) Stmt. ¶ 12. Moreover, Baig decided to use the word "naturally" because "it comes from the nature" and "the water is the gift of nature." *Id.* Hopkins, Baig's beverage consultant, similarly testified at his deposition that he believed that the name "Naturally Zero" was a good one because "Zero" immediately communicated to consumers attributes of the water, such as the fact it had no calories, no additives, no sweeteners, and no harmful, artificial ingredients. *Id.* ¶ 13.

The Seventh Circuit has held that such immediately apparent terms that describe characteristics of a product to a potential consumer are merely descriptive. For example, in

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 952 (7th Cir. 1992), the term "Thirst Aid" used in connection with Gatorade was found to be descriptive because it described a characteristic of drink as perceived by consumer. Similarly, in *Henri's Food Prods. Co., Inc. v. Tasty Snacks, Inc.*, 817 F.2d 1303, 1306-07 (7th Cir. 1987), the term "tasty salad dressing" was descriptive because "tasty" described the quality of, rather than type of, the product at issue. Similarly, as Baig acknowledged here, the phrase "naturally zero" describes the "quality of the water, purity, no sugar, no calories, you know, a drink about nothing." Def.'s LR 56.1(a)(3) Stmt. ¶ 12.

Plaintiffs further argue that Defendant is judicially estopped from claiming that ZERO is not a descriptive term, because it has argued to the USPTO in other proceedings that ZERO is suggestive and entitled to protection. Defendant responds that judicial estoppel is inapplicable based on the facts in the record. The Court agrees.

The principle of judicial estoppel states that "a party who prevails on one ground in a prior proceeding cannot turn around and deny that ground in a later proceeding." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 495 (7th Cir. 2011). "[N]o precise or rigid formula guides the application of judicial estoppel." *Jarrad v. CDI Telecomms., Inc.*, 408 F.3d 905, 914 (7th Cir. 2005). "Nevertheless, precedent teaches that several factors are relevant in deciding whether invocation of the doctrine may be appropriate. First, a party's position must be clearly inconsistent with a position earlier taken. Second, the party must have prevailed on the basis of its earlier position 'so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.' Third, we consider whether the party asserting the inconsistent position 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Id.* at 914-15 (citations

and quotations omitted). "A fourth factor to consider is whether the operative facts remain the same in both cases." *Id.* at 915.

Here, Defendant has provided the unrebutted declaration of Bruce W. Baber, one of its trademark attorneys, who attests that Defendant has never "prevailed" in any proceeding before the USPTO based on an argument that the term "ZERO," as used in any of its "ZERO" marks or any mark of a third party, is suggestive and not descriptive. Dkt. 191, 2d Baber Decl. ¶ 16; *see Jarrad*, 408 F.3d at 914. Rather, to the extent that these marks were deemed protectable at all, it was based upon their acquisition of secondary meaning. *See infra* Section I.B.2; 2d Baber Decl. ¶¶ 7, 11. Furthermore, a number of the proceedings cited by Plaintiffs remain pending before the USPTO, and thus the doctrine of judicial estoppel is inapplicable in those instances because TCCC has yet to "prevail" in them. 2d Baber Decl. ¶ 5; *see Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 597 (7th Cir. 2012) (judicial estoppel does not apply where other proceeding remains pending). Accordingly, Plaintiffs' reliance upon the doctrine of judicial estoppel is misplaced.

### 2. Secondary Meaning

Even though the "Naturally Zero" mark is descriptive, it may yet be protectable if it has acquired secondary meaning in the relevant community. *Platinum*, 149 F.3d at 727. "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its products or services in that particular industry that the 'word, term, name, symbol, or device' has come to mean that those products or services are the company's trademark." *Id.* (quoting *Gimix, Inc. v. JS&A Grp., Inc.*, 699 F.2d 901, 907 (7th Cir. 1983)). The burden is on a plaintiff to demonstrate secondary meaning, and where a mark is distinctive, a plaintiff "may face a heightened burden because 'the more descriptive the term, the greater the

evidentiary burden to establish secondary meaning.'" *Box Acquisitions*, 2014 WL 1245264, at *4 (quoting *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 576 (N.D. Ill. 1994)).

"To establish secondary meaning, a court may consider several factors to decide whether secondary meaning has been acquired or established: (1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." *Platinum*, 149 F.3d at 728 (citing *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1085 (7th Cir. 1988)). Other factors a court may consider include "place in the market and evidence of intentional copying." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 641 (7th Cir. 2001). An analysis of these factors reveals that Plaintiffs' mark has not acquired secondary meaning.

### a.      Amount and Manner of Advertising

As to the first factor, Defendant contends that Plaintiffs put forth only limited efforts at advertising and marketing their product, and that such efforts were targeted at the beverage industry rather than consumers. Def.'s Mem. Supp. Mot. 9. Plaintiffs fail to raise any counter-arguments on response, but simply deny Defendant's accusation that they never produced any magazine advertising, point-of-sale, or any other retail or consumer-facing marketing materials for Naturally Zero water. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 29. Plaintiffs instead aver that they created "brochures" or flyers regarding the Naturally Zero water, which were sent to potential distributors, and that they operated a website for their product for at least some period of time. *Id.* ¶¶ 30-31. Further, Plaintiffs outline the marketing efforts they put into place, with Hopkins' assistance, between 1998 and 2004, including developing their website. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 3-10.

### b. Sales and Customer Volume

With respect to the second factor, it is undisputed that Plaintiffs only produced and sold about 500,000 bottles of Naturally Zero water between 1998 and 2004. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 16, 19. Plaintiffs estimate the total gross sales during that time period to be less than $150,000. *Id.* ¶ 18. The bulk of these sales took place in the greater Chicago area, with some limited sales in the Milwaukee area and Northern Indiana. *Id.* ¶¶ 16, 19, 21; *Id.* ¶¶ 16, 19. The parties dispute whether Naturally Zero water was ever sold in Canada; Baig believes that a distributor may have done so. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 23-24; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 24. Plaintiffs, however, have no documentation or other proof of any sales of Naturally Zero in Canada. Def.'s LR 56.1(a)(3) Stmt. ¶ 25; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 25. It also is undisputed that, despite very limited efforts by Plaintiffs to revive the brand, no Naturally Zero water has been sold or bottled since 2004. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 48-50.

### c. Length and Manner of Use

Plaintiffs used the mark in connection with the bottled water they imported from Canada between 1998 and 2004. *Id.* ¶¶ 14-15. As set forth above, Plaintiffs sold the product in limited quantities during that time period in Northern Illinois, Northern Indiana, and Southern Wisconsin. *Id.* ¶¶ 16-22. The mark was used in limited advertising and marketing efforts between 1999 and 2004. *Id.* ¶¶ 26-28, 30-36, 52. The Naturally Zero mark was never formally registered with the USPTO, and although it was ultimately registered in Canada, that registration was expunged in 2009. *Id.* ¶¶ 42, 47.

### d. Place in the Market

There is no evidence in the record establishing that Naturally Zero ever held any significant share of the market for bottled water or soft drinks. The record also lacks evidence that Naturally Zero was sold outside of Northern Illinois, Northern Indiana, or Southern

Wisconsin. Nor is there any evidence that the mark was used in advertising or marketing materials outside of that limited market, save for one display at a beer wholesalers trade show in Las Vegas in 1999 and Plaintiffs' now-defunct and infrequently-visited website. *Id.* ¶ 28, 31, 58.

### e. Consumer Testimony, Surveys, and Intentional Copying

Plaintiffs have presented no consumer testimony, surveys, or evidence of intentional copying. Thus, the Court does not consider these factors as part of its analysis.

### f. Discussion of Factors

Plaintiffs' response includes only a single paragraph addressing secondary meaning, in which they simply cite 15 U.S.C. § 1052(f) for the proposition that "there is a presumption of acquired distinctiveness, or secondary meaning, after five years of use in commerce." But this argument ignores the plain language of the statute, which provides that prima facie evidence of distinctiveness requires "proof of substantially exclusive *and continuous use thereof as a mark by the applicant in commerce for the five years* before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f) (emphasis added). Similarly, the case law clearly provides that in order to establish secondary meaning, a plaintiff must "counter the impression that it in fact used the term inconsistently." *Gimix*, 699 F.2d at 907. Here, Plaintiffs admit that they made no sales of its product after 2004, that the sales were limited to the greater Chicago area, Northern Indiana, and Southern Wisconsin, and that they failed to market or advertise the product after 2004. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 16-22, 48-50, 52. As a result, Plaintiffs fail to satisfy their burden of establishing "continuous use" of the mark for a five-year period sufficient to entitle them to a presumption of acquired distinctiveness.

Plaintiffs further argue that secondary meaning usually involves questions of fact that in this case are inappropriate for resolution on summary judgment, because "the evidence shows

Plaintiffs made over five years of use and sold hundreds of thousands of bottles of its product in interstate commerce in the Chicago-land area, prior to Defendant's first use of ZERO in the United States." Resp. at 10. These facts, they argue, are sufficient evidence to preclude summary judgment. *Id.* But Plaintiffs cite no case law that supports either of these propositions.

As Judge Posner acknowledged in *Custom Vehicles*, "it is difficult, maybe impossible, for a small seller of an unpopular brand—a seller who has negligible sales—to acquire secondary meaning for its brand name. Such a seller is better off adopting a fanciful or arbitrary mark, which is enforceable without proof of secondary meaning." 476 F.3d at 484. This is precisely the conundrum Plaintiffs face. In *Custom Vehicles*, the product (a camping van) had only one "novel feature," which "did not satisfy a large pent-up demand that, had it materialized, might have conferred secondary meaning on [plaintiff's] mark before anyone else could get in on the act." 476 F.3d at 485. Here, the record does not reveal that Plaintiffs' bottled water product, with its modest sales figures, had any "novel feature" that would have generated secondary meaning in the mark.

After considering all of the relevant factors in their totality, the Court concludes that Plaintiffs have failed to present facts from which a reasonable jury could conclude that their mark has acquired secondary meaning. As a result, Plaintiffs' descriptive mark is not protectable, and their Lanham Act claim necessarily fails.[3]

---

[3] As set forth above, once a court concludes that a plaintiff has a protectable trademark, it then must consider whether there exists a likelihood of confusion as to the origin of the defendant's allegedly infringing product. *Ty, Inc.*, 237 F.3d at 897. To do so, a court will look to "the following factors to evaluate whether a likelihood of confusion exists in a trademark case: (1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiffs." *Id.* Here, because the Court has determined that Plaintiffs' trademark is not protectable, it need not conduct the likelihood of confusion analysis in order to grant summary judgment to Defendant as to Count I on the bases outlined above. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.

### B. Abandonment

Even if the Court had not concluded that the mark was merely descriptive and lacked secondary meaning, Defendant's argument that Plaintiffs have abandoned the mark provides a separate and independent basis for the Court to award summary judgment to Defendant as to Count I.

Section 45 of the Lanham Act provides that a mark "shall be deemed to be abandoned" where use of the mark "has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. Such "[i]ntent not to resume may be inferred from circumstances," and "[n]onuse for 3 consecutive years shall be *prima facie* evidence of abandonment." *Id.* The Lanham Act further provides that "'[u]se' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." Indeed, to overcome the presumption of abandonment, owner of the mark must present evidence that "amount[s] to more than intent of mere token use of the mark to reserve rights in it. It must be an intent for a bona fide use in the ordinary course of the trade." *Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 594 (N.D. Ill. 2010), *aff'd* 747 F.3d 929 (7th Cir. 2014) (citing *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 938 (7th Cir. 1989) (jury instruction given that "purely subjective intention in the owner's mind to reengage in a former enterprise at some further time is not, standing alone, sufficient to avoid abandonment.")).

Here, in their response to Defendant's Rule 56.1 Statement, Plaintiffs admit that they have not sold, bottled, nor maintained any inventory of Naturally Zero water since 2004. Pl.'s Resp. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 48-50. Plaintiffs further admit that they made no attempt to resume sales of Naturally Zero until 2010, approximately six years after they ceased using the

---

1992) (quoting *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 610 (7th Cir. 1986) ("'a court doesn't even reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant prima facie protection as a trademark.'")).

mark. *Id.* ¶¶ 52, 55. Accordingly, abandonment is presumed, and Plaintiffs must put forth evidence of an intent to resume use to overcome the presumption Plaintiffs have not satisfied this burden.

In retort, Plaintiffs make two arguments. First, Plaintiffs seek to explain their non-use as a "direct result of Defendant's infringement," and focus upon their efforts to combat Defendant's alleged infringement of their mark. Pl.'s Resp. Mot. Summ. J. 17. Plaintiffs also point to a 2010 agreement between Baig and Robert Corr as evidence of their intent to resume use of the mark. Neither argument has merit.

First, Plaintiffs have not provided this Court with any authority for the proposition that "pursuing" infringement claims demonstrates an intent to resume use sufficient to overcome the *prima facie* evidence of abandonment in the record. The only legal citation offered by Plaintiffs regarding abandonment at all is to *Sands*, wherein the Seventh Circuit did hold that the plaintiffs had rebutted the presumption of an intent not to resume use. 978 F.2d at 956. However, in that case, the plaintiff had hired a consultant to attempt to license the mark for use on a beverage during the time period at issue, and that consultant had made actual efforts to do so, approaching Shasta and Tropicana to license the mark "THIRST-AID." *Id.* The Court held these efforts sufficient to establish intent to resume use and defeat an abandonment defense. *Id.* Here, by contrast, Plaintiffs expressly admit they took *no* action toward resuming use of the mark until 2010, and what little evidence they cite regarding steps they took toward enforcement of the mark between 2004 and 2010 involved pursuing their infringement claims against Defendant. But simply "challenging infringing uses is not use," and is insufficient evidence "to forestall abandonment." *Silverman v. CBS Inc.*, 870 F.2d 40, 47-48 (2d Cir. 1989).[4] *See also* 3 *McCarthy*

---

[4] Plaintiffs' sporadic efforts to enforce their mark amount to Baig or his legal counsel either telephoning or writing to Defendant regarding the alleged infringement. However, while Plaintiffs cite

*on Trademarks and Unfair Competition* § 17:11 (4th ed.) ("a lawsuit against an infringing user . . . does not substitute for the required use of the mark in the marketplace").

In addition, Plaintiffs point to a 2010 agreement with Robert Corr as evidence of their intent to reuse their mark in commerce. But the document entitled, "The Agreement Between Mirza N. Baig & Robert J. Corr To Team Up In The Lawsuit: Baig V The Coca Cola Co. Case #08 CV 04206," centers upon Corr's promise to assist Baig with this lawsuit against Defendant, which does not rebut the presumption for the reasons stated above. Furthermore, although the document does mention "a separate joint venture" whereby Corr "agrees to develop a plan to revive the BlueSprings W. CO and produce some products of the NATURALLY ZERO brand COLA and BOTTLED WATER to RE-INTRODUCE in the market," 2d Baber Decl. Ex. HH, Corr himself testified that the purpose of the agreement was "to negotiate and reach a settlement of" the instant litigation and admitted that he never entered into any other agreements with Plaintiffs. *Id.* Ex. EE; Pls.' Resp. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 52, 53, 55. What is more, Plaintiffs have provided no evidence that they or Corr did anything in furtherance of the "joint venture" to reintroduce NATURALLY ZERO products into the marketplace. *Id.* Ex. EE; Pls.' Resp. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 52, 53, 55. Such "minor activities and worthy motives for non-use do not alter the analysis which requires use of the mark to avoid abandonment." *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 851 (2d Cir. 1992).

For these reasons, the Court concludes that Plaintiffs abandoned their trademark and grants summary judgment to Defendants with respect to Count I on this independent basis.

---

three instances of contact with Defendant in 2004, they cite only one instance each in 2005, 2006, and 2007. Pl.'s Resp. Mot. 17-18. Such minimal contact does little to bolster Plaintiffs' argument.

## II.    Canadian Trademark Claim (Count II)

Finally, Count II of Plaintiffs' Complaint seeks to assert a trademark claim under Canadian law.  Defendant argues that the Court lacks subject matter jurisdiction over Count II because Sections 52 and 53 of the Canadian Trade-marks Act provide that only "the Federal Court or the superior court of a province" is authorized to provide relief for a claim brought under the act.  Canadian Trade-marks Act §§ 52-53.  Plaintiffs respond that the Court is entitled to exercise jurisdiction over their Canadian law claim and reach its merits.  Here, the Court "may decline to exercise supplemental jurisdiction over claims that arise under foreign law" because it "'has dismissed all claims over which it has original jurisdiction'" pursuant to 28 U.S.C. § 1367(c)(3).  *Torah Soft Ltd. v. Drosnin*, 136 F. Supp. 2d 276, 292 (S.D.N.Y. 2001) (declining to exercise supplemental jurisdiction over copyright infringement claim arising under foreign law where only federal claim in action dismissed).  Therefore, the Court relinquishes jurisdiction over Count II and dismisses it without prejudice.

## Conclusion

For the reasons set forth above, the Court grants Defendant The Coca-Cola Company's Motion for Summary Judgment [160] as to Count I of Plaintiffs Mirza N. Baig and Blue Springs Water Co.'s Complaint.  As no viable federal claims remain in the action, the Court relinquishes jurisdiction over Count II of the Complaint, and it is dismissed without prejudice.  Civil case terminated.


SO ORDERED                                    ENTERED        9/24/14


                                              John Z. Lee
                                              United States District Judge

21